**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**HARRY WILEY, individually
and on behalf of all others similarly situated,**

      **Plaintiff,**

**v.**                              **Civil Action No. 2:25-cv-227
(Honorable Irene C. Berger)**

**ROBERT F. KENNEDY, JR., in his
official capacity as Secretary of Health and Human Services, and
U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES**

      **Defendants.**

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR PRELIMNARY INJUNCTION</u>**

### I. INTRODUCTION

It is well known that coal mining is dangerous work. Perhaps the most persistent, and most infamous, of these dangers is coal mine dust lung disease ("CMDLD") or Black Lung. Black Lung is caused by the dust that miners inhale as they cut ever deeper into the toxic sandstone underlying Appalachia to reach new seams of coal. The damage from this dust causes a range of symptoms, progressing from persistent coughing and chest tightness to the production of black sputum, wheezing and crackling in the lungs, and eventually massive fibrosis and death. There is no cure.

There are solutions, however. Since 1969 Congress has provided, under what is now the Mine Act and through the Department of Health and Human Services (HHS), a program in which active miners can be tested for developing Black Lung and moved to safer positions in a mine, where the disease will not progress as quickly. It is not a cure, but for decades this program gave sick miners a shot at longer lives and lower risk of developing a debilitating disease.

Then, on April 1 of this year, Defendants terminated almost every employee in the Respiratory Health Division of the National Institute for Occupational Safety and Health (NIOSH)—the arm of HHS responsible for helping these miners. Without these employees, HHS cannot carry out the Black Lung screening program, meaning that miners like Plaintiff Harry Wiley are stuck in positions where they are being forced, right now, to keep inhaling the dust that is destroying their ability to breathe. Congress gave sick miners a lifeline, and this administration's HHS has taken it away.

Harry Wiley now moves for a preliminary injunction seeking to restore all personnel in the Respiratory Health Division of NIOSH who are integral to carrying out the epidemiological surveillance and job transfer provisions of the federal Mine Act.

## II. FACTUAL BACKGROUND

On April 1, 2025, Defendant terminated, or placed on administrative leave, most of the critical employees for the Coal Workers' Health Surveillance Program ("CWHSP")—the screening program mandated by the Mine Act—without prior notice. Verified Statement of Anthony Scott Laney (Ex. A). These employees included the chief medical officer overseeing the CWHSP and the associated job transfer program (commonly called Part 90, after its implementing regulations). *Id.*

These firings were part of a massive series of cuts to the entirety of HHS, cuts that Secretary Robert F. Kennedy, Jr. admitted will contain "mistakes." *See* Brandon Drenon, "'We'll Make Mistakes' Says RFK as Fired US Health Staff Return to Work," BBC News (April 4, 2025) (Ex. B). Although he is responsible for the terminations, Secretary Kennedy is "not familiar" with all of the programs subject to his cuts. Hoffman, *et al.*, "RFK Jr. Says he's 'Not Familiar with All Health Program Cuts' in Interview," CBS News (April 9, 2025) (Ex. C). The perfunctory nature of

Kennedy's cuts could not be more clear, but the ramifications are dire. According to a 2018 study published in the American Journal of Public Heath, the rate of CMDLD in central Appalachian coal miners is roughly 20%. Center for Disease Control, "Prevalence of Black Lung Continues to Increase Among Appalachian Miners," CDC Press Release[1] (Ex. D). Coal Miners who are still working now have no recourse—as the former leader of the CWHSP put it: "We're going to be burying miners." Mike Tony, "We're Going to Be Burying Miners: NIOSH Cuts Gutting Key Work in Safety Research," Charleston Gazette-Mail (April 11, 2025) (Ex. E.)[2].

One of those miners is Plaintiff Harry Wiley, a miner in Kanawha County, West Virginia. Mr. Wiley works in a part of the mine where he is exposed to coal and silica dust, so when he learned he was developing Black Lung he took the initial steps towards a Part 90 job transfer through the CWHSP. Verified Statement of Harry Wiley (Ex. F). On November 8, 2024, he mailed the appropriate form and a radiographic image of his chest to NIOSH and the Coal Workers' Health Surveillance Program, 1000 Frederick Land M/S LB 208, Morgantown, West Virginia, 26508. *Id.* At the time of the filing of this Motion, Mr. Wiley had not received any response to his submission to CWHSP. *Id.*

Mr. Wiley has not received a response because HHS has effectively shut down the CWHSP. By firing almost all the employees in the Respiratory Health Division, Defendants have made it impossible for NIOSH to implement the CWHSP or Part 90, as the agency no longer has the necessary personnel or expertise to do so. Verified Statement of Anthony Scott Laney. (Ex. A.)

---

[1] The data for this study was generated by the Coal Workers' Health Surveillance Program – the program at issue in this action.

[2] *available at* https://www.wvgazettemail.com/news/politics/were-going-to-be-burying-miners-niosh-cuts-gutting-key-work-in-safety-research/article_85a4ecc0-f0d8-474c-bd68-b99d153c251c.html

There have been no indications that HHS has begun or even intends to restart the programs with other employees or in other divisions, nor has HHS given any indication of what it intends to do with the money Congress appropriated for the programs. *See Id.* And, while the effective shutdown of the Respiratory Health Division is *currently* depriving miners like Mr. Wiley of the path to safety that Congress provided, it is also self-evident that the longer HHS delays rehiring the Morgantown employees, the more likely those employees are to attain permanent employment elsewhere—if HHS cannot therefore rehire the personnel with the expertise to run the programs, the current closure will become a permanent, unilateral cancellation of these Congressionally mandated health measures.

Mr. Wiley knows he has Black Lung because, when he applied for benefits from the West Virginia Offices of the Insurance Commissioner, a three-doctor review panel from the state Occupational Pneumoconiosis Board told him so. (Ex. F.) At the onset of pneumoconiosis, it is critical to reduce exposure to heavy dust loads to prevent the development of progressive massive fibrosis. *See* David Weissman, *Progressive massive fibrosis: An overview of the recent Literature,* Pharmacology & Therapeutics (Dec. 2022) (Ex. G). The fact that Mr. Wiley must continue to work in unsafe conditions—facing the certainty of further dust exposure and worsening his existing lung disease—is purely the result of the decisions of Robert F. Kennedy Jr. and the Department of Health and Human Services.

### III. STATUTORY AND REGULATORY BACKGROUND

To protect miners like Mr. Wiley from the worsening effects of Black Lung, Congress passed the Coal Mine Health and Safety Act of 1969 (CMHSA), later amended by the federal Mine Safety and Health Act of 1977 (Mine Act or Act). The Mine Act grants coal miners the right to have respiratory diseases detected and, if a disease is detected, a right to transfer to positions that

are less damaging to their lungs. 30 U.S.C. § 843. The Act requires that "[t]he operator of a coal mine shall cooperate with the Secretary of Health and Human Services in making available to each miner working in a coal mine the opportunity to have a chest roentgenogram[3] . . . ." 30 U.S.C. § 843(a). These roentgenograms, or X-rays, are given on a specified schedule and "shall be read and classified" through procedures set by HHS, which must in turn provide miners with results and inform them of their rights under the chapter. 30 U.S.C. § 843(a). Those rights include, for miners showing signs of pneumoconiosis, the option of transferring from his position to another position in any area of the mine, for such period or periods as may be necessary to prevent further development of such disease." 30 U.S.C. § 843(b)(1).

Two principal sets of regulations delineate how miners' rights under the Mine Act are effectuated. 42 C.F.R. §§ 37.1-204 define how HHS conducts, receives, and interprets miner screenings, including X-rays. 30 C.F.R. §§ 90.1-301 in turn define how the miners evaluated by HHS can take advantage of the rights afforded to them by the Mine Act and the protections they are to receive from the Department of Labor. A miner like Mr. Wiley only becomes eligible for Part 90 programs, however, when he, "in the judgment of the Secretary of HHS, has evidence of the development of pneumoconiosis based on a chest X-ray, read and classified in the manner prescribed by the Secretary of HHS." 30 C.F.R. § 90.3 (effective until April 14, 2025); *accord* 30 C.F.R. § 90.3T (effective April 14, 2025). The HHS classification is therefore an irreplaceable part of the statutory and regulatory structure of the Mine Act.

In 1970, the Occupational Safety and Health Act of 1970 established the National Institute for Occupational Safety and Health ("NIOSH") as the research division of the Occupational Safety

---

[3] Roentgenogram is synonymous with an X-Ray. *See* Collins Online Dictionary *available at:* https://www.collinsdictionary.com/us/dictionary/english/roentgenogram (last accessed April 14, 2025).

and Health Administration. 29 U.S.C. § 671. NIOSH's office of Mine Safety and Health was permanently established by Congress after the 2006 Sago Mine disaster to advance research and technology-focused health and safety protections of the Mine Act. 29 U.S.C. § 671. Until employees were terminated on April 2, 2025, HHS fulfilled its obligations to evaluate miner health and guarantee position transfers to miners with signs of CMDLD through the Respiratory Health Division of NIOSH's Office of Mine Safety and Health. *See, e.g.,* 42 C.F.R. §37.53 (detailing how NIOSH reviews and classifies chest radiographs). In fact, Congress has specifically appropriated funds to NIOSH for carrying out section 203 of the Mine Act (30 U.S.C. § 843). Further Consolidated Appropriations Act, 2024, PL 118-47, 138 Stat. 460, 654 (2024); American Relief Act, 2025, PL 118-158, 138 Stat. 1722 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, PL 119-4, 139 Stat. 4 (2025)

## IV. ARGUMENT

Plaintiff is entitled to a preliminary injunction against Defendants Robert F. Kennedy, Jr. and the Department of Health and Human Services to reinstate the office that can secure his statutory right to a job transfer. Plaintiff's counsel are unaware of any announcements by the HHS or other indication that the services of the Respiratory Health Division have been replaced. Recently terminated employee Anthony "Scott" Laney avers that he knows of no plans to replace terminated employees and that the relevant expertise to carry out the mandatory functions of the Respiratory Health Division does not exist elsewhere in the Department. (Ex. A.) Mr. Wiley's Part 90 claim certainly remains utterly inert. As a result, miners, including Harry Wiley, are left to face daily exposure to hazardous coal and silica dust—aggravating their known, existing disease— despite their statutory right to transfer to a safer position.

As explained more fully below, Harry Wiley has constitutional standing to sue. The Court has jurisdiction over the action and is competent to provide the relief requested. Because Plaintiff

is likely to succeed on the merits, is likely to suffer irreparable harm in the absence of an injunction, and because the balance of equities and the public interest are in Plaintiff's favor, the Court should preliminarily enjoin Defendants to reestablish the Respiratory Health Division and reinstate the services of the CWHSP.

**A.    Plaintiff Has Standing to Sue**

"Standing under Article III of the Constitution requires that an injury be concrete, particularized and actual and imminent; fairly traceable to the challenged action; and redressable by a favorable ruling. *Monsanto v. Geertson Seed Farms,* 561 U.S. 139, 149 (2010). Although Mr. Wiley's standing in this action is easily demonstrated, at the preliminary injunction stage only the showing of a substantial likelihood of meeting the standing requirements is necessary. *See Elec. Priv. Infor Ctr. v. U.S. Dep't of Com.,* 928 F.3d 95, 104 (D.C. Cir. 2019). Mr. Wiley conclusively meets this standard.

Unless he can transfer to a safer position under Part 90, Mr. Wiley will continue to be exposed to hazardous coal and silica dust on a daily basis. Because NIOSH is no longer carrying out the CWHSP, Mr. Wiley cannot obtain a Part 90 transfer. By effectively cancelling the CWHSP, Defendants' termination of NIOSH staff is therefore directly injuring Mr. Wiley every time he goes to work. That actual injury can be redressed, however, by enjoining the terminations themselves. By issuing an injunction for the reestablishment of the Respiratory Health Division and the CWHSP, the Department of Health and Human Services will once again be able to provide services consistent with their statutory and regulatory duties.

**1.    Plaintiff has suffered an actual or imminent injury in fact**

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

6

conjectural or hypothetical.' *Wikimedia Foundation v. National Security Agency*, 857 F.3d 193, 207 (4th Cir. 2017) (quoting *Spokeo Inc. v. Robbins,* 576 U.S. 330, 339 (2016)). The purpose of this requirement is to ensure that the plaintiff has a "personal stake in the outcome of the controversy." *Kenny v. Wilson,* 885 F.3d 280, 287 (4th Cir. 2018) (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id.* (quoting *Susan B. Anthony List v. Dreihaus* 573 U.S. 149, 158 (2014)).

Here there should be little doubt that Mr. Wiley meets the requirements of actual and imminent injury in fact. He has personally been deprived of his statutorily guaranteed right to have his medical examinations reviewed by HHS for a job transfer. As a consequence, he has a very real and personal stake in the outcome – he must, on a daily basis, continue to work in a hazardous environment despite having already developed Black Lung. His health is at risk and his continued exposure to coal and silica dust imminently threaten to worsen his condition.

### 2.    Plaintiff's injuries are fairly traceable to Defendants' conduct

The traceability element of standing "merely requires a causal connection between the defendant's conduct and the plaintiff's injury, such that 'there is a genuine nexus' between the two." *Kadel v. Folwell,* 446 F. Supp. 3d 1, 10 (M.D.N.C. 2020) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 151 (4th Cir. 2000)). It is not so rigid as to be an equivalent to the requirement of tort causation. *Id.* (quoting *Huttton v. Nat'l Bd. of Exam'rs in Optometry, Inc.* 892 F.3d 613, 623 (4th Cir. 2018)). Here, the firing of employees at the Respiratory Health Division has directly deprived Mr. Wiley of his right to have his medical records examined, and he and his company informed of his right to transfer jobs. Without adequate staff, the Respiratory Health Division is unable to meet its duties, creating a "genuine nexus"

7

between Mr. Wiley's prolonged exposure to harmful dust and the conduct of the Defendants. To put it bluntly, Mr. Wiley's suffering and imminent health risks are a direct result of Defendant Robert F. Kennedy, Jr.'s cavalier firing of the employees implementing the CWHSP.

### 3. Plaintiff's injuries are redressable by a favorable ruling by this Court

An injury is redressable if it is "likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.* 528 U.S. 167, 181 (2000). "[N]o explicit guarantee of redress to a plaintiff is required to demonstrate a plaintiff's standing. *Equity in Athletics, Inc. v. Dep't of Educ.,* 639 F.3d 91, 100 (4th Cir. 2011). A decision by this Court to grant the injunction would effectively reinstate NIOSH's Respiratory Health Division and effectuate Mr. Wiley's right to transfer to a job with low dust exposure. His health and safety are directly redressed by an injunction.

### B. This Court Should Enjoin Defendant's Disbandment of the Coal Workers' Health Surveillance Program.

The standard for preliminary injunctions is well settled. In the Fourth Circuit, plaintiffs must demonstrate the following: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *DiBiase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter v. Natural Resource Defense Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

Prohibitory injunctions "aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). The status quo for this purpose is defined as "the last uncontested status between the parties which preceded the controversy." *Id*. at 320 (internal quotation marks and citation omitted). "To be sure, it is

sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (internal quotation marks and citation omitted). Under the balance of hardship test the Court considers the four *Winter* factors in "flexible interplay." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985).

     1.    **Plaintiff is likely to succeed on the merits**

     a.    **The HHS action was a "final action" subject to judicial review under the Administrative Procedure Act**

Under the Administrative Procedure Act ("APA"), courts may review "final agency action." 5 U.S.C. § 704. Agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 178 (1997). Here, letters of termination and/or administrative layoffs have been sent to staff for the Respiratory Health Division. *See, e.g.,* Attachment A to the Verified Statement of Anthony Scott Laney (Ex. A). While Mr. Kennedy acknowledges that some HHS cuts may have been a mistake, "[t]he mere possibility that an agency might reconsider" its decision "does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

The determination of whether an agency action has "direct and applicable legal consequences" under *Bennett* is a "pragmatic" inquiry. *Sierra Club v. Environmental Protection Agency,* 955 F.3d 56, 62 (D.C. Cir. 2020) (quoting *U.S. Army Corps of Engineers v. Hawkes, Co.* 578 U.S. 590, 599 (2016)). Here the consequences are obvious. Critical staff of the Respiratory Health Division have been terminated or placed on administrative leave. As a result, the Department of Health and Human Services is not fulfilling its statutory and regulatory mandates.

Miners such as Harry Wiley are left without recourse to obtain their statutorily guaranteed right to a job transfer if they develop signs of Black Lung.

### b.    Defendants' actions were arbitrary and capricious

On the merits, Defendants' actions to terminate critical employees from the Respiratory Health Division are arbitrary and capricious. The APA requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).  Under that standard, the reviewing court "must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made." *ArkInitiative v. Tidwell,* 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Ins. Co.* 463 U.S. 29, 43 (1983)). Moreover, an agency changing its course "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *See Motor Vehicles Mfs. Ass'n*, 563 U.S. at 42; *see also Aids Vaccine Advocacy Coal. v. U.S. Dep't of State,* No. CV 25-00400 (AHA), 2025 U.S. Dist. LEXIS 42875, 2025 WL 752378, at \*10 (D.D.C. Mar. 10, 2025) ("When an agency suddenly changes course, it must recognize 'longstanding policies may have engendered serious reliance interests that must be taken into account.'" (quoting *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020)) (internal citations omitted).

HHS has offered no explanation for how it will continue its mission despite laying off most of the staff at the Respiratory Heath Division. *See* Department of Health and Human Services Press Release (March 27, 2025) (Ex. D). No information has been provided as to how employees responsible for reading specialized medical tests and interpreting examinations will be replaced. As Mr. Wiley's experience exemplifies, the Department is simply not fulfilling its congressionally

dedicated role to implement the provisions of the Mine Act. Secretary Robert F. Kennedy, Jr. has already admitted there will be mistakes made in program cuts and that he is not familiar with all of the program cuts that have been implemented. (*See* Exs. B, C.) The cuts, in other words, appear to be based on nothing more than an ill-conceived desire for general, sweeping budget cuts.

### c.    Defendants' actions are contrary to law because they violate the Mine Act

Defendants' actions are contrary to law because they eviscerate rights to miners guaranteed under the Mine Act and leave the Department of Health and Human Services unable to fulfill mandatory duties required by statute and regulation. Pursuant to 30 U.S.C. § 843(b) a miner who shows signs of CMDLD "*shall be afforded the option of transferring from his position to another position in any area of the mine, for such period or periods as may be necessary to prevent further development of such disease. . .*"  HHS cannot fulfill that duty without providing for the conducting, evaluation and classification of miners' test results.  30 U.S.C. § 843(a). When it fired the NIOSH staff with the capacity and expertise to facilitate that testing and classification, HHS stopped complying with § 843. As described above, HHS classifications are also the crucial link in the Part 90 regulatory scheme—now that NIOSH is not making those classifications, neither HHS nor the Department of Labor is able to fulfill its responsibilities under the regulations.[4] *See* 30 C.F.R. § 90.3; 42 C.F.R. § 37.103.[5]

---

[4] "So long as the [agency's] regulations 'provide a meaningful standard by which the court could review the agency's actions" and [the court's] review does not "infringe any of the agency's prerogatives under the statute' then [the court] has jurisdiction pursuant to the APA to review the agency's compliance with its own regulations." *Trout Unlimited v. Pirzadeh,* 1, F.4th 738, 752 (9th Cir. 2021) (quoting *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (internal brackets omitted).

[5] The disbandment of the Respiratory Health Division is also a violation of the Secretary's mandatory duty to make health screenings available to miners in their own locality. 30 U.S.C. § 843(c) ("Where such examinations or tests cannot be given. . . in the locality where the miner

Without staff at the Respiratory Health Division to carry out duties and responsibilities of the Department of Health and Human Services under the Mine Act, the entire Part 90 transfer program has effectively been eliminated. The Division is no longer providing services, and no alternatives have been made available. Miners like Mr. Wiley are denied the rights guaranteed under the Mine Act and are forced to continue working in dangerous positions that seriously compromise their health.

### d.  Defendants' actions are contrary to law because they constitute an illegal impoundment

The firings at the Respiratory Health Division were also contrary to law because they constituted an illegal impoundment in violation of the Constitution's separation of powers, the Impoundment Control Act of 1974, and the congressional mandate of the 2024 appropriations bill (including appropriations that were continued into the relevant period).

The Administrative Procedure Act provides for the setting aside of unconstitutional agency actions challenged under the act. 5 U.S.C. § 706; *F.C.C. v. Fox Television Stations, Inc.*, 566 U.S. 502, 516 (2009) ("the Administrative Procedure Act separately provides for setting aside agency action that is 'unlawful,' 5 U.S.C. § 706(2)(A), which of course includes unconstitutional action."). As the Supreme Court has explained, the Constitution was written to guarantee, as much as possible, "that each Branch of government would confine itself to its assigned responsibility." *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 951 (1983). When "considering

---

resides*,* arrangements shall be made to have them conducted, . . in such locality by the Secretary of Health and Human Services."). The denial of these services means that miners who are part of the putative class will not have access to the free screenings that have been provided by Respiratory Health Division. To be sure, Mr. Wiley will have to pay expenses out of his own pocket for follow-up or future screenings – despite the Secretary's duty to provide local examinations and tests in a miner's locality at no cost to the miners themselves. 30 U.S.C. § 843(c).

claims of Presidential power" and whether they are commensurate with the Constitutional separation of powers, courts should refer to "Justice Jackson's familiar tripartite framework from *Youngstown Sheet & Tube Co. v. Sawyer*." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)). *Youngstown* reinforces the principle that the "President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself," *Youngstown*, 343 U.S. at 585, and Justice Jackson's concurrence sets forth the further principle that "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Id.* at 637 (J. Jackson, concurring).

Congress has "exclusive power over the federal purse." *U.S. Dept. of Navy v. Federal Labor Relations Authority*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180, 185 (D.C. Cir. 1992)). Funding decisions are therefore clearly not beyond the control of Congress, meaning that they cannot be countermanded by the executive branch, including Defendants. *Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579*, 640 (1952).

On the basis of this Constitutional authority, Congress has set strict limits, through the Impoundment Control Act, for how the executive can respond to Congressional appropriations and spending directives. 2 U.S.C. §§ 682-88. Specifically, "[w]henever the President determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons" the executive is directed to propose such a rescission to Congress, at which point Congress can act on the proposal – the executive branch cannot change budgetary authority on its own authority. 2 U.S.C. § 683. The executive branch cannot even defer the use of budgetary

13

authority except "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law," and even then only after a detailed message to Congress describing the reasons for and duration of the deferral. 2 U.S.C. § 684.

Congress specifically appropriated $362,800,000 to NIOSH in 2024 "[f]or carrying out . . . sections 101, 102, 103, 201, 202, 203, 301, and 501 of the Federal Mine Safety and Health Act," as well as other statutory directives. Further Consolidated Appropriations Act, 2024, PL 118-47, 138 Stat. 460, 654 (2024). Funding for carrying out those directives has been continued through to the present. American Relief Act, 2025, PL 118-158, 138 Stat. 1722 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, PL 119-4, 139 Stat. 4 (2025). As described above, section 203 (codified at 30 U.S.C. § 843) requires NIOSH to carry out Black Lung evaluations like the one requested by Mr. Wiley. 30 U.S.C. § 843, P.L. 91–173, title II, sec. 203, 83 Stat. 763 (1969). Congress's appropriations mandate that NIOSH spend the money necessary to carry out those evaluations. An implication of that command – a necessary implication – is that Defendants staff the CWHSP so that someone actually completes the necessary tasks.[6]

---

[6] This is not a situation in which a program has been funded out of a lump-sum appropriation that gives Defendants discretion to reallocate its funds. *See Lincoln v. Vigil*, 508 U.S. 182, 187, 193 (1993). And, unlike the appropriation at issue in the 2002 *Milk Train* case, there is no language in the 2024 appropriations bill giving the Department of Health and Human Services any discretion as to whether and in what manner to "carry[] out . . . section . . . 203 . . . of the Federal Mine Safety and Health Act." Further Consolidated Appropriations Act 2024, PL 118-47, 138 Stat. 460, 654 (2024); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002) (holding that, when an amount was appropriated to be spent "in a manner determined appropriate by the Secretary," the courts had no jurisdiction to review the Secretary of Agriculture's technical decision on how to apportion aid between milk producers who lost revenue in 1998 and 1999). Under 30 U.S.C. § 843(a) HHS has the discretion to determine the best way to collect and evaluate tests submitted to it under the Act, as well as procedures for distributing those results so miners can take advantage of the options afforded to them by the Act, and the Department of Health and Human Services has in fact done so. *See* 42 C.F.R. § 37.1-204; 30 C.F.R. 90.3. The Department of Health and Human Services does not have the discretion to fire the staff responsible for collecting and

As described above, HHS has terminated the personnel who had the capacity and expertise to carry out the CWHSP, meaning that the Department no longer can, and in fact is not, operating the program. There is no indication that the CWHSP is being undertaken by any other employees at HHS, and it is unclear if it could be. Unless HHS rehires the Respiratory Health Division personnel before they permanently find other employment, it will not be able to revive the CWHSP's expertise. Not only have Defendants neglected to spend the money that Congress intended for the CWHSP since April 1, therefore, it has also created a risk of disabling the CWHSP for the long term. The money that Congress appropriated for miners like Mr. Wiley has been illegally impounded by HHS and is being used for unknown purposes that do not serve Congress' goals or the health of miners like Mr. Wiley.

There are no other statutes or Constitutional provisions that give HHS the authority to impound those funds. *See Youngstown Sheet & Tube Co.*, 343 U.S. at 585. The firing of the Respiratory Health Division staff was therefore contrary to law under the Administrative Procedure Act, and this Court should order the Department of Health and Human Services to reinstate the Respiratory Health Division Staff so that NIOSH can spend the funds appropriated by Congress in the manner that Congress directed.[7]

---

evaluating those tests, thereby impounding the funds appropriated by Congress for the benefit of miners like Mr. Wiley.

[7] In doing so, this Court would join many courts that have consistently restrained the attempts of at least the last four presidential administrations to interfere with Congress' exclusive power to direct the spending of federal funds. *See In re Aiken County*, 725 F.3d 255, 259-61 (D.C. Cir. 2013); *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1231-35 (9th Cir. 2018); *General Land Office v. Biden*, 722 F. Supp. 3d 710, 738-43 (S.D. Tex. 2024); *Washington v. Trump*, No. 2:25-cv-00244-LK, 2025 U.S. Dist. LEXIS 36890, 2025 WL 659057, at *11-12 (W.D. Wash. Feb. 28, 2025); *PFLAG, Inc. v. Trump*, No. 25-337-BAH, 2025 U.S. Dist. LEXIS 38036, 2025 WL 685124 at *18-20 (D. Md. March 4, 2025); *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 U.S. Dist. LEXIS 40346, 2025 WL 715621 at *9-11 (D. R.I. March 6, 2025); *Aids Vaccine Advocacy Coalition v. United States Department of State*, 2025 U.S. Dist. LEXIS 42875, 2025 WL 752378 at *14-18 (D.D.C. March 10, 2025).

### e.    The effective closure of the CWHSP has deprived Mr. Wiley of his Fifth Amendment due process rights

The Supreme Court has long acknowledged that statutory entitlements are protected by the due process requirements of the Fifth Amendment.[8] *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970). The statutory entitlement at issue here is Mr. Wiley's right to retain his employment without sacrificing his health and his life. Since Defendants effectively closed the CWHSP, Mr. Wiley's effort to get a Part 90 transfer has been blocked without any hearing or even response from HHS. Verified Statement of Harry Wiley (Ex. G). Defendants' unlawful actions have therefore also deprived Mr. Wiley "of life, liberty, or property, without due process of law." U.S. Const. am. V.

### 2.    Plaintiff and putative class members are likely to suffer irreparable harm if an injunction is not granted

Irreparable harm for purposes of a preliminary injunction "is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Challenel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1991) (quoting *Danielson v. Loc. 275 Laborers Int'l Union of N. Am. AFL-CIO*, 479 F.2d 1033, 1037 (2d Cir. 1973)). In this Circuit, the denial of a statutory right guaranteeing high-quality health care suited to a person's individual needs is sufficient to demonstrate irreparable harm. *See Planned Parenthood v. Baker* ("*Baker*") 941 F.3d 687, 707 (4th Cir. 2020) ("It is clear that the plaintiff would suffer irreparable harm in the absence of a preliminary injunction. Denial of her statutory right to select a qualified provider visits a tangible harm: diminished access to high-quality health care suited to the

---

[8] Such entitlements can include "subsidies to farmers and businessmen, routes for airlines and channels for television stations; long term contracts for defense, space, and education; social security pensions for individuals." *Goldberg*, 397 U.S. n. 8. Many of these, like Mr. Wiley's right to a Part 90 transfer, merely provide a way to make a living—the Supreme Court's examples do not reach the importance of Mr. Wiley's right because they do not involve the same health and safety protections.

plaintiff's needs."); *see also PFLAG Inc. v. Trump*, 2025 WL 510050 at *22 (D. Md. Feb. 14, 2025) ("The circumstances in this case yield no justification to depart from the Fourth Circuit's reasoning in *Baker,* as the sudden denial of medical care "visits a tangible harm" on the health and well-being of Plaintiffs.)

The harm to Mr. Wiley is much greater than that visited upon the plaintiff in *Baker.* He has not simply been denied his statutory right to choose a qualified healthcare provider – he has been denied his right to a guaranteed medical accommodation. Black Lung is a progressive and irreversible disease that can progress from pneumoconiosis to progressive massive fibrosis. (Exs. A, G.) Mr. Wiley is unable to transfer to a less hazardous position because of the actions of the Defendants. Without an injunction he faces daily exposure to dangerous levels of coal and silica dust and health consequences that cannot be adequately remedied by monetary damages.

### 3.    The balance of equities and public interest favor Plaintiff

"When a plaintiff seeks preliminary injunctive relief against the Government, the balance of the equities and the public interest factors merge." *Jensen v. Md. Cannabis Admin.* 719 F. Supp. 3d 466, 478 (D. Md. 2024) (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009) and *Roe v. Dep't of Def.* 947 F.3d 207, 230 (4th Cir. 2020)). "This is so because the government's interest *is* the public interest in such a case." *Id.* (internal quotations and citations omitted) (emphasis in original). As such these two factors should be considered together.

"It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf,* 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)*.* "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations … —

17

that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). Because the Plaintiff challenges and is likely to succeed on claims that the Defendants' actions are arbitrary and capricious under the APA and not in accordance with the mandates of the Mine Act, its implementing regulations, and the statutory and Constitutional restrictions on impoundments, the balance of equities and public interest favor the Plaintiff.

But, even if the Court were to consider the balance of equities and public interest separately, and as if the Defendants were not government actors, the test would still tip strongly towards Plaintiff. On the balance of equities, Plaintiff is being denied a statutory right and a necessary medical accommodation to prevent the progression of a disease and the onset of a more serious illness. In contrast Robert F. Kennedy, Jr. and the Department of Health and Human Services seek to impose gross cost saving measures, some of which the Secretary himself has already admitted are "mistakes." (Ex. B.) But an injunction here would only be a pause to such cost savings. A temporary suspension of a government effort to decrease costs is not enough to overcome the balance of equities to a plaintiff that is facing negative health outcomes. *See Ass'n of Community Cancer Ctrs. v. Azar,* 509 F. Supp. 3d 482, 502 (D. Md. 2020) ("Should [the government] prevail in this litigation, it will only suffer a delay in implementation of the rule.").

To be clear, Plaintiff does not allege that HHS may not be reorganized. If such reorganization is to occur, however, it must be conducted rationally with due regard to the statutory mandates and purposes of the Mine Act. This Court should reverse the hasty and overly broad termination of the entire RHD, whose personnel were all integral to the functioning of the mandatory Mine Act programs. While Congress or the Defendants may be able to fashion more finely tailored cuts to the agency, such line drawing is not within the province of this Court. The only practical means by which this Court can redress the closure of the mandatory Mine Act

programs is by enjoining and reversing the wholesale RHD Closure.  (Ex. A at ¶ 15.)  The wholesale termination of medical staff trained and experienced in detecting Black Lung is simply not consistent with the functioning of these mandatory programs. There is no evidence of a plan to replace these employees and others within the Department lack the specialized expertise to carry out the CWHSP. Verified Statement of Anthony Scott Laney (Ex. A at ¶¶ 16, 1.)

The public interest in maintaining these programs is demonstrated in Congress's own statements of purpose of the Mine Act and its predecessor, the Coal Mine Safety and Health Act. In establishing the programs to protect coal miners' health, including the job transfer program, Congress recognized "the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource: the miner. 30 U.S.C. § 801(a). Congress further noted that "deaths and serious injuries from unsafe and unhealthful conditions and practices in the coal and other mines cause grief and suffering to miners and their families." *Id.* at 801(b). Finally, Congress recognized "an urgent need to . . . improv[e] working conditions and practices in the Nation's coal and other mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines." *Id.* at 801(c). More recently, West Virginia Senator Shelley Moore Capito recognized that cuts to the CWHSP could impact "vital health programs that are important to many West Virginians, especially our coal miners" and called for the immediate restoration of health monitoring. Charles Young, "West Virginia Sen. Capito Raises Alarm over NIOSH Cuts Threatening Coal Miner Health; Reports Indicate," WV News (April 2, 2025) (Ex. H). Congress itself has recognized the important public interest in the medical monitoring and job transfer programs established in 30 U.S.C. § 843. So too, should this Court acknowledge the serious ramifications of the action taken by Robert F. Kennedy, Jr. and the

19

Department of Health and Human Services in denying miners like Mr. Wiley the right to safeguard their health through the accommodation of a job transfer.

## V. CONCLUSION

Plaintiff has established he is entitled to a Preliminary Injunction restoring the Respiratory Health Division of NIOSH. Harry Wiley and members of the putative class presently are facing imminent harm in the form of prolonged exposure to coal and silica dust. The Defendant, Secretary Robert F. Kennedy, Jr. and West Virginia federal officials have recognized that the layoff of NIOSH employees was a mistake. Plaintiff therefore respectfully requests that this clear mistake be corrected forthwith and that his application for a Preliminary Injunction be granted.

**Respectfully Submitted,**
**HARRY WILEY, individually**
**and on behalf of all others similarly**
**situated,**
**By counsel:**

  /s/ Samuel B. Petsonk
Samuel B. Petsonk (WVSB #12418)
PETSONK PLLC
PO Box 1045
Beckley, WV 25802
(304) 900-3171 (phone)
(304) 986-4633 (fax)
sam@petsonk.com

  /s/ Bren J. Pomponio
Bren J. Pomponio (WVSB #7774)
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier Street
Charleston, West Virginia 25301
(304) 344-5565
(304) 344-3145 (fax)
bren@msjlaw.org

  /s/ J. Michael Becher
J. Michael Becher (W.Va. Bar # 10588)
APPALACHIAN MOUNTAIN
ADVOCATES
PO Box 507
Lewisburg, WV 24901
(304) 382-4798
mbecher@appalmad.org