**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

HARRY WILEY, individually and on
behalf of all others similarly situated,

      Plaintiff,

v.                                      Case No: 2:25-cv-00227

ROBERT F. KENNEDY, JR., in his official
Capacity as Secretary of Health and Human
Services, and U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

      Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
AND RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

      Defendants, by and through undersigned counsel, respectfully file this memorandum of law in support of Defendants' recently filed Motion to Dismiss, (ECF No. 14), and in opposition to Plaintiff's Motion for Preliminary Junction, (ECF No. 7). For the reasons discussed below, the Court should deny Plaintiff's motion and dismiss this civil action.

**INTRODUCTION**

      Plaintiff brings claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706, and the Fifth Amendment, challenging the alleged closure of the Respiratory Health Division of the National Institute for Occupational Safety and Health ("NIOSH") facility in Morgantown, West Virginia, and the U.S. Department of Health and Human Services' ("HHS'") alleged inability to carry out the Coal Workers' Health Surveillance Program ("CWHSP") in accordance with the Coal Mine Health and Safety Act of 1969 ("Coal Act"), as amended by the Federal Mine Safety and Health Act of 1977 ("Mine Act"), which was later amended by the Mine Improvement and

New Emergency Response Act of 2006 ("Miner Act"), and their implementing regulations. *See generally* 30 U.S.C. § 843; 30 C.F.R. pt. 90; 42 C.F.R. pt. 37. Plaintiff purports to bring his claims on behalf of himself and a class of others similarly situated. (ECF No. 10 ¶¶ 5, 26-27.)

Plaintiff alleges that he developed coal workers' pneumoconiosis in 2024 and applied for transfer to a non-dusty job under the Part 90 regulatory program in November 2024. (*Id.* ¶¶ 14, 16-17.) Plaintiff further alleges that he never received a response from NIOSH regarding his application. (*Id.* ¶ 18.) He claims that because of a recent reduction in force ("RIF") notice sent to certain employees at the Morgantown NIOSH facility, HHS no longer has the capacity to comply with its statutory duties to maintain the CWHSP and, consequently, his application will remain pending. (*Id.* ¶¶ 20-23.)

The Court should decline Plaintiff's demands for the following reasons. First, Plaintiff lacks Article III constitutional standing to pursue this case. He seeks redress for a nonexistent injury—the submission he made to NIOSH in November 2024 was adjudicated in December 2024. This alone necessitates dismissal of the Amended Complaint. Second, all three counts in the Amended Complaint are barred by sovereign immunity.

Notwithstanding Plaintiff's lack of standing and the sovereign immunity bar, Plaintiff demands nothing less than an injunction "to restore all personnel in the Respiratory Health Division of NIOSH who are integral to carrying out the epidemiological surveillance and job transfer provisions of the federal Mine Act." (ECF No. 8 at 2.) But he similarly lacks standing to seek this type of relief. If these sorts of speculative claims regarding an executive agency's ability to execute its duties and responsibilities gave rise to standing, virtually any American could sue over administrative cuts at any federal agency. Indeed, the Supreme Court recently stayed an injunction in an analogous challenge to the termination of probationary employees that would

allegedly result in diminished public services, explaining that "under established law, those allegations are presently insufficient to support . . . standing." *OPM v. AFGE*, No. 24A904, --- S. Ct. ----, 2025 WL 1035208, at *1 (Apr. 8, 2025).

Even if Plaintiff had standing to bring this case on behalf of NIOSH employees who received a RIF notice, his complaints about HHS workforce reductions would face another jurisdictional hurdle. Congress has enacted comprehensive statutory schemes governing the review of federal agencies' employment decisions. Those schemes give no rights to those outside the employment relationship, like Plaintiff here, and therefore preclude review of such claims, which must instead be channeled to administrative agencies, as multiple courts have recently held.

Jurisdiction aside, Plaintiff's claims about staffing at the HHS-NIOSH facility in Morgantown fail on the merits. APA review is precluded because HHS administrative reforms are committed to agency discretion. Moreover, Plaintiff does not seek review of a discrete, final agency decision, and his predictions about the future of the NIOSH Respiratory Health Division are purely speculative at this juncture. The United States has not waived its sovereign immunity via the APA on issues of general employment and organizational reform decisions. As such, the APA claim must fail.

Plaintiff's Fifth Amendment claim fares no better. He argues that he has a property interest in his continued participation in the CWHSP, which is threatened following the RIF notices sent to employees at the Morgantown NIOSH facility. Even if Plaintiff has the claimed property interest, he cannot show that he has suffered any injury. At this point, he is wholly speculating about his future ability to participate in the program. That is insufficient to sustain a claim under the Fifth Amendment.

The equities and public interest also tilt against injunctive relief. Plaintiff's injunction would intrude on administrative prerogatives that are properly the province of the Executive Branch. Such an injunction would largely upend, rather than preserve, the status quo. Further, Plaintiff already received the demanded remedy that gave rise to this case—the CWHSP adjudicated his radiographic submission in December 2024. Thus, he faces no demonstrable or irreparable harm if his motion is denied. The Court should decline Plaintiff's invitation to superintend HHS' administrative reforms, deny his motion, and dismiss this civil action.

## STATUTORY AND REGULATORY BACKGROUND

The Mine Act was enacted to improve and promote safety and health in mines throughout the country. *See* 30 U.S.C. § 801. It set forth a health surveillance program to be administered by HHS for miners working in a coal mine. *See id.* § 843. That program, also known as the CWHSP, *see generally* 42 C.F.R. pt. 37, has four main components:

a) Periodic medical examinations including chest radiographs and spirometry (a type of breathing test) provided to active coal miners at mine operators' expense through healthcare facilities approved by NIOSH to participate in the CWHSP. The chest radiographs and spirometry tests are sent to NIOSH for evaluation as specified in 42 C.F.R. Part 37;

b) a mobile health surveillance team and unit that travels to coal mines and mining communities across the U.S. providing chest radiographs, spirometry, and blood pressure screening to current and former miners at government expense;

c) an internationally recognized training and certification program (the B Reader Certification Program) for physicians to perform standardized evaluations (classifications) of chest radiographs for findings of pneumoconiosis (a medical term describing diseases like black lung that are caused by inhaling mineral dust); and

d) a program providing autopsies limited to the chest for deceased coal miners' next of kin.

Ex. 1 (Reynolds Decl.) ¶ 2.[1] *See also* 30 U.S.C. § 843(a), (c), (d). Results of radiographic films are read and classified according to HHS regulations and confidentially submitted to the miner along with a description of any applicable rights under the Mine Act. *See* 30 U.S.C. § 843(a); Ex. 1 ¶ 6.

Importantly, "any miner who, in the judgment of the Secretary of [HHS] based upon such reading or other medical examinations, shows evidence of the development of pneumoconiosis shall be afforded the option of transferring from his position to another position in any area of the mine, for such period or periods as may be necessary to prevent further development of such disease . . . ." 30 U.S.C. § 843(b)(1)-(2). If a miner exercises his right to transfer to a low-dust position in the mine, he must be paid at least what he was receiving prior to the transfer. *See id.* § 843(b)(3).

When a miner participates in the CWHSP, he receives a chest x-ray, lung function test (spirometry), and blood pressure screening. *See* Ex. 1 ¶ 6.   Almost all chest x-rays of coal miners received by NIOSH are digitally transmitted and evaluated by physicians specially qualified in recognizing and classifying pneumoconiosis in accordance with 42 C.F.R. § 37.51. *See also* 42 C.F.R. § 37.52(b) (providing requirements for qualification and approval as an A Reader and B Reader); Ex. 1 ¶ 6 ("Chest x-rays are sent to a panel of specialized physicians (B Readers) to classify the x-ray according to the International Labour Office's International Classification of Radiographs of Pneumoconiosis ('black lung')."). The method for definitive evaluations of digital chest x-rays received by NIOSH is detailed in 42 C.F.R. § 37.53. If a coal miner is determined to show evidence of the development of pneumoconiosis based on a chest x-ray, he is notified of his right to exercise the transfer option pronounced in 30 U.S.C. § 843(b), known as the Part 90 option

---

[1] The Declaration of Laura E. Reynolds is attached as Exhibit 1 to Defendants' Motion to Dismiss. (*See* ECF No. 14-1.) The attachments to that declaration are the exhibit to Defendants' Motion to Seal. (*See* ECF No. 15-1.)

(named after the implementing regulations in 30 C.F.R. Part 90).[2] *See* 30 C.F.R. §§ 90.102 (describing the miner's transfer options), 90.104 (providing that a miner may waive his rights under Part 90 but re-exercise them at any time); *see also* Ex. 1 ¶ 7 ("The CWHSP provides medical screening to miners, evaluates results, and determines if miners are medically eligible for the Part 90 option. The CWHSP mails miners their medical results and determinations regarding their Part 90 eligibility.").

If a coal miner submits to a chest x-ray that is determined not to show evidence of pneumoconiosis, the miner may submit other medical examinations for review, "such as [a] computed tomography scan of the chest or lung biopsies, as evidence of the development of pneumoconiosis." *See* 42 C.F.R. § 37.102; *see also* Ex. 1 ¶ 8. A later submitted chest x-ray is evaluated in the same manner as chest x-rays submitted under an operator's plan. *See* 42 C.F.R. § 37.100; Ex. 1 ¶ 8. If a miner submits a chest CT scan, the CWHSP's chest radiologist reviews it and makes a pneumoconiosis determination. Ex. 1 ¶ 8. Once a final determination is made regarding the submitted other evidence, the CWHSP sends a letter with the results to the miner. *Id.* Results of the independently submitted examinations may similarly trigger the miner's transfer rights under the Mine Act. *See* 42 C.F.R. § 37.103. And if the submitted examination indeed shows evidence of the development of pneumoconiosis, the miner is notified of his right to exercise the

---

[2] Part 90 provides, in part, as follows:

> Any miner employed at a coal mine who, in the judgment of the Secretary of HHS, has evidence of the development of pneumoconiosis based on a chest X-ray, read and classified in the manner prescribed by the Secretary of HHS, or based on other medical examinations shall be afforded the option to work in an area of a mine where the average concentration of respirable dust in the mine atmosphere during each shift to which that miner is exposed is continuously maintained at or below the applicable standard. Each of these miners shall be notified in writing of eligibility to exercise the option.

30 C.F.R. § 90.3(a). *See also* 42 C.F.R. § 37.102.

Part 90 option. Ex. 1 ¶ 8. There is no limit to the number of times a miner can submit other evidence for a Part 90 eligibility determination. *Id.*

### FACTUAL BACKGROUND

Plaintiff's first interaction with the CWHSP was in 2010, when the CWHSP sent him a letter notifying him that he was eligible to participate in a CWHSP respiratory screening at approved facilities. *Id.* ¶ 9 & Attach. A. The CWHSP sent him other notification letters about his eligibility to receive CWHSP screenings in 2014, 2017, and 2018. *See id.* & Attachs. B, C.

Plaintiff had his first CWHSP respiratory health screening on May 15, 2018, on the CWHSP mobile unit. *Id.* ¶ 10. Plaintiff underwent a chest x-ray and spirometry test. In accordance with the CWHSP, Plaintiff's chest radiograph was evaluated by doctors specially trained and certified to recognize and accurately classify pneumoconiosis on chest radiographs. Plaintiff was notified of his radiograph results via letter dated September 10, 2018, which showed no evidence of pneumoconiosis. *Id.* & Attach. E. Further, Plaintiff's baseline spirometry testing indicated results within normal limits, and the CWHSP sent a separate letter to Plaintiff dated July 6, 2018, explaining the spirometry results. *Id.* & Attach. F. Because Plaintiff's chest radiograph and spirometry testing exhibited no evidence of pneumoconiosis, Plaintiff was not eligible for a transfer option under Part 90 after that screening.

Plaintiff had a chest computed tomography ("CT") scan on October 12, 2023, which he attempted to submit to the CWHSP in November 2024, through his attorney in this case, as other evidence in support of his previous Part 90 application. *See id.* ¶ 11 & Attachs. G, H. The scan eventually was uploaded into PICOM (cloud based software for sharing, viewing, and managing diagnostic studies) for review on December 6, 2024. *Id.* Plaintiff's chest CT scan was evaluated by Robert J. Tallaksen, MD, Senior Consultant Fellow, Respiratory Health Division, NIOSH, a

physician qualified to identify pneumoconiosis. *See id.* ¶ 12 . Dr. Tallaksen found that the CT scan showed no signs of pneumoconiosis. *Id.* & Attachs. I, J. The CWHSP created a results letter in their database dated December 10, 2024, which stated as follows: "Your CT scan shows NO findings consistent with black lung." *Id.* & Attach. K. That results letter would have been mailed to Plaintiff via first class USPS mail by December 13, 2024. *Id.*

Since that letter was mailed to Plaintiff, the NIOSH facility in Morgantown has not received any additional correspondence from Plaintiff, and nothing remains for HHS to act upon with regard to Plaintiff and the CWHSP. Based on the information in Plaintiff's file with the CWHSP, Plaintiff shows no evidence of pneumoconiosis, and he is not eligible for the Part 90 option. *See id.* ¶ 13.

## ARGUMENT

### I.  Plaintiff Does Not Have Standing to Pursue This Case, and It Should Be Dismissed.

Article III of the United States Constitution constrains the judicial authority of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2; *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009) (citations omitted). Embedded in this limitation is the requirement of standing to sue, which "ensure[s] that federal courts do not exceed their authority" and "confines the federal courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016). The Supreme Court has reiterated the following when determining whether a plaintiff has standing to bring a claim:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *accord Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 230–31 (4th Cir. 2008).

In other words, "[p]roper standing requires that a plaintiff assert a direct injury that can be traced to the defendant's conduct and from which relief to the plaintiff will likely follow from a favorable adjudication to the plaintiff." *Gilbert Imported Hardwoods, Inc. v. Holland*, 176 F. Supp. 2d 569, 576 (S.D. W. Va. 2001) (citations omitted). Plaintiffs who file their complaint in federal court bear the burden of establishing all three requirements. *See Doe v. Va. Dep't of State Police*, 713 F.3d 745, 753 (4th Cir. 2013).

The "[f]irst and foremost" of standing's three elements concerns injury in fact. *See Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted). To be "particularized," an injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. And to be "concrete," an injury "*must actually exist*." *Spokeo, Inc.*, 578 U.S. at 340 (emphasis added) (citing *Black's Law Dictionary* 479 (9th ed. 2009)). Here, no injury exists, and Plaintiff cannot establish a concrete injury necessary to have constitutional standing to bring this case.

The entire foundation of Plaintiff's Amended Complaint rests on the following allegations:

16. On November 7, 2024, Mr. Harry Wiley took the initial step in applying for transfer to a non-dusty job under Part 90 by completing Form 0920-0020.

17. On November 8, 2024, Mr. Wiley mailed the form and a radiographic image of his chest by certified mail to the NIOSH Coal Workers' Health Surveillance Program, 1000 Frederick Lane M/S LB208, Morgantown, WV 26508.

18. As of the filing of this Complaint, Mr. Wiley has received no response from the CWHSP.

(ECF No. 10 ¶¶ 16-18.) However, the foundation on which this whole case is built crumbles with the incontrovertible sworn facts in Exhibit 1, the Declaration of Laura E. Reynolds, and its attachments.

Plaintiff first had imaging and testing conducted by the CWHSP in 2018. *See* Ex. 1 ¶ 10. At that time, Plaintiff's chest x-ray and spirometry results showed no evidence of pneumoconiosis. *See id.* Therefore, Plaintiff was not eligible in 2018 for the Part 90 option to transfer. *See id.* In accordance with HHS policy and regulations, Plaintiff submitted other evidence in late 2024 to determine whether he was eligible for the Part 90 option. *Id.* ¶ 11. Plaintiff inaccurately refers to this as an "appl[ication] for transfer to a non-dusty job under Part 90," (ECF No. 10 ¶ 16), but until the CWHSP makes a determination that a miner's examination or testing shows evidence of pneumoconiosis, a miner is not eligible for the Part 90 option, *see* 30 U.S.C. § 843(b); 30 C.F.R. § 90.102. Nevertheless, Plaintiff's CT scan received by the CWHSP in December 2024 was evaluated pursuant to policy and regulations, and the CWHSP chest radiologist determined that the CT scan showed no signs of pneumoconiosis. *See* Ex. 1 ¶ 12. Thus, the CWHSP sent a letter to Plaintiff stating those findings. *Id.* Plaintiff still remains ineligible for the transfer option in Part 90, and there are no pending examinations or testing of Plaintiff for the CWHSP to review.

Because the CWHSP evaluated and adjudicated "the form and radiographic image of his chest" Plaintiff submitted in November 2024, (ECF No. 10 ¶ 17), Plaintiff has no concrete injury for the Court to remedy or standing to pursue his claims. Therefore, this Court lacks subject matter jurisdiction over this civil action, and it must be dismissed.

## II.  Plaintiff's Claims Are Barred by Sovereign Immunity.

The Amended Complaint contains three counts: (1) Count I – Declaratory Judgment, 5 U.S.C. §§ 702, 706; (2) Count II – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Arbitrary, Capricious, and Unlawful Agency Action; and (3) Count III – Deprivation of Procedural Due Process (U.S. Constitution, Fifth Amendment). (*See* ECF No. 10 ¶¶ 29-52.) The threshold questions that must be first answered by the Court are (1) has there been a waiver of sovereign immunity to allow these claims, and (2) does this Court have subject matter jurisdiction over these claims. *See Lancaster v. Sec'y of Navy*, 109 F.4th 283, 288 (4th Cir. 2024) ("[W]e must first address—even if the parties do not—whether federal courts, including the district court, could properly exercise jurisdiction."). As explained above, the second question regarding whether the Court has subject matter jurisdiction should be answered in the negative. *See supra* pp. 8–10.

As federal courts are courts of limited jurisdiction, they have only the powers and jurisdiction authorized by the Constitution and by Congress through statute. Federal courts are not free to expand their jurisdiction by judicial decrees. Rather, it is presumed that a case lies outside the jurisdiction of a federal court. The party asserting federal court jurisdiction has the burden of proving that a federal district court has jurisdiction over the facts and legal issues involved in a case. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The plaintiff carries this burden throughout the litigation and at all stages of the proceedings. If the allegations of jurisdiction are challenged, the plaintiff must prove those allegations of jurisdiction by competent proof. Even if the defendant does not challenge those allegations of jurisdiction, the federal district court may do so. *See Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936).

11

"It is elementary that 'the United States, as sovereign, is immune from suit save as it consents to be sued[.]'" *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). *See also F.D.I.C. v. Meye*r, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). It is further axiomatic that the existence of consent to sue the United States "is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).

Under federal law, "[w]aivers of sovereign immunity must be unequivocal and are to be strictly construed." *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33–34 (1992). Accordingly, courts "must first decide" whether "[sovereign] immunity has been waived." *Meyer*, 510 U.S. at 475. "For that reason, it is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists. . . . If the plaintiff fails to meet this burden, then the claim must be dismissed." *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005). *See also Lancaster*, 109 F.4th at 292 (noting a plaintiff has the burden to show that an unequivocal waiver of sovereign immunity exists). Even if the United States is not named as a defendant, "[a]n action against a federal agency or official will be treated as an action against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act.'" *Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983) (quoting *Dugan v. Rank*, 372 U.S. 609, 620, (1963) (citations omitted)). Consequently, sovereign immunity bars monetary claims against officers in their official capacity since such suits effectively operate against the sovereign itself." *Lancaster*, 109 F.4th at 292 (footnote omitted).

"A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Mitchell*, 445 U.S. at 538 (quoting *United States v. King*, 395 U.S. 1, 4 (1969)).

Further, ambiguity must be construed in favor of immunity. *F.A.A. v. Cooper*, 566 U.S. 284, 290–91 (2012). "Ambiguity exists if there is a plausible interpretation of the statute that would *not* authorize [the relief sought]." *Id.* (emphasis added). *See also Lane v. Peña*, 518 U.S. 187, 192 (1996); *Randall v. United States*, 95 F.3d 339 (4th Cir. 1996).

A.    **The Basis for Count I, the Declaratory Judgment Act, Does Not Constitute a Waiver of Sovereign Immunity Nor Does It Serve to Create Jurisdiction.**

The Declaratory Judgment Act ("DJA"), 5 U.S.C. § 702, does not create a basis of jurisdiction or act as a waiver of sovereign immunity. It has long been recognized that the DJA "is not one which adds to the jurisdiction of the court, but is a procedural statute which provides an additional remedy for use in those cases and controversies of which the federal courts already have jurisdiction." *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 323 (4th Cir. 1937). *See also Schilling v. Rogers*, 363 U.S. 666, 677 (1960) ("[T]he Declaratory Judgments Act is not an independent source of federal jurisdiction . . . ; the availability of such relief presupposes the existence of a judicially remediable right. No such right exists here."); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937 ) ("Thus the operation of the Declaratory Judgment Act is procedural only.").

Moreover, the DJA "plainly does not operate as an express waiver of sovereign immunity . . . because it 'neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief.'" *Muirhead v. Mecham*, 427 F.3d 14, 17 n.1 (1st Cir. 2005) (quoting *Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1230 (1st Cir. 1996) (citation omitted) (internal quotation marks omitted)). *See also Goldstein v. Moatz*, 364 F.3d 205, 219 (4th Cir. 2004) ("If a declaratory judgment proceeding actually constitutes a suit against the sovereign, it is barred absent a waiver of sovereign immunity."); *Fatmi v. Chertoff*, No. 07-0786, 2007 WL 9805723, at *1 (E.D. Va. Nov. 30, 2007)

("Similarly, neither the Mandamus Act nor the Declaratory Judgment Act serves as a waiver of sovereign immunity and this [c]ourt similarly lacks jurisdiction to entertain these claims.").

Since the DJA does not constitute a waiver of sovereign immunity and does not create subject matter jurisdiction, Count I of the Amended Complaint should be dismissed.

**B.**     **The APA Does Not Waive Sovereign Immunity in This Case, and Count II Must Be Dismissed.**

While the APA does create a limited waiver sovereign of immunity, Congress has created several exceptions to that waiver. As will be shown below, *see infra* pp. 16–28, those exceptions apply in this case. Thus, sovereign immunity has not been waived with regard to Count II of the Amended Complaint, and it should be dismissed.

**C.**     **Count III, Based on the Deprivation of Due Process (Fifth Amendment of the Constitution) Should Also Be Dismissed Because It Is Barred by Sovereign Immunity.**

"No federal statute provides an express cause of action against federal officers who have allegedly violated a person's federal constitutional rights." *Lancaster*, 109 F.4th at 293 n.6. The Fourth Circuit has made it clear that sovereign immunity bars Fifth Amendment claims against the United States and its officials acting in their official capacity. *See Radin v. United States*, 699 F.2d 681, 684 (4th Cir. 1983) ("Radin argues that if a federal officer can be held liable for a [F]ifth [A]mendment deprivation, the United States is likewise liable for [F]ifth [A]mendment deprivations by federal agencies. This theory, a quantum leap from the rationale of *Bivens* and *Davis*, fails to clear the hurdle of sovereign immunity."). As the Fourth Circuit further stated in *Radin* in response to a Fifth Amendment claim asserted by the plaintiff in that case, "Unless Congress has consented to a cause of action against the United States, there is no jurisdiction in any court of the land to entertain such suits . . . . Congress has not seen fit to provide the cause of action Radin seeks here. *Bivens* and *Davis*, which held that sovereign immunity does not shield

14

*federal officers* in their *individual* capacity from liability for violation of an individual's constitutional rights, did not waive the sovereign immunity of the United States." *Id.* at 685 (emphasis in original).[3]

### III.  The Court Should Deny the Motion for Preliminary Injunction.

#### A.  Standard of Review

The purpose of a preliminary injunction "is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds*, *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Cnty. Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

A party seeking a preliminary injunction bears the burden of persuasion and must demonstrate, by a clear showing, that the requested relief is warranted. *See Williams v. Rigg*, 458 F. Supp. 3d 468, 473–74 (S.D. W. Va. 2020); *Robertson v. Colvin*, No. 3:16-2113, 2016 WL 3406134, at *1 (S.D. W. Va. June 17, 2016). He must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  All four requirements must be met for a preliminary injunction to be granted. *See id.*; *Williams*, 458 F.

---

[3] While Plaintiff asserts federal jurisdiction for his claims under 28 U.S.C. § 1331, that statute is "merely a jurisdictional grant that in no way affects the sovereign immunity of the United States." *Radin*, 699 F.2d at 685 n.9. *See also Garcia v. United States*, 666 F.2d 960, 966 (5th Cir. 1982) ("The complaint alleges jurisdiction under 28 U.S.C.A. § 1331 and looks directly to the Constitution for its substantive basis. This Court and others have held that 28 U.S.C.A. § 1331 is not a waiver of sovereign immunity.").

Supp. 3d at 473–74 (citations omitted). And the third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiff cannot carry his burden on the *Winter* factors.

### B. Plaintiff Fails to Demonstrate a Likelihood of Success on the Merits of His Claims.

First, Plaintiff cannot demonstrate a likelihood of success on the merits of Counts I through III of the Amended Complaint insofar as those claims allege that Defendants "failed to adjudicate Plaintiff's Part 90 application, failed to issue notice of his right to transfer, and failed to tender an opportunity to be heard in the effective denial of these job transfer rights." (*See, e.g.*, ECF No. 10 ¶¶ 37, 51.) As explained above and in Exhibit 1, Plaintiff's Part 90 application was originally adjudicated in September 2018, and his submission of other evidence in further support of that application was adjudicated in December 2024. NIOSH determined that none of Plaintiff's medical examinations or testing displayed signs of pneumoconiosis. Consequently, he is not and has never been entitled to the Part 90 option to transfer positions, and there is no relief for the Court to grant with respect to Plaintiff. Without standing, and as a matter of law, Plaintiff cannot succeed under the APA or Fifth Amendment. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017) (finding "[a] plaintiff unlikely to have standing is *ipso facto* unlikely to succeed" on the merits and, as such, is not entitled to pretrial injunctive relief). Because Plaintiff is not in a position to pursue claims on his own behalf, he similarly cannot pursue claims on behalf of a purported class. His lack of standing is dispositive of his motion.

Second, even if Plaintiff was accurate and he had a pending Part 90 application or could demonstrate standing in some other way, he cannot succeed on the merits of Counts I through III as they relate to the RIF notices sent to employees at the HHS-NIOSH facility in Morgantown, West Virginia, or the future of HHS' management of the CWHSP. And a failure to show that he is likely to succeed on the merits "is a basis to deny a preliminary injunction, regardless of the remaining factors." *Vitkus . Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

    1. <u>APA</u>

The crux of Plaintiff's APA claim rests on RIF notices sent to certain NIOSH employees. (*See* ECF No. 8 at 10.) He ultimately asks the Court to permanently enjoin those employment decisions and "restore all personnel . . . who are integral to carrying out" the CWHSP and Part 90 program. (*Id.* at 2.) Plaintiff's APA claim fails for three discrete reasons: (1) Congress has precluded district court review of such federal employment claims; (2) HHS' administrative reforms are committed to agency discretion; and (3) Plaintiff impermissibly seeks review of generalized complaints about agency behavior.

    (a)    *Federal personnel statutes divest this Court of subject matter jurisdiction to consider claims concerning the employment of HHS employees*

Congress has precluded district court review of the type of broad federal employment claims Plaintiff is asserting related to staffing at the Morgantown NIOSH facility. Such claims must proceed in another forum because Congress has "established a comprehensive system" that provides the "exclusive means" for reviewing challenges to the employment decisions of federal agencies. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012) (internal quotation marks omitted).

The Civil Service Reform Act ("CSRA"), together with the Federal Service Labor-Management Relations Statute ("FSLMRS"),[4] "creates an integrated scheme of administrative and judicial review, wherein Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2023) (cleaned up). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, with limitations imposed by Congress on the kinds of claims and remedies available. *See Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019) [hereinafter *AFGE v. Trump*]. The purpose of this statute was to "replace the haphazard arrangements for administrative and judicial review of personnel action, part of the outdated patchwork of statutes and rules built up over almost a century that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (citation omitted) (internal quotation marks omitted).

When such a comprehensive remedial scheme permits only some plaintiffs to seek review, the scheme implicitly precludes judicial review by other individuals who are not authorized to bring claims. The Supreme Court recognized this in *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), where it considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review

---

[4] The CSRA establishes the "comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Under the CSRA, most civilian employees can appeal a major adverse personnel action to the Merit Systems Protection Board ("MSPB"). 5 U.S.C. §§ 7512, 7513(d), 7701. Employees subject to a RIF may also pursue relief before the MSPB. *See* 5 C.F.R. § 351.901. The CSRA empowers the MSPB to order relief, including reinstatement. 5 U.S.C. §§ 1204(a)(2), 7701(g). An employee aggrieved by a final decision of the MSPB may obtain judicial review. *Id.* § 7703(a)(1). *See also id.* § 7703(b) (providing the Federal Circuit with exclusive jurisdiction over most final MSPB decisions). In addition, the FSLMRS governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The Federal Labor Relations Authority ("FLRA") is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Review of the FLRA's decisions is available in the courts of appeals. *Id.* § 7123(a).

by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding." *Id.* at 347. In the "complex scheme" Congress had provided, "the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* Accordingly, the statute's "structure . . . indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* The "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other result, the Court said, would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

In *Fausto*, the Supreme Court applied the same reasoning to the CSRA itself. The Court explained that the "exclusion" of a party "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "*prevents* [the party] from seeking review" under other provisions. 484 U.S. at 455 (emphasis added). The Court emphasized that the CSRA's "comprehensive nature," its express provisions for different kinds of review for different kinds of plaintiffs, and its exclusion of those in the plaintiffs' position from the comprehensive scheme, reflected a "considered congressional judgment" that those employees "should not have statutory entitlement to review for" that type of personnel action covered by the CSRA. *Id.* at 448. *See Grosdidier v. Chairman*, 560 F.3d 494, 497 (D.C. Cir. 2009) (Kavanaugh, J.) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.").

Those principles likewise foreclose this Court's exercise of subject matter jurisdiction over Plaintiff's employment-related claims. Just as Congress "intentionally foreclosed judicial review to" certain employees under the CSRA, *see Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984), it

intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief. As in *Fausto*, it would turn the CSRA's comprehensive structure "upside down" for Plaintiff, who is a stranger to the federal government's employment relationships, to challenge HHS employment decisions in federal district court, "free" from any of the restrictions that would apply if the claim were brought by the HHS employees themselves. *See* 484 U.S. at 449–50. The exclusion from the CSRA's review scheme reflects Congress's considered judgment limiting who may challenge a personnel decision and on what grounds—rather than providing carte blanche for those excluded to sue outside the CSRA's comprehensive scheme. *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (explaining that "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of the specific remedies" that precludes jurisdiction).

The Supreme Court's more recent decisions in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175, 186 (2023), reflect these same principles. Those cases underscore that where, as here, Congress has established a "comprehensive" review scheme, district courts lack subject matter jurisdiction over a claim where it is, as here, "of the type Congress intended to be reviewed within" the statutory structure. *See Axon Enters., Inc.*, 598 U.S. at 186 (quoting *Thunder Basin Coal Co.*, 510 U.S. at 212).

Congress did not establish an implausible scheme in which employees must litigate their employment actions through a comprehensive, integrated scheme, but others are left free to challenge those same employment actions directly in federal district court with "greater rights" than the affected employees themselves. *See Graham*, 358 F.3d at 934. Instead, Congress limited review of federal employment actions to actions by affected employees themselves, in a different

forum. And as then-Judge Roberts summed up, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005).

Multiple courts, including very recently, have declined jurisdiction on this ground. *See, e.g.*, *AFGE v. Trump*, 929 F.3d at 752; *see also, e.g.*, *Am. Fed'n of Gov't Emps. v. Ezell*, No. 25-10276-GAO, 2025 WL 470459, at *1–2 (D. Mass. Feb. 12, 2025) (finding no jurisdiction to consider plaintiffs' claims to enjoin the Office of Personnel Management from enforcing the deadline for its "Fork in the Road" offer); *Nat'l Treasury Emps. Union v. Trump*, No. 25-cv-420 (CRC), 2025 WL 561080, at *4–7 (D.D.C. Feb. 20, 2025); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (CJN), 2025 WL 573762, at *7–11 (D.D.C. Feb. 21, 2025); *Maryland v. U.S. Dep't of Agric.*, Nos. 25-1248, 25-1338, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) (ordering stay of district court's preliminary injunction and explaining that the government is likely to show that the district court lacked jurisdiction over plaintiff States' claims, where the government had argued, among other things, that the "[CSRA] provides the exclusive means for review of personnel actions taken against federal employees"—and observing that "[t]he Supreme Court has stayed a similar preliminary injunction issued by the United States District Court for the Northern District of California" (citing *OPM v AFGE*, 2025 WL 1035208, at *1)).

Here, much of the relief Plaintiff seeks (other than adjudication of his Part 90 application, which has already occurred) is at its core a challenge to HHS employment policies, including the recent implementation of a RIF mandate. That Plaintiff has framed his alleged injury under the APA does not allow him to sidestep the CSRA's mandatory channeling regime. Were his theory correct, downstream consumers of government services and benefits could always go directly to court to raise such challenges, notwithstanding Congress's determination that federal employees must first pursue relief administratively. It would be an odd result indeed if claims that cannot be

raised in district court by those most directly affected—the employees themselves—could be raised by plaintiffs whose asserted injuries are entirely derivative. The Court therefore lacks jurisdiction over these employment and RIF related claims because they must be litigated in another forum.

(b)    *APA review is precluded because HHS' administrative reforms are committed to agency discretion*

The APA grants a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. But it withdraws that cause of action "to the extent that . . . agency action is committed to agency discretion by law." *Id.* § 701(a). "Agency action is committed to agency discretion by law when 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Steenholdt v. F.A.A.*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).

As noted above, the Court lacks jurisdiction over challenges to HHS' workforce reductions, which Congress has channeled to other forums. *See supra* pp. 17–21. The balance of Plaintiff's motion largely challenges an administrative plan to reorganize the agency. (*See, e.g.*, ECF No. 8 at 11–12.) *See also* "HHS Announces Transformation to Make America Healthy Again," HHS Press Office (Mar. 27, 2025), *available at* https://www.hhs.gov/press-room/hhs-restructuring-doge.html. Congress vested with the Secretary of HHS "broad authority to reorganize the department through the redistribution of functions for which he is responsible." *See* Darrel J. Grinstead, *Statutory Framework for the Organization and Management of the U.S. Department of Health and Human Services*, *in* HHS IN THE 21ST CENTURY: CHARTING A NEW COURSE FOR A HEALTHIER AMERICA 209, 211 (Leonard D. Schaeffer et al. eds., 2009) (discussing Reorganization Plan No. 1 of 1953 and Reorganization Plan No. 3 of 1966). And staffing and organizational

22

decisions are squarely in the realm of actions that courts have traditionally found committed to agency discretion. *See e.g.*, *Lincoln v. Vigil*, 508 U.S. 191, 193 (1993) (holding that the Indian Health Service's 1985 decision to "reallocate the [Indian Children's] Program's resources" from "handicapped Indian children in the Southwest," who had been served since the late 1970s and early 1980s, to a "nationwide effort to assist such children" was "committed to agency discretion by law" and "therefore not subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2)"); *Local 2855 v. United States*, 602 F.2d 574, 579 (3d Cir. 1979) ("The existence of broad discretionary power in an agency often suggests that the challenged decision is the product of political, military, economic, or managerial choices that are not really susceptible to judicial review."); *see also* 5 U.S.C. § 301 ("The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."); 5 C.F.R. § 351.201(a)(1) ("Each agency is responsible for determining the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated. This includes determining when there is a surplus of employees at a particular location in a particular line of work."); *General Counsel*, B- 199491 (Comp. Gen.), 1980 WL 16137, at *1 (Aug. 14, 1980).

Plaintiff points to no statute limiting HHS' inherent discretion to reorganize. He speculates that the CWHSP is essentially shuttered, but that is nothing more than guesswork at this posture. And he offers no judicially manageable standard for the Court to second-guess the Secretary's judgment about what staffing levels or office structures are the "right" ones to best accomplish the agency's statutorily mandated programs such as the CWHSP. Those decisions, therefore, are not subject to APA review.

(c)    *Plaintiff's generalized complaints about HHS' RIF decisions do not
relate to discrete, final agency action*

"The federal courts are not authorized to review agency policy choices in the abstract."
*Fund for Animals v. U.S. Bureau of Land Manag.*, 460 F.3d 13, 18 (D.C. Cir. 2006). Rather, the
APA "provides a generic cause of action to '[a] person suffering legal wrong because of *agency
action*, or adversely affected or aggrieved by *agency action*.'" *Id.* (quoting 5 U.S.C. § 702
(emphasis added)). Review under the APA is further limited to "*final agency action* for which
there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). Plaintiff's motion
breezes over these threshold requirements, arguing they are satisfied because "letters of
termination and/or administrative layoffs have been sent to staff for the Respiratory Health
Division." (ECF No. 8 at 10.) This, alone, fails to satisfy the APA's preconditions.

The APA's definition of "action" is "not so all-encompassing as to authorize [courts] to
exercise judicial review [over] everything done by an administrative agency." *Indep. Equip.
Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.). Rather, the "agency
action" limitation prevents plaintiffs from "seek[ing] wholesale improvement of [a] program by
court decree, rather than in the offices of the Department or the halls of Congress, where
programmatic improvements are normally made." *Lujan*, 497 U.S. at 891. That is, "[u]nder the
terms of the APA, [plaintiffs] must direct [their] attack against some particular 'agency action'
that causes [them] harm." *Id.* at 891. And that agency action must be "circumscribed" and
"discrete[.]" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). "Because 'an on-
going program or policy is not, in itself, a final agency action under the APA,' [a court's]
jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell
v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Here, Plaintiff's APA claim amounts to impermissible wholesale challenges, i.e., the sort of "broad programmatic attack" rejected in *Lujan*, rather than a challenge to discrete final agency action. Plaintiff challenges a collection of past and potential future actions—reductions of staff, transfer of functions, reorganization of various offices, and so on. In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting *principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well*—cannot be laid before the courts for wholesale correction under the APA, simply because one of them is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892–93 (emphasis added). *See also Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (rejecting plaintiffs' attempt to "attach[] a 'policy' label to their own amorphous description of the [agency's] practices" because "a final agency action requires more"). Indeed, the purpose of the APA's discrete agency action requirement is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton*, 542 U.S. at 62.

Alternatively, even assuming Plaintiff can show a discrete agency action in this case, it was not final for APA purposes. For an agency action to be "final" within the meaning of the APA, two considerations must be met. "First, the action must mark the 'consummation' of the agency's decision-making process—[i]t must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citation omitted). "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Id.* at 178 (citation omitted).

25

Plaintiff relies on two documents to argue that the employment and reorganization decisions complained of represent a "final action." (*See* ECF No. 8 at 10.) First, Plaintiff relies on a RIF notice sent to Anthony Laney and dated March 31, 2025. (*See id.*; ECF No. 10-1 at 2–6.) Although the letter indicates that Mr. Laney will be separated from Federal employment effective June 2, 2025, a future date, it specifically provides the following: "Should the circumstances of the RIF otherwise change, *this notice may be withdrawn*." (ECF No. 10-1 at 2 (emphasis added).) Thus, the notice is not representative of a final agency action because the anticipated separation of Mr. Laney's employment may change before June 2, 2025. Plaintiff further relies on an undated email or memorandum of unknown origin stating that the CWHSP is "**paused**." (*Id.* at 7 (emphasis in original).) Again, the document does not say that the CWHSP has been permanently discontinued or shuttered as Plaintiff alleges. Consequently, this document does not represent a final agency action for purposes of the APA. *See also Pause*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/pause (last visited Apr. 30, 2025) ("1: a *temporary* stop" (emphasis added)).

As consumers of statewide news media are aware, decisions regarding staffing at the Morgantown NIOSH facility are still in flux and subject to revision, evidencing their interlocutory nature. *See, e.g.*, Mike Nolting, *Capito Announces Some Temporary Job Reinstatements at NIOSH in Morgantown*, MetroNews (Apr. 29, 2025, 10:33 PM), https://wvmetronews.com/2025/04/29/capito-announces-some-temporary-job-reinstatements-at-niosh-in-morgantown/ ("Capito told MetroNews that somewhere between 30 and 40 NIOSH workers would be reinstated. . . . 'It's still yet to be told what the final answer will be . . . .'"); Shannon Stowers, *Some NIOSH Workers in West Virginia to Temporarily Return, Capito Says*, WCHS (Apr. 29, 2025, 4:00 PM), https://wchstv.com/news/local/some-niosh-workers-in-west-

26

virginia-to-temporarily-return-capito-says. West Virginia Senator Shelley Moore Capito recently announced that some staff at the Morgantown NIOSH facility are returning to work before the end of the week of April 28, 2025. *See* Steven Allen Adams, *Capito Reports Progress Toward Reversing NIOSH Layoffs, But Says There's More Work To Do*, The Intelligencer (Apr. 30, 2025), *available at* https://www.theintelligencer.net/news/top-headlines/2025/04/capito-reports-progress-toward-reversing-niosh-layoffs-but-says-theres-more-work-to-do/. Indeed, it is clear that there have been political discussions behind closed doors regarding the current and future state of the facility. *See* Letter from Shelley Moore Capito, United States Senator, to the Honorable Robert F. Kennedy, Jr., Secretary, U.S. Department of Health & Human Services (Apr. 21, 2025), *available at* https://www.capito.senate.gov/imo/media/doc/04-21-2025_capito_letter_to_hhs_on_niosh_final.pdf ("Thank you for taking the time to talk with me regarding the important work CDC's National Institute for Occupational Safety and Health (NIOSH) does to improve and monitor the health care of our coal miners in West Virginia.").

As such, Plaintiff's motion challenges what he believes to be the future of the CWHSP and the Morgantown NIOSH facility, which is, at best, tentative, or merely based on misapprehensions. Moreover, Plaintiff identifies no way in which the challenged decisions have any concrete effect on his "rights or obligations" beyond speculation regarding the future of the CWHSP. Plaintiff does not show that these administrative reforms have "legal consequences" in and of themselves, such as by changing the benefits to which he is entitled. And HHS has never indicated that despite the RIF sent to employees in Morgantown, it does not intend to carry out its statutory duties under the Mine Act by, for instance, transferring duties under the CWHSP to other offices. Plaintiff therefore fails to identify a cognizable final agency action. *Cf. Shank v. U.S. Dep't of Interior*, 907 F. Supp. 285, 289 (C.D. Ill. 1995) ("There is no dispute that [the Office of Surface Mining and

Reclamation Enforcement] had discretion to implement a RIF . . . . Therefore, the decision to implement the RIF is not reviewable under the APA. Consequently, the [c]ourt does not have jurisdiction over Petitioners' Motion for Preliminary Injunction.").

Because there is no final agency action in this case, there is nothing for this Court to analyze under the arbitrary and capricious standard of the APA. *Cf. Springs v. Stone*, 362 F. Supp. 2d 686, 703 (E.D. Va. 2005) ("[T]here are no readily identifiable standards by which to evaluate the alleged arbitrariness and capriciousness of the RIF. This case represents one of those rare instances when judicial review is precluded."). Similarly, the RIF notices sent to employees at the Morgantown NIOSH facility did not result in immediate terminations, and the future of staffing at that NIOSH location and how the programs it administers will be managed is yet to be finalized and publicized by HHS. Thus, it is impossible to find that any HHS decisions at this point are contrary to law as there have been no final agency decisions.

Given the above, Plaintiff is not likely to succeed on any APA claim. First, he has no standing to pursue such claims. Second, he cannot meet the APA's jurisdictional threshold. Finally, he cannot make out a prima facie case on the merits. Therefore, Plaintiff's motion should be denied insofar as it is based on a claim under the APA.

### 2. Fifth Amendment

A prerequisite for the advancement of any due process claim is the identification of a qualified protected property or liberty interest. *See Kerry v. Din*, 576 U.S. 86 (2015). Plaintiff claims that he has been deprived of his statutory entitlement to a Part 90 transfer because his "effort to get a Part 90 transfer has been blocked without any hearing or even response from HHS." (ECF No. 8 at 17 & n.8.) But as explained above, Plaintiff has never qualified for a Part 90 transfer. *See*

*supra* pp. 6–8. Thus, this cannot serve as an alleged property right for purposes of a Fifth Amendment claim.

Even if Plaintiff had a pending Part 90 application with the CWHSP, he still is unlikely to succeed on the merits of his Fifth Amendment claim because at its core, the claim rests on his subjective beliefs about the future of the CWHSP. Defendants already explained that the future organization of HHS and staffing related to the CWHSP is fluid, *see supra* pp. 26–27, so without more, Plaintiff's allegations are far too vague and speculative to give use to a cognizable injury. Plaintiff cannot rely on an alleged inability to access the CWHSP at some undetermined future date because such an allegation would be too attenuated to support standing, as it rests on a chain of unsupported and conclusory inferences—i.e., that workforce reductions, administrative reorganizations, and other reforms to streamline HHS will inevitably lead to an actual reduction in benefits downstream, rather than efficiencies. *See also Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1085 (10th Cir. 2006) (noting "it is well established that 'an entitlement to nothing but procedure' cannot 'be the basis for a [liberty or] property interest'" (citation omitted)).

Notably, in a recent case proceeding on an analogous standing theory—i.e., that the termination of probationary employees would result in diminished public services—the Supreme Court stayed the district court's injunction, explaining that "under established law, those allegations are presently insufficient to support . . . standing." *OPM v. AFGE*, 2025 WL 1035208, at *1 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)). So too here. Plaintiff has not shown that any of the employment decisions or programmatic changes complained of has caused him any particular harm. There is no plausible deprivation of right on which Plaintiff can rely to support a Fifth Amendment claim, and he is unlikely to succeed on the merits.

### C. Plaintiff Cannot Establish a Likelihood of Immediate Irreparable Harm.

First, Plaintiff cannot show any potential irreparable harm because the main injury on which his suit is based—that his November 2024 Part 90 application has not been adjudicated—does not exist. Second, "[i]rreparable harm is inseparably linked to the likelihood of success on the merits because a plaintiff not likely to succeed on the merits is not likely to suffer irreparable harm." *Mahmoud v. McKnight*, 102 F.4th 191, 227–28 (4th Cir. 2024) (Quattlebaum, J., dissenting) (quoting *Centro Tepeyac v. Montgomery Cnty.*, 772 F.3d 184, 190 (4th Cir. 2013)) (cleaned up), *cert. granted*, 145 S. Ct. 1123 (2025). *See also Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 894 F.2d 113, 120 (4th Cir. 1993) ("All four factors do not weigh equally, however; the first two dominate."). Plaintiff cannot establish that he will suffer immediate irreparable harm if the Court denies the injunction. He has no application or other evidence pending with the CWHSP, nor has he indicated that he intends to submit any new examinations to the CWHSP for consideration in the near future. Therefore, this balance clearly weighs in favor of denying a preliminary injunction.

### D. The Balance of Harms and the Public Interest Weigh Against Relief.

The future of staffing decisions and HHS reorganization is being contemplated as this litigation progresses. *See supra* pp. 26–27. And staffing and organizational decisions are squarely in the realm of actions that courts have traditionally found committed to agency discretion. *See supra* pp. 21–23. In other words, the public has a strong interest in permitting the President to take decisive action when it comes to setting his policy priorities for HHS. A preliminary injunction would displace and frustrate the President's decision about how to best address those issues, and the Court should give deference to the Executive Branch in this regard. *See Heckler*, 470 U.S. at 831–32. Streamlining efficiencies—the stated goals underlying the decisions at issue, *see* "HHS

Announces Transformation to Make America Healthy Again," HHS Press Office (Mar. 27, 2025), *available at* https://www.hhs.gov/press-room/hhs-restructuring-doge.html—is manifestly in the public interest. An injunction would stymie this iterative process, unnecessarily injecting the judiciary into agency management. *See Spokeo, Inc.*, 578 U.S. at 347 (Thomas, J., concurring) ("Standing doctrine keeps courts out of political disputes by denying private litigants the right to test the abstract legality of government action." (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974)). Further, as noted above, if this injunction were allowed, it would invite similar emergency litigation any time an agency undertakes a restructuring or similar programmatic change with virtually any potential downstream effects on public services. Encouraging such challenges is not in the public interest. Because the government and the public have much to lose if the Secretary of HHS is not permitted to make discretionary employment decisions about the Department, this factor also weighs against granting an injunction.

### E. The Court Should Limit Relief.

For all the foregoing reasons, it would be inappropriate for the Court to issue relief in any form. However, should the Court conclude otherwise, "an injunction must be narrowly tailored to remedy the harm shown." *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985). Here, Plaintiff's requested orders go far beyond that principle. Not only do they fail to "describe in reasonable detail . . . the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1)(C), they also are not tailored to remedying any particular harm shown.

### F. The Court Should Require Plaintiff to Post Security.

Federal Rule of Civil Procedure 65(c) states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  To the extent that the Court grants relief to Plaintiff, Defendants respectfully request that the Court require Plaintiff to post security in an appropriate amount.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court deny Plaintiff's Motion for Preliminary Injunction, (ECF No. 7), grant Defendants' Motion to Dismiss, (ECF No. 14), and dismiss this civil action.

Respectfully submitted,

LISA G. JOHNSTON
Acting United States Attorney

**s/Fred B. Westfall, Jr.**
WV State Bar No. 3992
Assistant United States Attorney
Attorney for United States
300 Virginia Street East, Room 4000
Charleston, WV  25301
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2025, I electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system which will send notification to the following CM/ECF participants:

Samuel B. Petsonk
PETSONK PLLC
P.O. Box 1045
Beckley, WV 25802
(304) 900-3171 (phone)
(304) 986-4633 (fax)
sam@petsonk.com

Bren J. Pomponio
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier Street
Charleston, WV 25301
304-344-3144
Fax: 304-344-3145
Email: bren@msjlaw.org

J. Michael Becher (W.Va. Bar # 10588)
APPALACHIAN MOUNTAIN ADVOCATES
PO Box 507
Lewisburg, WV 24901
(304) 382-4798
mbecher@appalmad.org

**s/Fred B. Westfall, Jr.**
WV State Bar No. 3992
Assistant United States Attorney
Attorney for United States
300 Virginia Street East, Room 4000
Charleston, WV 25301
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov