IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**HARRY WILEY, individually**
**and on behalf of all others similarly situated,**

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　**Civil Action No. 2:25-cv-227**
　　　　　　　　　　　　　　　　　　　　　　　　**(Honorable Irene C. Berger)**

**ROBERT F. KENNEDY, JR., in his**
**official capacity as Secretary of Health**
**and Human Services, and U.S. DEPARTMENT**
**OF HEALTH AND HUMAN SERVICES**

    Defendants.

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Many of the issues raised by Plaintiff's Motion for Preliminary Injunction are undisputed. First and foremost, Defendants do not dispute they have a mandatory duty to execute the congressionally funded Coal Workers' Health Screening Program ("CWHSP") and its "Part 90" low-dust job transfer program for coal miners diagnosed with Black Lung disease. Nor do Defendants dispute they have at least temporarily closed the Respiratory Health Division ("RHD") of NIOSH that operates those programs. (*See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss & Resp. in Opp. to Mot. for Prelim. Inj. at 26 [ECF Doc. # 16-1] ("Resp. Br.") (conceding that the CWHSP is "paused").) And Defendants do not provide any explanation for how or when they plan to resume the CWHSP without the critical epidemiologists and other personnel employed in the RHD. Moreover, Defendants do not explain where the funding for the Program is or why the pause in the Program is not an unconstitutional impoundment. Accordingly, Plaintiff seeks for this Court

1

to restore the status quo *ante* until such time as Defendants demonstrate they have a concrete plan to fulfil those mandatory statutory duties going forward.

Rather than substantively defend its closure of the RHD – which is indefensible – the Defendants raise several procedural and prudential arguments, all of which – as is more fully set forth below and will be demonstrated at the hearing – are unavailing. Because the Defendants' failures to carry out their mandatory duties present a substantial likelihood of irreparable and irreversible pulmonary harm to coal miners with black lung disease, the Court should **GRANT** the Plaintiff's Motion, restore the status quo *ante* to the RHD, and order the Defendants to submit quarterly reports to the Parties and the Court regarding their plans and activities for fulfilling their mandatory duties under the Mine Act to conduct the CWHSP, including the necessary epidemiology to guide the surveillance program, and to operate the low-dust job transfer program for coal miners.

## II. ARGUMENT

**A.  Mr. Wiley Has Established Article III Standing Because He is Entitled to Submit Medical Information to the RHD to Support His Part 90 Job Transfer Request and to Obtain Ongoing Medical Screening.**

Defendants' primary defense is that NIOSH's most recent evaluation of information submitted by Mr. Wiley to gain access to the Part 90 program has ended his relationship with the office and deprived him of standing. Mr. Wiley was diagnosed with pneumoconiosis by the West Virginia Occupational Pneumoconiosis Board. (Verified Am. Compl. at Ex. 3 [ECF Doc. # 6-3] (Verified Statement of Harry Wiley) ("On or about January 25, 2025, the OP Board issued a determination that I suffer from occupational pneumoconiosis, also known as black lung disease.").) Defendants claim that the CWHSP evaluated Mr. Wiley's chest CT image---an assertion Wiley cannot verify insofar as he never received their reading until after filing this

2

lawsuit---but, more importantly, the Defendants erroneously assert "there are no pending examinations or testing of Plaintiff for the CWHSP to review." (Resp. Br. at 10.) On the contrary, Mr. Wiley can establish that he has Article III standing because he is still entitled to submit the significant aforementioned medical evidence to RHD in support of his Part 90 job transfer application and to ongoing medical screening from RHD as an active coal miner.

        1.     *Mr. Wiley has standing to sue under Article III.*

The Parties agree on the applicable standard for standing under Article III of the U.S. Constitution. (*See* Resp. Br. at 8-9 ("[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) and *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).) Defendants challenge only whether Mr. Wiley has an injury in fact based on a single radiologist's opinion that his 2024 CT scan did not show Black Lung; they do not contest traceability or redressability. (Resp. Br. at 9.)

Despite the one apparently adverse evaluation of the 2024 CT scan, Defendants in their Response do concede that Mr. Wiley is entitled to present additional independent medical evidence demonstrating that he does in fact suffer from pneumoconiosis. (Resp. Br. at 7); (Wiley Verified Statement ¶ 3.) Under the Mine Act, the term "pneumoconiosis" means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. 30 U.S.C. § 902(b). Substantial medical expertise and factual background regarding a miner's exposures and medical history are required in order to make an accurate

3

diagnosis, which often requires months or years of consultation. This is why NIOSH customarily obtains opinions from no fewer than three independent radiologists before rendering a final decision regarding the presence or absence of pneumoconiosis.

The closure of the RHD halted all further submission of evidence to NIOSH. (Plf.'s Mot. for Prelim. Inj. at Ex. A [ECF Doc. # 7-1] (Verified Statement of Anthony Scott Laney) ("Due to a reduction in force being implemented across NIOSH by HHS, the Coal Workers' Health Surveillance Program (CWHSP) is **paused**. We cannot accept new chest radiographs, spirometry, or forms at this time.") (emphasis in original).) Thus, absent the involvement of this Court, Mr. Wiley has lost his ability to submit additional evidence in support of his Part 90 transfer request. This effectively extinguishes his statutory right to obtain a transfer, which constitutes an injury in fact that is concrete, particularized and actual or imminent.

To be sure, Defendants do not dispute that Mr. Wiley's right to present supportive evidence remains open-ended. (Resp. Br. at 7) ("There is no limit to the number of times a miner can submit other evidence for a Part 90 eligibility determination.").) That is, now that Mr. Wiley has notice of Dr. Tallaksen's reading of his chest CT image, Mr. Wiley is fully free to provide supplemental information in support of his Part 90 transfer request, which must be further medically reviewed and evaluated by NIOSH – something that cannot and will not occur unless this Court enjoins the Defendants from pausing the CWHSP.

Additionally, the closure of the RHD prevents Mr. Wiley from additional screenings pursuant to the CWHSP. As an active miner, Mr. Wiley has a right to receive cost-free periodic screenings pursuant to 30 U.S.C. § 843 no less frequently than every five years. The last chest x-ray he received through the CWHSP was in 2018. Now that the O.P. Board has diagnosed him with

Black Lung, Mr. Wiley holds a heightened interest in exercising his right to participate in the x-ray surveillance program in order to track the progress of his disease.

Mr. Wiley did not receive the letter notifying him that the CWHSP did not find evidence of pneumoconiosis. In any event, the finding in December 2024 does not signal the end of Mr. Wiley's application. Mr. Wiley is entitled to present evidence that he indeed suffers from pneumoconiosis as was found already by the West Virginia Occupational Pneumoconiosis Board. (Wiley Verified Statement at ¶ 3.) Rather than stripping Mr. Wiley of his Constitutional standing, the initial finding by CWHSP that he does not have Black Lung demonstrates his ongoing injury because he is unable to present dispositive evidence conflicting with the initial agency determination. Mr. Wiley and the many other coal miners who benefit from the various parts of the CWHSP, and who would have the chance to enter the Part 90 program if the CWHSP was still operating, are currently being injured by Defendants' actions – injuries that are inherently irreparable due to the permanent pulmonary damage caused by progressive black lung disease. (*See* Verified Statement of Matthew Ward (Ex. A).)

2. ***Mr. Wiley has standing to bring his APA claim.***

The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Because Defendants' closure of the RHD has prevented Mr. Wiley from presenting further evidence to support his Part 90 application, he has been adversely affected or aggrieved by the RHD closure and has a sufficient injury to support standing pursuant to the APA.

"The APA has broadened the 'categories of injury that may be alleged in support of article III standing,' but it has not displaced the analytical framework under which the constitutional

determination is made." *Motor Coach Industries, Inc. v. Dole*, 725 F.2d 958, 963 (4th Cir. 1984); *cf. Aiken County v. Bodman*, 509 F. Supp. 2d 548, 553 (D.S.C. 2007) (applying *Motor Coach* to analyze Article III standing for APA claims). In order for a plaintiff to have standing to challenge an agency action under the APA, the plaintiff must: 1) identify some "final agency action" that causes an injury that can be redressed by the courts and 2) establish that the injury he complains of arguably falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 882-83 (1990); *Motor Coach*, 725 F.2d at 963; *Robishaw Eng'g, Inc. v. United States*, 891 F. Supp. 1134, 1147 (E.D. Va. 1995). Wiley and the class he represents are coal miners with advancing lung disease who are the precisely intended beneficiaries of the Mine Act and the Part 90 protections it creates—as shown in his opening brief and further below, HHS' shuttering of the CWHSP is a final action that can be easily undone through an injunction. *See infra* § C.1.c. Wiley has standing to pursue his APA claims.

**B.      Mr. Wiley's Claims are not Barred by Sovereign Immunity.**

Defendants also argue that this case must be dismissed because the United States' sovereign immunity deprives this Court of jurisdiction. (Resp. Br. at 11-14.) To the contrary, the APA specifically waived the government's sovereign immunity for these kinds of claims. Defendants first argue that the Declaratory Judgment Act does not independently grant jurisdiction to federal courts, which is undoubtedly true when no other legal right is invoked. *Schilling v. Rogers*, 363 U.S. 666, 676 (1960). When, however, a party seeks nonmonetary relief, including declaratory relief, the APA itself provides a waiver of sovereign immunity. *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017). Wiley is therefore permitted to seek declaratory and injunctive relief on his APA claims in this court.

Defendants' primary argument, however, is that the claims in this case cannot be brought under the APA and therefore do not fall within that act's waiver of sovereign immunity. That argument is misguided, as will be shown below, because Wiley's claims challenge the precise kind of final agency action for which the APA provides judicial review. *See infra* § C.1.c.

**C.    A Preliminary Injunction Is Warranted to Undo the Closure of the Respiratory Health Division of NIOSH.**

The Parties agree on the appropriate standard for considering a Motion for Preliminary Injunction. (Resp. Br. at 15 (setting forth the elements for granting a preliminary injunction: "(1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) why the injunction is in the public interest.") (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).) Defendants dispute Wiley's likelihood of success, likelihood of irreparable injury, and the public interest, but they have misapplied the relevant legal standards.

> **1.    *Defendants' arbitrary, capricious and unlawful action is properly challenged under the APA; Mr. Wiley is likely to succeed on the merits of his claims.***

The primary argument raised by Defendants against Mr. Wiley's likelihood of success on the merits is that his claims are not cognizable under the APA; however, Mr. Wiley's claims are precisely of the type intended to be vindicated through the APA.

> *a.    The Civil Service Reform Act and the Federal Service Labor Management Relations Statute do not divest this Court of jurisdiction over Plaintiffs' APA claims.*

Defendants argue that, because the Civil Service Reform Act ("CSRA") (which includes, in part, the Federal Service Labor Management Relations Statute ("FSLMRS")) is "a 'comprehensive and exclusive' statutory scheme that 'protects covered federal employees against a broad range of personnel practices, and . . . supplies a variety of causes of action and remedies to employees when their rights under the statute are violated,'" Mr. Wiley is foreclosed from

challenging the Department's effective closure of the CWHSP under the APA. (Resp. Br. at 17-22 (quoting *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013); and *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009)).) Defendants are correct that the agency action at issue in this case is being carried out – in part – through firing federal employees, but that fact alone does not bring the action under the exclusive regime of the CSRA. To start, the agency action did not only involve firing federal employees, it also involved an announcement to participants in the CWHSP that the program was no longer functioning. (*See* Laney Verified Statement at Ex. B; U.S. Centers for Disease Control and Prevention, *Coal Workers' Health Surveillance Program, Notice*, https://www.cdc.gov/niosh/cwhsp/about/index.html.) It is that elimination of functionality that Wiley is challenging, not a personnel decision as such. The CSRA is silent as to how a beneficiary of a Congressionally mandated program can challenge that program's unilateral elimination by the Executive.

The flaw in HHS' logic is best exemplified by its argument that "[i]t would be an odd result indeed if claims that cannot be raised in district court by those most directly affected—the employees themselves—could be raised by plaintiffs whose asserted injuries are entirely derivative." (Resp. Br. at 21-22.) The fired employees are no doubt affected by this agency action, but they are not affected in the same way as the miners being forced to continue working in jobs that are worsening their lung diseases. That worsening lung disease is, in a strict sense, "derivative" of the elimination of the effective part of the CWHSP staff. It is not the kind of thing, however,

that Congress intended to be reviewed under the procedures of the CSRA.[1] Instead, the miners' claim is properly brought under the APA.

Federal district courts only have jurisdiction under the APA when Congress has not intentionally precluded review by statute. *Block v. Community Nutrition Institute*, 467 U.S. 340, 345-46 (1984). The framework for evaluating preclusive Congressional intent was defined by *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). The D.C. Circuit has explained that framework as a two-step analysis by which a court can infer that "Congress intended that a litigant proceed exclusively through a statutory scheme when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within the statutory structure." *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019) (cleaned up).

---

[1] It is also unclear from the government's argument which part of the CSRA they believe controls judicial review of this agency action. One representative reduction in force ("RIF") notice in this case specifies that the RIF is being undertaken according to "Chapter 35 of Title 5 of the United States Code and Title 5 of the Code of Federal Regulations, Part 351." (Laney Verified Statement Ex. A.) Chapter 35 of the U.S. Code empowers the Office of Personnel Management ("OPM") to regulate "the release of competing employees in a reduction in force" while taking into consideration certain specified factors. 35 U.S.C. § 3502. Chapter 35 is silent on the subject of the review or appeal of RIFs, and OPM regulations (promulgated on the basis of § 3502, *see* 52 Fed. Reg. 46,051 (December 4, 1987)) on RIFs discuss review very briefly, stating only that "[a]n employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board." 5 C.F.R. § 351.901. Unlike the complex scheme for review of employment decisions under Chapter 75 of Title 5, *see* 35 U.S.C. § 7513, there is no statutorily mandated procedure for review of RIFs beyond the provision allowing OPM to establish regulations for RIFs generally (in fact, Congress specified that chapter 75, which is referenced throughout the government's argument and forms the basis of the decision in *U.S. v. Fausto*, 484 U.S. 439 (1988), does not apply to § 3502 RIFs, *see* 35 U.S.C. § 7512). OPM has decided that employees subject to an RIF can appeal to the Merit Systems Protection Board ("MSPB"). That one line of OPM regulation does not, however, evince a Congressional intent to limit federal court jurisdiction over a program beneficiary's challenge to the complete elimination of a program via RIF.

Courts frequently hold that the CSRA precludes federal employees from pursuing grievances over employment decisions outside of its statutory scheme. The Supreme Court has detailed the specific review schemes comprehended by the CSRA, including one which allows employees subject to major adverse actions – but not "nonpreference excepted service employees" – a way to appeal to the MSPB and eventually the Federal Circuit Court. *Fausto*, 484 U.S. at 446-48. The *Fausto* court ultimately concluded:

> the comprehensive nature of the CSRA, the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for administrative and judicial review contained in Chapter 75, combine to establish a congressional judgment that those employees should not be able to demand judicial review *for the type of personnel action covered by that chapter*.

484 U.S. at 448 (emphasis added). Federal employee unions, similarly, are bound by the specific review provisions found, for example, in Chapter 71. *See AFGE*, 716 F.3d at 637-38; *Am. Fed'n of Gov't Emps. v. Ezell*, No. 25-10276-GAO, 2025 WL 470459 at *2 (D. Mass. Feb. 12, 2025).

All these cases share one thing in common – they were brought by federal employees or the unions that represent them against their employers. Where the CSRA comprehensively delineates which kinds of employees can challenge which kinds of actions in which kinds of forums, district courts have no independent jurisdiction, even if the CSRA does not provide a route to judicial review of certain kinds of actions. *Fausto*, 484 U.S. at 448-49. The *Fausto* decision relied, however, on the fact that the employee in question was attempting to challenge a grievance of the kind that Chapter 75 specifically made reviewable for some classes of employees, but not others. *Id.*

In this case, however, the action is not the kind for which the CSRA specifically mandates any kind of review procedure. *See supra* n.1. Furthermore, it is not being challenged by a federal employee – Mr. Wiley and the miners protected by the CWHSP are not government employees

10

and are not bound by the courts' injunction that "federal employees may not circumvent the [CSRA] by seeking judicial review outside its procedures." *AFGE*, 929 F.3d at 756 (cleaned up).

Defendants rely on the notion that, when "a comprehensive remedial scheme permits only some plaintiffs to seek review, the scheme implicitly precludes judicial review by other individuals who are not authorized to bring claims." (Resp. Br. at 18.) For this proposition they cite *Block*, in which the Supreme Court held that consumers could not use the APA to challenge market orders setting price minimums for milk because the Agricultural Marketing Agreement Act of 1937 "contemplates a cooperative venture among the Secretary, handlers, and producers the principal purposes of which are to raise the price of agricultural products and to establish an orderly system for marketing them" – the review provisions of the act therefore implicitly and properly excluded consumers from entering into the process through the APA. 467 U.S. at 346-47. Key to the Court's reasoning was that "the preclusion issue turns ultimately on whether Congress intended for that class to be relied upon to challenge agency disregard of the law." *Id.* at 347.

There is nothing in the CSRA that suggests that Congress intended to make federal employees, working through the procedures by which they can challenge changes to their own *personal* employment statuses, the only class of people capable of making sure that federal agencies follow through on their Congressional mandates. In this case, the Department of Health and Human Services ("HHS") made public announcements that the CWHSP was no longer functioning and divested it of its entire functional staff. The only way to make the CWHSP functional again is for HHS to restore the NIOSH employees subject to RIFs. That is the quintessential kind of action that affected members of the public can challenge under the APA.

    b.   *The actions taken by the HHS were not within its discretion.*

11

Defendants attempt to characterize their actions as discretionary and within the broad powers of the agency to reorganize. Strikingly, however, Defendants do not provide any example of how they are currently fulfilling, or plan to fulfill the mandatory statutory duties imposed upon NIOSH and the congressional directive to use funds to carry out the job transfer program established by the Federal Mine Safety and Health Act, Section 203 (codified at 30 U.S.C. § 843).

An agency action "is committed to agency discretion by law" only "where a statute is drawn in such broad terms that in a given case there is no law to apply, and the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 592 (1988) (emphasis added); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *INOVA Alexandria Hosp. v. Shalala,* 244 F.3d 342, 346 (4th Cir. 2001) (holding that the § 701(a)(2) exception applies when "'there is truly no law to apply"). Courts must "read the exception in § 701(a)(2) quite narrowly, restricting it to 'those *rare circumstances* where the relevant statute is drawn so that a court would have *no meaningful standard* against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil,* 508 U.S. 182, 191 (1993)) (emphasis added). Even when Congress intended to create a wide zone within which decisions are committed to an agency's discretion, the agency still must meet "permissible statutory objectives." *Lincoln*, 508 U.S. at 183.

The law to apply in this matter is simply whether the Defendants are fulfilling their statutory and regulatory obligations, and whether they have made a decision which is arbitrary and capricious or otherwise contrary to law. *See* 5 U.S.C. § 706(a)(2) (requiring a court to set aside a decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). As Plaintiff pointed out in his initial brief, HHS has a duty to a coal miner showing signs of "black lung" so that he or she "*shall be afforded the option of transferring from his position to*

*another position in any area of the mine, for such period or periods as may be necessary to prevent further development of such disease. . ."* 30 U.S.C. § 843(a). To effectuate this option the Department must ensure that relevant "films" or x-rays "shall be read and classified . . ." and that the "Secretary shall also submit such results to each miner and advise him of his rights. . ." *Id.* In addition, the Department is responsible for making arrangements to have such imaging conducted, in the locality where the miner resides, and at no cost to the miner him or herself. *Id.* at § 843(c). Based on the declaration of Dr. Scott Laney and as will be further elucidated at hearing, none of these statutory functions are being met. (Laney Verified Statement ¶¶ 14, 17, 19; Ward Verified Statement.) Moreover, the CWHSP website leaves little question as it advises potential submitters "Due to the reduction in force across NIOSH, the NIOSH Coal Workers' Health Surveillance Program (CWHSP) is not providing any new medical screening to miners or accepting any new requests for review of medical information to determine coal miners' rights to transfer to low-dust jobs." (Ex. B.)

More broadly HHS is also congressionally directed to conduct "studies, research, experiments, and demonstrations as may be appropriate . . . to improve working conditions and practices in coal or other mines, and to prevent accidents and occupational diseases originating in the coal or other mining industry." 30 U.S.C. § 951(a). Specifically, the Department is directed to "develop epidemiological information to (A) identify and define positive factors involved in occupational diseases of miners, (B) provide information on the incidence and prevalence of pneumoconiosis and other respiratory ailments of miners, and (C) improve mandatory health standards." *Id.* at § 951(a)(5)-(9). Plaintiff will elicit testimony at hearing from epidemiological scientists who were responsible for implementing these duties, who will testify that the employees responsible for such implementation 1) are centralized in the Morgantown NIOSH office; 2) have

been placed on administrative leave and effectively terminated; and, 3) have specialized knowledge and expertise with no parallel in the federal government and which cannot easily be replaced.

Finally, as explained in Plaintiff's opening brief, the Department cannot legally "impound" funds specifically allocated to an agency or for a specific purpose from Congress. Congress has specifically appropriated $362,800,000.00 *to NIOSH* for the express purpose of carrying out the purposes of the Federal Mine Safety and Health Act, including Section 203 (codified at 30 U.S.C. § 843), which implements the CWHSP and job transfer programs. The Department has no authority to decline the use of funds for that purpose. *See*, *e.g.*, *J. Does 1-26 v. Musk*, No. 25-0462-TDC, 2025 WL 840574 at *25 (D. Md. March 18, 2025) ("it is for the congress in the responsible exercise of its legislative power to make provisions for terminations of a program and until those provisions are made the function of the Executive is to administer the program in accordance with the legislative purpose.") (internal quotation marks omitted) (quoting *Local 2677, Am. Federation of Gov't Employees v. Phillips*, 358 F. Supp. 60, 72 (D.D.C. 1973)). Noticeably absent from Defendants' Response is any explanation of the status of these appropriated funds or any defense of their unconstitutional impoundment.

        c.    *The Defendants' actions constituted "final agency action" because there are legally recognizable consequences.*

Defendants argue that their actions are not a final agency action because they have only taken interim steps in reorganization, have only temporarily paused programs, and may even choose to rehire workers that have been subject to their reductions in force. Such arguments ignore the correct standard of when an agency action becomes final. As explained in Plaintiff's opening brief, "agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations . . . from which legal consequences will flow."

14

*Bennett v. Spear,* 520 U.S. 154, 178 (1997); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). In *National Wildlife Federation*, the Supreme Court stated that "[e]xcept where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of laws only when, and to the extent that, a specific 'final agency action' has an *actual or immediately threatened effect*." *Nat'l Wildlife Fed'n*, 497 U.S. at 894 (emphasis added) (citing *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164–66 (1967)). The examination of whether an action is final is a "pragmatic" one. *Sierra Club v. Environmental Protection Agency,* 955 F.3d 56, 62 (D.C. Cir. 2020) (quoting *U.S. Army Corps of Engineers v. Hawkes, Co.* 578 U.S. 590, 599 (2016)); *see also Robishaw Eng'g, Inc. v. United States*, 891 F. Supp. 1134, 1151 (E.D. Va. 1995).

Factors to consider when determining whether an "agency action" is a "final agency action" include: 1) whether the action is a definitive statement of the agency's position; 2) whether the action has the status of law and requires immediate compliance; 3) whether the action has a direct and immediate impact on the plaintiff's day-to-day affairs; 4) whether the request for declaratory relief is designed to speed enforcement and prevent piecemeal litigation; and 5) whether the questions presented are primarily legal rather than factual. *Robishaw Eng'g*, 891 F. Supp. at 1151 (citing *FTC v. Standard Oil Co*., 449 U.S. 232, 239–240 (1980); *Natural Resources Defense Council, Inc. v. EPA*, 16 F.3d 1395, 1407 (4th Cir. 1993)).

An agency's failure or refusal to act can constitute a "final agency action" subject to judicial review. *See San Juan Citizens' Alliance v. Babbitt*, 228 F. Supp. 2d 1224, 1230 (D. Colo. 2002) (district court exercised jurisdiction to review agency's failure to comply with the National Environmental Policy Act (NEPA)); *Florida Keys Citizens Coalition, Inc. v. West*, 996 F. Supp. 1254, 1257 (S.D. Fla.1998) (district court exercised jurisdiction under APA to review Army Corps

of Engineers alleged failures to maintain records of wetland acreage loss and consult with other agencies before granting permits to discharge materials into U.S. waters).

Here the evidence shows that the actions of the Department and Secretary are final for the purposes of the APA because they directly determine "rights and obligations" from which "legal consequences will flow." Most notably, the Department has informed miners, health care providers, and operators that it will no longer be providing medical screenings or processing medical evidence in support of the job transfer program. (*See* Laney Verified Statement at Ex. B; Ex. B (website notice.); *see also* Ward Verified Statement.) The legal rights of miners are not being afforded by the agency at the present time. There is no other way to characterize this action except as an abdication of the Department and Secretary's duties.

In addition, RIF notices have been sent with specific termination dates. As epidemiologists at the Department will explain during the hearing, no actions have been taken to retract those terminations. In addition, on April 17, 2025, the White House issued a Presidential Memorandum extending a previous hiring freeze until July 15, 2025. (Ex. C.) Under this Memorandum, no vacant positions may be filled and no new positions created. Thus, in addition to the termination of employees in the RHD, there is currently a hiring freeze that would prevent rehiring or the creation of new jobs to fulfill the vacant roles. Despite the Defendants' unsupported argument that a temporary "pause" is unreviewable, several courts have recently held that pauses to programs that provide critical services are reviewable final agency actions. *See e.g. Nat'l. Council of Nonprofits v. Office of Management and Budget*, No. 25 - 239 (LLA), 2025 WL 597959 at *13 (D. D.C. February 25, 2025) (finding an OMB "Pause Memorandum" caused legal consequences to Plaintiffs and others and was a reviewable final agency action); *Woonasquatucket River Watershed Council v. Dep't of Agriculture*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157 at *15-16

(D.R.I. April 15, 2025) (holding that a "breadth of caselaw" supports the conclusion that a pause in programs constitutes final agency action) (citing *Louisiana v. Biden* 622 F. Supp. 3d 267, 291–92 (W.D. La 2022); *Aids Vaccine Advocacy Coalition v. U.S. Dept. of State*, Nos. 25-00400 (AHA), 25-00402 (AHA), 2025 WL 752378 at *10 (D. D.C. March 10, 2025) ("The desire to review programs for efficiency or consistency, and to access information in one place, does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid."); *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 715621 at *8 (D. R.I. March 6, 2025).

In short, the CWHSP "pause" fulfills all five factors indicating final agency action: 1) Defendants have informed associated clinics and the public that the CWHSP is no longer operational and have effectively fired the workers in the CWHSP; 2) CWHSP workers have been directed to stop fulfilling program functions and are being forced to find new employment ahead of the June and July terminations, while at the same time the President has ordered a hiring freeze preventing their replacement; 3) miners who would have benefited from the CWHSP cannot access the program, including by sending medical information to gain access to Part 90 protections—they are instead forced to go to work every day in positions that are actively damaging their lungs; 4) the relief requested here will end the illegal impoundment of appropriated funds, immediately restore congressionally mandated functions, and resolve this issue until such time as Congress might address the program on its own, Constitutionally granted authority; and 5) the claims here can be resolved entirely through legal analysis of the Defendants' congressionally mandated duties.

Defendants have taken final and effective agency actions which have direct legal consequences on beneficiaries of CWHSP. Moreover, there is absolutely no evidence of when or how these functions will be replaced. The Court should decline to engage in the speculation offered

by the Defendants insinuating that their actions are a work in progress and recognize the crucial nature of exercising its review immediately.

> **2. Defendants' arguments against Mr. Wiley's likelihood of irreparable injury and balancing of the equities are misguided.**

Defendants' argument that Mr. Wiley will not suffer irreparable harm from their elimination of the CWHSP is identical to their argument that he does not have standing. As shown above, Mr. Wiley and the other miners cannot and will not be able to access Part 90 protections or the other benefits provided by the CWHSP and are therefore suffering daily harm. (*See* Wiley Verified statement; Ward Verified Statement.) Because diseases like Black Lung get worse with each day of exposure, this harm cannot be undone. *See supra* Part A. Defendants' argument on the public interest and the balance of the equities is based entirely on their opinion that the President enjoys an unfettered right to "streamlin[e] efficiencies." (Resp. Br. at 30-31.) As explained above and in Mr. Wiley's opening brief, the closure of the CWHSP is illegal, will contribute to a growing public health crisis across Appalachian coal country, and will permanently disable miners. The public interest is on Mr. Wiley's side, and he should be granted an injunction.

**D.    The Court Should Waive the Security Requirement for Injunctions or Set Only a Nominal Bond Because the Injunction Would Serve the Public Interest.**

While Rule 65(c) of the *Federal Rules of Civil Procedure* provides for security from the movants for preliminary injunctions, courts have the discretion to waive that bond requirement or set only a nominal bond. *Pashby v. Delia*, 709 F.3d 307, 331-32 (4th Cir. 2013) *abrogated on other grounds, as recognized by Stinnie v. Holcomb*, 37 F.4th 977, 981 (4th Cir. 2022). As other courts in the 4th Circuit have recognized, setting a nominal bond is typical in public interest cases such as this one. *See Maryland v. United States Dept. of Agriculture*, 2025 WL 800216 at *26 (D. Md. March 13, 2025); *see also State of Ala. ex rel. Baxley v. Corps of Engineers of U. S. Army*, 411 F.

Supp. 1261, 1276 (S.D. Ala. 1976) (in which the court was "simply unwilling to close the courthouse door in public interest litigation by imposing a burdensome security requirement on plaintiffs who otherwise have standing to review governmental action"). Furthermore, the plaintiffs in this case seek only the preservation of the status quo, which would not require HHS to incur any financial loss besides continuing to spend the money already budgeted for NIOSH and appropriated to it by Congress – the agency can therefore suffer no significant harm from the granting of an injunction, meaning that a more than nominal bond is unwarranted. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

### E. Mr. Wiley's Requested Relief Is Narrowly Tailored, Easily Fulfilled and Commensurate to the Problem Created by Defendants.

Contrary to Defendants' assertion that the relief requested here is not narrowly tailored to the evident harm of their actions, Mr. Wiley's request is simple: preserve the status quo *ante*. It would be improvident, if not impossible, for this Court to pick and choose which staff within the RHD are expendable or unnecessary to the mandatory functions of the Mine Act programs. Plaintiff simply seeks an Order from this Court enjoining the pause, reinstituting the CWHSP and Part 90 program, specifically by ordering Defendants to reinstate the Division's staffing and capacity necessary to carry out the statutory requirements of the Program and requiring quarterly updates on Defendants' plans to carry out their statutory duties as they pursue reorganization. Such narrowly tailored relief would prevent the permanent loss of staff and functions that Defendants are currently pursuing at breakneck speed – in violation of their mandatory duties.

## II. CONCLUSION

As demonstrated by Verified Statements and further by testimony at the hearing set for May 7, Mr. Wiley has standing, is likely to prevail on his APA claim and is entitled to a preliminary injunction to preserve the status quo *ante* Defendants' unconstitutional closure of the RHD. For

the foregoing reasons, and any others appearing to the Court, Plaintiff humbly prays the Court **GRANT** the Plaintiff's Motion, enjoin the Defendants from pausing and consummating the RHD Closure during the pendency of this case, and order the Defendants to submit quarterly reports to the Parties and the Court regarding their plans for fulfilling their mandatory duties under the Mine Act to conduct the CWHSP, including necessary epidemiology to guide the surveillance program, and to operate the low-dust job transfer program for coal miners.

                                                        **Respectfully Submitted,**
                                                        **HARRY WILEY, individually**
                                                        **and on behalf of all others similarly situated,**
                                                        **By counsel:**

/s/ Samuel B. Petsonk
Samuel B. Petsonk (WVSB #12-418)
PETSONK PLLC
PO Box 1045
Beckley, WV 25802
(304) 900-3171 (phone)
(304) 986-4633 (fax)
sam@petsonk.com

Bren J. Pomponio (WVSB #7774)
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier Street
Charleston, West Virginia 25301
(304) 344-5565
(304) 344-3145 (fax)
bren@msjlaw.org

J. Michael Becher (W. Va. Bar # 10588)
APPALACHIAN MOUNTAIN ADVOCATES
PO Box 507
Lewisburg, WV 24901
(304) 382-4798
mbecher@appalmad.org