## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

HARRY WILEY, *individually and on
behalf of all others similarly situated*,

     Plaintiff,

v.             CIVIL ACTION NO.   2:25-cv-00227

ROBERT F. KENNEDY JR., *in his official
capacity as Secretary of Health and Human
Services*, and U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

     Defendants.

### MEMORANDUM OPINION AND ORDER

The Court has reviewed the Plaintiff's *Amended Complaint* (Document 10), the Plaintiff's *Motion for Preliminary Injunction* (Document 7), the *Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction* (Document 8), the *Defendants' Motion to Dismiss* (Document 14), the *Memorandum of Law in Support of Defendants' Motion to Dismiss and Response in Opposition to Motion for Preliminary Injunction* (Document 22), and the *Plaintiff's Reply to Defendants' Response in Opposition to Motion for Preliminary Injunction* (Document 25), as well as all exhibits.   The Court held a hearing on the motion for a preliminary injunction on May 7, 2025, to receive evidence including witness testimony.   For the reasons stated herein, the Court finds that the motion for a preliminary injunction should be granted.

## FACTS

Black lung, or coal workers' pneumoconiosis,[1] is a debilitating, progressive disease caused by long-term exposure to coal dust and other mineral dusts in coal mines.  There is no cure for black lung.  Early diagnosis, followed by interventions to limit additional dust exposure, can slow or stop the disease from progressing into more debilitating, advanced forms.  Since 1969, Congress has required mine operators and the Secretary of Health and Human Services (HHS) to "mak[e] available to each miner working in a coal mine the opportunity to have a chest roentgenogram," or x-ray, within specified intervals "not to exceed five years."  30 U.S.C. § 843. Testing now includes spirometry and a respiratory assessment.  42 C.F.R. § 37.92.

The Respiratory Health Division (RHD) within the National Institute for Occupational Safety and Health (NIOSH) in Morgantown, West Virginia, is responsible for providing screening and reviewing medical examinations submitted by outside providers to determine whether miners have "evidence of the development of pneumoconiosis."  42 C.F.R. § 37.102(a).  Miners who have evidence of pneumoconiosis may exercise their "Part 90" option to "work in an area of a mine" with dust below specified limits.  30 C.F.R. §90.1.

The Coal Workers Health Surveillance Program (CWHSP) within the RHD manages the agency's role related to Part 90, in addition to conducting research, outreach, and other work related to the occupational health risks posed by work in coal mines.  After NIOSH determines that a miner's medical tests reveal evidence of pneumoconiosis and issues a Part 90 letter detailing the miner's condition and rights, the miner can enforce his or her rights through the Mine Safety

---

1 The various witnesses, exhibits, and briefing refer to coal workers' pneumoconiosis as black lung, occupational pneumoconiosis, or coal workers' pneumoconiosis.  The scientific or medical distinctions between the terms are not relevant to the claims presented, and the Court has used the terms interchangeably for purpose of this motion.

and Health Administration (MSHA) within the Department of Labor. An outside diagnosis without the Part 90 letter from NIOSH does not confer the job transfer rights that protect miners from continued dust exposure. Only NIOSH offers testing and interpretation of x-rays at no cost to miners, and only NIOSH can issue the Part 90 determination. Miners cannot access Part 90 protections without NIOSH.

The named Plaintiff, Harry Wiley, is employed as a mine electrician in Raleigh County, West Virginia. He has worked in coal mines for 38 years. A local clinic diagnosed Mr. Wiley with black lung in November 2024. He was examined by the Occupational Pneumoconiosis Board of the West Virginia Offices of the Insurance Commissioner on November 19, 2024, and in January 2025, the Board determined that he suffered from early-stage occupational pneumoconiosis, or black lung disease.

Mr. Wiley submitted a radiographic image to NIOSH in Morgantown, West Virginia, in November 2024. Although Mr. Wiley testified that he did not receive a response, despite multiple phone calls to NIOSH regarding his application, the Defendants submitted a letter dated December 10, 2024, stating that a CT scan dated 10/12/2023 did not show findings consistent with black lung. (Defs.' Attachment K, Document 15-1) (sealed). The Defendants' exhibits also indicate that Mr. Wiley received screening through the CWHSP in 2018, with results then indicating no evidence of black lung. As five years has passed since his previous NIOSH provided screening, he is eligible for additional testing.

Mr. Wiley testified that, had he received the December 2024 letter from NIOSH, he would have submitted additional evidence to verify his black lung diagnosis and secure his Part 90 letter. He also indicated that he would participate in additional medical screening if the CWHSP were

3

operational to provide such screening. As an active mine employee with diagnosed black lung, his testimony evinced some urgency about accessing his right to transfer pursuant to Part 90 to avoid continuing dust exposure.

A second coal miner testified that he had been diagnosed with a more advanced case of black lung in March 2025 and submitted a Part 90 application to NIOSH in April on the advice of his healthcare provider. The testimony from NIOSH employees indicates that NIOSH had already shut down the relevant operations, and that miner stated that he did not receive a return receipt from the application sent via certified mail. While that miner is currently out on short-term worker's compensation leave for an unrelated injury, he expects to return to work after completion of treatment in the coming weeks, and the Part 90 letter would allow him to return to a low-dust role to avoid further progression of his pneumoconiosis.

Two epidemiologists within the RHD testified, describing their work. Dr. Anthony Scott Laney began working with the CWHSP in 2008. He studies the causes and consequences of coal-related respiratory disease. He led a research team that identified increasing rates of black lung in younger miners, information that is important in developing effective interventions and effective policy responses. His group studies the efficacy of interventions, such as the Part 90 program. He outlined the types of exposure that impact miners and the types of respiratory diseases that develop in miners, including silicosis, chronic obstructive pulmonary disease (COPD), and other diseases as well as black lung. Dr. Laney explained that scientific studies have confirmed the importance of the Part 90 program: reducing dust exposure reduces the progression of the disease. Dr. Laney's work includes quality control for Part 90 and the B-Reader program, described in

more detail below.  He has received a Reduction in Force (RIF) notice and is currently on administrative leave.

Dr. Noemi Hall testified that her work as a research epidemiologist supports the CWHSP. One of her recent projects compares when patients begin reporting symptoms, such as shortness of breath, to when medical testing through x-rays, labs, and spirometry shows evidence of disease. The results indicated that screening could identify disease before miners began experiencing symptoms—information that Dr. Hall testified could be shared with miners to encourage them to get testing early and often.  She explained that early intervention is crucial for miners to limit progression of the disease.  Dr. Hall also received a RIF notice and is on administrative leave.

The testimony from every witness who worked with black lung repeatedly emphasized importance of early intervention for miners.  They explained that miners with later stages of the disease suffer much more severe debilitation.  One witness recalled carrying retired miners up the stairs of the CWHSP mobile unit because their lung function was so limited they could not walk up 2-3 stairs.  Another said they frequently struggled to get a complete patient history because miners with more advanced or complicated cases of black lung had such difficulty breathing that they could barely speak with providers.

In addition to providing screening for miners and issuing Part 90 letters to miners with signs of black lung, NIOSH developed the B-Reader program for physicians, usually radiologists, to gain certification to conduct the specialized reading of a chest x-ray necessary to diagnose black lung.  The B-Reader program tests competency for reading x-rays for black lung through an examination process with recertification every five years.  Without the CWHSP, no new physicians will be certified as B-Readers and existing B-Readers will be unable to recertify.

The former coordinator for the RHD and CWHSP at NIOSH, Anita Wolfe, provided testimony based on her 30-year career at NIOSH.   Ms. Wolfe retired in 2020 and continued involvement as a consultant until recently.   She explained that the core functions of the program included certifying facilities to provide chest screenings for coal miners, training and certifying physicians to read chest x-rays for occupational lung disease through the B-Reader program, conducting public relations and outreach to talk about the programs with miners and mine operators, developing and approving mine plans with each coal operator to ensure miners are screened and tracked for black lung, overseeing the Part 90 program, and operating a mobile unit for testing.   She testified that those core functions are necessary to fulfill the mandates of the Mine Act.

CWHSP processed nearly 5,000 radiographs in fiscal year 2024.   (CWHSP 2024 Fiscal Rep. at 7, Pl.'s Ex. 5, Document 33-7.)   It also reviewed 1,756 spirometry test results, approved 226 mine plans, approved 16 new digital radiograph units, and administered 75 B-Reader tests. (*Id*. at 2, 7-9.)   NIOSH researchers published several articles and gave several presentations on various topics related to coal workers' pneumoconiosis.   Ms. Wolfe's testimony highlighted the ways in which each function of the CWHSP supported the other mandatory functions: researchers used information collected from the field to identify areas of need, and the resulting research provided science based information and data that could be used during outreach to miners and operators and also to develop effective interventions.

The CWHSP mobile unit is a truck equipped for screening miners with x-rays and spirometry.   NIOSH personnel bring the mobile unit to remote and underserved locations to reach miners who lack an accessible clinic certified to screen for black lung.   NIOSH also brings the

mobile unit to events that attract attendance from significant numbers of active and retired coal miners. For example, NIOSH employees completed 105 screenings at the 2024 Mine Rescue Contest. (CWHSP 2024 Fiscal Rep. at 4, Pl.'s Ex. 5, Document 33-7.) Ms. Wolfe testified that NIOSH began using the mobile unit in 2003 because of the increase in black lung and the increase in rapidly progressing disease. The mobile unit allowed CWHSP personnel to go to areas where they identified rapid progression of the disease to ensure miners received screening. As researchers identified evidence of increased disease prevalence among surface miners, CWHSP brought the mobile unit to surface mine sites to offer screening as well.

Both Ms. Wolfe and Dr. Laney indicated that all of the NIOSH employees who performed duties related to the CWHSP were necessary to maintain the essential functions of the program, and the Defendants did not present contrary evidence. Dr. Laney and Dr. Hall testified that there is no other agency in HHS or anywhere in the federal government that does similar work. Other governmental programs that address occupational pneumoconiosis among miners, such as the Black Lung Program within the Department of Labor's Officer of Workers' Compensation Programs, rely on the work done by the CWHSP at NIOSH. Dr. Laney also emphasized the level of specialization in his role and that of others in the CWHSP. He has mentored students and post-doctoral candidates who worked at NIOSH, and testified that it took about two years of work in the field to develop adequate familiarity with pneumoconiosis—knowledge that cannot be gained in the classroom or through unrelated work experience. Dr. Laney noted the small group of people involved in black lung research, both within and outside government, describing an annual conference of black lung specialists that included researchers, doctors, lawyers, advocates, benefit advisors, and others, that could not fill a conference room.

7

Dr. Laney, Dr. Hall, and most employees of the RHD at NIOSH received RIF notices on or about April 1, 2025, with a termination date of June 2, 2025. The remaining employees received RIF notices on May 2, with a termination date of about July 2. Nearly all employees have been placed on administrative leave. They were briefly called back to the office on May 5, but then returned to administrative leave, and have been unable to perform their job duties. Dr. Laney's RIF notice states: "In accordance with President Donald Trump's Executive Order 14210, dated February 11, 2025, and the Department of Health and Human Services' (HHS) broader reorganization strategy to improve its efficiency and effectiveness to make America healthier, HHS is executing a Reduction in Force." (Laney 3/31/25 RIF, Document 33-3 at 2.) It states that "this RIF is necessary to reshape the workforce of HHS." (*Id.*) The RIF notice closes with a paragraph that includes the following language: "your duties have been identified as either unnecessary or virtually identical to duties being performed elsewhere in the agency." (*Id.* at 6.) Dr. Laney and Dr. Hall testified that no work is currently being performed. There has been no effort to preserve projects. They have received no communication regarding any plan to transition their work to another agency or new employees, and there is no training program for others to perform the highly specialized work done within the RHD.

Dr. Laney and Dr. Hall stated that they were aware of press releases broadly announcing an intent to restructure HHS. The Defendants introduced those press releases. The press releases indicate that HHS will be downsized from 82,000 to 62,000 full time employees, that 28 divisions will be consolidated into 15 new divisions, "including a new Administration for a Healthy America, or AHA," and regional offices "will be reduced from 10 to 5." (3/27/25 HHS Press Release at 1, Document 33-1.) The press release indicates that NIOSH, among several other

8

agencies, will be centralized into the new "AHA," which will "focus on areas including Primary Care, Maternal and Child Health, Mental Health, Environmental Health, HIV/AIDS, and Workforce Development." (*Id.* at 3.) A related fact sheet contains similar information. Neither document mentions the RHD, the CWHSP, black lung, Part 90, or the Mine Act. Laura Reynolds, the team lead for the CWHSP, testified that she was unaware of any plan to transition the services of the CWHSP.

Debbie Reynolds, a benefits coordinator who directs a black lung program at Bluestone Health Center in Princeton, West Virginia, testified that her program received a letter in early April stating that NIOSH had closed the Part 90 program to applications. An undated memo included with Plaintiff's Exhibit 2, addressed to "Approved NIOSH CWHSP facilities," states that "the CWHSP is **paused**. We cannot accept new chest radiographs, spirometry, or forms at this time. We will be suspending SAMS and Powershare accounts next week to ensure that NIOSH does not receive radiographs or spirometry tests that we may be unable to process…We have no further information about the future of the CWHSP at this time." (Document 33-3 at 7.) Ms. Reynolds testified that she knew of multiple miners who had submitted tests from her clinic to NIOSH, hoping to exercise their Part 90 job transfer option, but had not received any response when the program shut down. She had other miners with x-rays ready to submit. Those miners, like the miners who testified, will continue working in dusty conditions, despite having reason to believe they may have black lung, because the CWHSP is unavailable.

## STATUTORY FRAMEWORK

Congress determined that "there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines

9

in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines." 30 U.S.C. §801(c).   It passed the Coal Mine Health and Safety Act of 1969, followed by the Federal Mine Safety and Health Act of 1977 (Mine Act) to mandate protections for miners.   30 U.S.C. § 841 provides that "it is the purpose of this subchapter to provide, to the greatest extent possible, that the working conditions in each underground coal mine are sufficiently free of respirable dust concentrations in the mine atmosphere to permit each miner the opportunity to work underground during the period of his entire adult working life without incurring any disability from pneumoconiosis or any other occupation-related disease during or at the end of such period."   30 U.S.C. § 841(b).

In general, mine regulations are promulgated and enforced through the Mine Safety and Health Administration of the Department of Labor.   However, as part of the program to effectuate the purposes described in the Mine Act, Congress requires HHS to work with mine operators to make available "to each miner working in a coal mine the opportunity to have a chest roentgenogram" at intervals not to exceed five years.   30 U.S.C. § 843(a).   HHS is further required to prescribe uniform specifications for giving, reading, and classifying the tests, and to determine any need to supplement screening with additional tests.   *Id.*   The Mine Act requires that such examinations must be provided to miners at no cost to the miner.   30 U.S.C. § 843(c). When the examinations show evidence of pneumoconiosis, the miner "shall be afforded the option of transferring from his position to another position in any area of the mine…where the concentration of respirable dust" is below prescribed levels, without any reduction in pay.   30 U.S.C. § 843(b)(2)-(3).   The Mine Act also requires HHS to pay the costs of autopsies performed

10

on active miners who die in coal mines and on active and inactive miners who die elsewhere, with the consent of their next of kin.   30 U.S.C. § 843.

NIOSH was established by the Occupational Safety and Health Act of 1970.   29 U.S.C. §671.   NIOSH is required to permanently establish "an Office of Mine Safety and Health" for the purpose of "enhanc[ing] the development of new mine safety technology and technological applications and to expedite the commercial availability and implementation of such technology in mining environments."   29 U.S.C. § 671(h)(1)-(2).   "[T]he Office of Mine Safety and Health shall be responsible for research, development, and testing of new technologies and equipment designed to enhance mine safety and health."   29 U.S.C. §671(h)(3).   The Mine Act incorporates reference to NIOSH, including providing for NIOSH and HHS to submit the results of "research, demonstrations, and experiments," advising the Secretary of Labor of the need for promulgation of new rules to effectuate the objectives of the Mine Act.   30 U.S.C. §811(a)(1).

NIOSH is required to approve mine plans, submitted by operators to provide examinations of miners for black lung during a 6-month period, beginning no sooner than 3.5 years and ending no later than 4.5 years after the ending date of the previous examination period.   42 C.F.R. 37.3(a). Mandatory testing must be provided to new miners within 30 days after commencement of employment, three years after the initial examination, and two years thereafter if the second set showed evidence of pneumoconiosis.   42 C.F.R. § 37.3(b).   Spirometry testing must be made available on a similar timeline.   42 C.F.R. § 37.92.   The medical facilities for such exams must be approved by NIOSH, in accordance with standards established by NIOSH.   42 C.F.R. §§ 37.1, 37.40.   NIOSH is responsible for giving the exam by which physicians may be certified as B Readers with "[p]proficiency in evaluating chest radiographs for radiographic quality and in the

11

use of the ILO Classification for interpreting chest radiographs for pneumoconiosis."   42 C.F.R. §37.52.

30 C.F.R. Part 90 "establishes the option of miners who are employed at coal mines and who have evidence of the development of pneumoconiosis to work in an area of the mine" with dust below specified levels.   30 C.F.R. § 90.1; *see also* 42 C.F.R. § 37.102.   NIOSH makes its determination that a miner has evidence of the development of pneumoconiosis based on chest radiographs and any other medical examinations provided to NIOSH for review.   42 C.F.R. § 37.102.   "NIOSH will provide radiographic classification, evaluation of spirometry test results, and reporting of the results of examinations made at the miner's expense in the same manner as if they were submitted under an operator's plan."   42 C.F.R. § 37.103.   Miners eligible for the Part 90 job transfer option provide the Part 90 determination from NIOSH to MSHA, and MSHA is responsible for enforcing the transfer right and enforcing regulations that require the operator to maintain the concentration of respirable dust to which Part 90 miners are exposed below the applicable specified levels.   30 C.F.R. §§ 90.100-90.102.

Congress appropriated $362,800,000 to NIOSH for carrying out its responsibilities pursuant to the Mine Act, the Mine Improvement and New Emergency Response (MINER) Act, and other statutes.   Further Consolidated Appropriations Act, 2024, PL 118-47, 138 Stat 460, 654 (March 23, 2024) (maintained through continuing appropriations).   The 2024 fiscal year budget specifically for the CWHSP was $466,000, according to the testimony of Ms. Wolfe.   (Hearing Tr. at 105:10.)

## STANDARD OF REVIEW

Rule 65(b)(1) of the Federal Rules of Civil Procedure provides that a temporary restraining order may be issued without notice

> only if (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).   A preliminary injunction may be issued "only on notice to the adverse party."   Fed. R. Civ. P. 65(a)(1).   The Defendants have appeared and responded in this matter.

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."   *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (internal punctuation and citations omitted).   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   Plaintiffs must satisfy all four requirements.   *JAK Prods., Inc. v. Bayer*, 616 F. App'x 94, 95 (4th Cir. 2015) (unpublished, per curiam opinion); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated,* 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010), and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010).   The standard requires the plaintiff "to make a clear showing of likelihood of success on the merits."   *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292 (4th Cir. 2011) (quotation marks omitted).   It does not require plaintiffs to establish a certainty of success,

13

however.  *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020). The final two factors, "assessing the harm to the opposing party and weighing the public interest…merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## STANDING

The Supreme Court has established three elements necessary for constitutional standing: (1) "the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) "there must be a causal connection between the injury and the conduct complained of;" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks, punctuation, and citations omitted).  Plaintiffs must support each element "with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* at 561.  Where the plaintiff is "an object of the action (or foregone action) at issue…there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  *Id.* at 561–62.  Plaintiffs seeking declaratory and injunctive relief "must establish an ongoing or future injury in fact."  *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *8 (D. Md. Feb. 21, 2025), *opinion clarified*, No. 25-CV-0333-ABA, 2025 WL 750690 (D. Md. Mar. 10, 2025) (quoting *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018)).

In addition to Article III standing, federal court jurisdiction is subject to prudential limitations.  *Bennett v. Spear*, 520 U.S. 154, 162 (1997).  The "zone of interests" test for

prudential standing asks "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970). "[T]he Administrative Procedure Act grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'" *Id.* (quoting 5 U.S.C. § 702 (1964 ed., Supp. IV). The Supreme Court has adopted a "lenient approach" in the context of the Administrative Procedures Act (APA) as "an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

The Defendants argue that the Plaintiff lacks standing because he has suffered no injury. They contend that NIOSH reviewed his November 2024 submission of a 2023 CT scan in December 2024 and sent him a letter indicating the reviewer found no evidence of black lung. Thus, the Defendants contend that "nothing remains for HHS to act upon with regard to Plaintiff and the CWHSP," and the Plaintiff is "not eligible for the Part 90 option." (Defs.' Resp. at 8, Document 22.) Because Mr. Wiley has nothing currently pending with NIOSH, the Defendants contend that he has no concrete injury, and this case should be dismissed for lack of standing.

The Plaintiff notes that the Defendants' response brief outlines the application regulations and how the CWHSP handles medical submissions and makes clear that miners may submit additional medical examinations for review if NIOSH finds no evidence of pneumoconiosis upon submission. They note the Defendants' own statement that "there is no limit to the number of times a miner can submit other evidence for a Part 90 determination." (Defs.' Resp. at 6-7.) Mr. Wiley testified that he did not receive the December 2024 letter indicating that the reviewer found

no evidence of black lung in the scan, and now that he is aware of it, he would submit supplemental medical information if the CWHSP were operational. He argues that the closure of the RHD prevents him from accessing free screenings from the CWHSP. He emphasizes that "the finding in December 2024 does not signal the end of Mr. Wiley's application," but rather "demonstrates his ongoing injury because he is unable to present dispositive evidence conflicting with the initial agency determination." (Pl.'s Reply at 5) (Document 25.) The Plaintiff further contends that he, and the class of miners he represents, are the intended beneficiaries of the Mine Act and the Part 90 regulations, and his claims fall within the zone of interests intended to be protected by the Mine Act and related regulations.

The Court finds that Mr. Wiley is likely to establish that he has standing to pursue his claims. As an active coal miner with diagnosed black lung, he is within the group intended to be protected by the Mine Act and Part 90, and he is among those served by the CWHSP at NIOSH. He is also among those harmed by its closure. He credibly testified that, having learned that his November 2024 medical submission was not sufficient, he would like to submit additional medical documentation from other providers—documentation that presumably resulted in the West Virginia Occupational Pneumoconiosis Board's finding that he suffers from pneumoconiosis. He also testified that he would seek additional screening tests from NIOSH if they were being offered. In short, Mr. Wiley has been diagnosed with black lung, and without the CWHSP, he has no way to access the protections of Part 90 to limit the dust exposure that threatens his health and, ultimately, his life.

Whatever led to Mr. Wiley's failure to receive the December 2024 letter, the Defendants are simply incorrect to suggest that that letter closes the matter for Mr. Wiley. Mr. Wiley has the

right to continue submitting medical documentation for review by NIOSH.   The fact that he has been diagnosed with black lung elsewhere suggests that it is likely that submission of that documentation and/or participation in additional screening would result in a finding that he has evidence of black lung and is eligible for the Part 90 option.   Because the CWHSP is closed and its staff placed on leave pending their termination dates, he cannot access those services.   Lacking a Part 90 letter, he continues to be exposed to coal dust at work.   As the testimony before the Court made clear, that dust exposure will cause his disease to progress until it becomes debilitating. Does the Secretary of the Department of Health and Human Services genuinely believe that a miner diagnosed with black lung is not being injured when the program designed to confirm his condition and provide him with workplace protections to prevent its progression is rendered inaccessible?   This Court does not share such a belief.   Mr. Wiley has presented evidence of an actual, concrete, particularized, imminent injury, causally connected to the Defendants' actions in indefinitely "pausing" the CWHSP, and that injury would likely be redressed by the relief sought.

## SOVEREIGN IMMUNITY

The Defendants next assert that the Plaintiff's claims are barred by sovereign immunity. They contend that sovereign immunity bars Count One, wherein the Plaintiff seeks declaratory judgment, because the Declaratory Judgment Act does not waive sovereign immunity or provide a basis for federal jurisdiction.   They further argue that, although courts have found that sovereign immunity does not shield federal officers sued in their individual capacities from Constitutional due process claims, it does shield the United States and its officials sued in their official capacities, and Count Three must therefore be dismissed.   The Defendants concede that the APA contains a

waiver of sovereign immunity, but contend that exceptions to the waiver apply in this case because there is no final, discrete agency action.

The Plaintiff relies on the APA's waiver of sovereign immunity, which he contends extends to permit the related declaratory judgment claim contained in Count One. He argues that this case presents a challenge to final agency action subject to suit under the APA.

As a general matter, "a plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his statutory or constitutional authority." *Strickland v. United States*, 32 F.4th 311, 363–64 (4th Cir. 2022); *see also PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 685124, at *9-*11 (D. Md. Mar. 4, 2025). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). As both parties recognize, the APA contains an express waiver of sovereign immunity. That waiver applies only to final agency actions, and "[b]ecause sovereign immunity is jurisdictional in nature, finality under the APA is a jurisdictional requirement." *Jake's Fireworks Inc. v. United States Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (internal quotation marks and citation omitted). As discussed below, the Court finds that the Plaintiff's APA claims are likely to succeed on the merits. Therefore, the Defendants' sovereign immunity defense fails.

## APA

The APA provides that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. Courts are directed to:

> hold unlawful and set aside agency action, findings, and conclusions
> found to be: (a) arbitrary, capricious, an abuse of discretion, or

18

otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (d) without observance of procedure required by law; (e) unsupported by substantial evidence…or (f) unwarranted by the facts to the extent that that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2)(A-F).   "An agency action must satisfy two conditions in order to be deemed 'final' under the APA: 'First, the action must mark the *consummation* of the agency's decision making process — it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'"   *Jake's Fireworks Inc. v. United States Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (citing *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016)).   The "mere possibility that an agency might reconsider its action does not suffice to make an otherwise final agency action nonfinal*."   Sierra Club v. W. Virginia Dep't of Env't Prot.*, 64 F.4th 487, 499–500 (4th Cir. 2023) (quoting *Sackett v. EPA*, 566 U.S. 120, 127 (2012)).

"[F]inal agency action does not encompass an agency's day-to-day management."   *Clear Sky Car Wash LLC v. City of Chesapeake, Va.*, 743 F.3d 438, 445 (4th Cir. 2014) (internal punctuation and quotation marks omitted).   "Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific final agency action has an actual or immediately threatened effect."   *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) (internal quotation marks omitted).

19

In addition to arguments, addressed below, that the Plaintiff's claims are, at their essence, challenges to employment decisions that must be raised by the employees in other forums rather than under the APA, the Defendants contend that HHS has inherent discretion to reorganize. They argue that the Plaintiff "speculates that the CWHSP is essentially shuttered, but that is nothing more than guesswork," and the Court cannot properly "second-guess the Secretary's judgment about what staffing levels or office structures" are appropriate.  (Defs. Resp. at 23.) The Defendants further assert that the Plaintiff's claim does not challenge a discrete final agency action.  Citing news reports and based on the press releases introduced during the preliminary injunction hearing, they argue that "decisions regarding staffing at the Morgantown NIOSH facility are still in flux" and the asserted reorganization is in process.  (*Id.* at 26.)  They contend that "HHS has never indicated that despite the RIF sent to employees in Morgantown, it does not intend to carry out its statutory duties under the Mine Act by, for instance, transferring duties under the CWHSP to other offices."  (*Id.* at 27.)

The Plaintiff contends that by sending RIF notices and placing key employees on administrative leave, HHS ceased to fulfill its statutory duties.  He argues that "HHS has offered no explanation for how it will continue its mission despite laying off most of the staff at the Respiratory Health Division" or how it will replace specialized employees.  (Pl.'s Reply at 10.) He points to the precedent establishing that the possibility that an agency could reverse the challenged action does not defeat finality.  He contends that the Defendants' actions are arbitrary and capricious because no consideration was given to the programs at issue.  He also contends that the effective elimination of the RHD is contrary to law because it prevents compliance with the Mine Act and because it constitutes an illegal impoundment of funds appropriated by Congress.

The Plaintiff presented overwhelming evidence that the CWHSP has ceased operations. Employees necessary to its operation received RIF notices and are on administrative leave pending their termination dates. Approved community facilities received notice that the CWHSP is paused and not accepting x-rays or spirometry. Mr. Wiley's calls to check the status of his submission went unanswered, and another miner did not receive the return receipt for his submission, sent via certified mail.

Because the CWHSP does such specialized work, the employee terminations carry a great deal of weight in establishing that there has been a final decision to shutter the program. The uncontroverted testimony of multiple highly qualified NIOSH employees indicated that there is no one else, within HHS or any other agency, that does similar work. HHS cannot simply add the CWHSP duties to epidemiologists with other specialties. Dr. Laney testified that it takes approximately two years for an epidemiologist to develop, under the mentorship of existing experienced staff, an expertise in occupational pneumoconiosis. NIOSH developed a program to certify B-Readers. That, too, is specialized work that cannot readily be transferred. The employees testified that there has been no effort to transition their work to others, and they have not been asked to train replacements. The Defendants offered no contrary testimony or evidence. The Defendants' evidence consisted solely of press releases regarding a planned reorganization of HHS that contained no mention of the programs at issue. Thus, the only evidence before the Court is that the CWHSP and the RHD have been shut down. Shutting down programs without conducting rulemaking or otherwise engaging in a process that results in an official written statement announcing the shutdown is no less final. No evidence in the record suggests that the

Defendants have any plan to provide the services that have been terminated.[2]   Therefore, the Court finds that the challenged actions are not merely tentative or interlocutory.   Legal consequences for Mr. Wiley and other miners in his position flow from the closure of the CWHSP: they are unable to receive screenings or have medical tests read to obtain the Part 90 transfer option as required by the Mine Act.

The Court also finds that the Defendants' actions are arbitrary and capricious and contrary to the law.   The Mine Act and associated regulations require HHS to provide medical examinations to screen for black lung, to evaluate chest radiographs and spirometry tests, to issue Part 90 findings to miners with signs of black lung, to maintain a mobile health unit that travels to mines and mining communities, to maintain the B-Reader program, and to provide chest autopsies to examine for black lung in deceased miners.   With the termination of employees and the cessation of the CWHSP, HHS and NIOSH are no longer fulfilling those obligations.   The Defendants' sole argument on the merits is that the allegation that the CWHSP has been terminated is "speculative" because HHS has issued public statements about a potential reorganization.   This argument invites the Court to speculate that perhaps HHS will someday reinstitute some version of the services offered by the CWHSP.   There is no dispute that those services are not currently being offered, and there is no testimony or plan offered explaining how they will resume.   The only reasoning for their actions put forth by the Defendants is an effort to streamline efficiencies. (Defs.' Resp. at 30.)   The Defendants do not indicate how many extra months of dust inhalation, in their considered judgment, is acceptable for a miner with black lung while the program Congress established to eliminate that risk is "paused."   The Defendants presented no evidence of any

---

2 If the Defendants indeed intend to provide the services at issue, the preliminary injunction will require little more than they intended to do in any event.

reasoned basis for their actions.   Mr. Wiley has established a strong likelihood of success on the merits of his APA claim.

## EMPLOYMENT CLAIMS

The Defendants contend that the Plaintiff's claims, at their core, challenge personnel decisions.   They argue that the Civil Service Reform Act and the Federal Service Labor-Management Relations Statute provide the sole means of challenging personnel decisions and preclude judicial review in other forums or by other parties.   In their view, "Congress limited review of federal employment actions to actions by affected employees themselves, in a different forum."  (Defs.' Resp. at 20-21.)   They note recent decisions addressing challenges to other aspects of the Trump Administration's large scale terminations of civil servants and elimination of federal agencies and programs that have found that certain claims are likely required to proceed through the processes established by the Civil Service Reform Act.

The Plaintiff argues that his claims are not employment claims.   While rehiring employees is a necessary component of re-instituting the CWHSP, he argues that he challenges the "elimination of functionality…not a personnel decision as such."  (Pl.'s Reply at 8.)   He notes that the Civil Service Reform Act provides no avenue for "a beneficiary of a Congressionally mandated program [to] challenge that program's unilateral elimination by the Executive."  (*Id.*) He argues that "nothing in the CSRA…suggests that Congress intended to make federal employees, working through the procedures by which they can challenge changes to their own *personal* employment statuses, the only class of people capable of making sure that federal agencies follow through on their Congressional mandates."  (*Id.* at 11.)   The Plaintiff further

argues that the recent cases cited by the Defendants involved actions brought by employees or their unions, not by program beneficiaries.

The Supreme Court explained that "[u]nder the Civil Service Reform Act…certain federal employees may obtain administrative and judicial review of specified adverse employment actions." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012). The Court held that the CSRA "provides the exclusive avenue to judicial review when a qualifying employee challenges an adverse employment action by arguing that a federal statute is unconstitutional." *Id.* The Fourth Circuit has likewise held that "the CSRA constitutes the exclusive remedy for claims arising out of federal employment." *Hall v. Clinton*, 235 F.3d 202, 203 (4th Cir. 2000).

A split panel of the Fourth Circuit recently stayed a preliminary injunction in which the United States District Court for the District of Maryland enjoined the termination of probationary employees. *Maryland v. United States Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025). The court characterized the claims, brought by nineteen states and the District of Columbia, as allegations "that the Government violated federal law when it terminated thousands of probationary federal employees without following the procedures required for a reduction in force, including advance notice to the affected States." *Id.* The court concluded that the federal agency defendants were likely to succeed on their claim that the district court lacked jurisdiction because the CSRA provides the exclusive remedy for challenges to employment actions. *Id.* The District Court for the Central District of California issued a temporary restraining order preventing the Trump Administration from carrying out its agency restructuring plans, RIFs, terminations, and cuts to programs and staff on May 9, 2025. *American Federation Of Government Employees, AFL-CIO v. Trump*, 3:25-cv-03698 (N.D. Cal.) (May 9, 2025 TRO)

(Document 85). That opinion contains a thorough review of the cases addressing the proper forum for claims related to the mass terminations and closures of agencies and programs, including multiple cases addressing the argument presented herein that any claim even tangentially involving personnel actions cannot be litigated in federal district courts, which the Court finds to be well-reasoned and instructive. *Id.* at 18-24.

As the Court advised the parties at the outset of the hearing, the Court is not persuaded by the Defendants' argument that employment decisions are central to the claims in this case. Mr. Wiley is not an employee, and he cannot present his claims under the CSRA. His injury does not arise from any employment relationship. He is among the intended beneficiaries of a Congressionally established program that the Defendants terminated, and he challenges the cancellation of that program. Unlike *Maryland v. United States Dep't of Agriculture*, the central claim in this case is about the services offered to the public, not the direct impact of the employment terminations on employees. No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025).

The Defendants seek to frame the elimination of the RHD and the CWHSP as "personnel decisions" because, in eliminating those programs, it sent RIF notices to everyone or nearly everyone employed within them. But the employees have not brought suit here, and the Plaintiff's claims relate only to his inability to access statutorily mandated programs. The injuries at issue are injuries to coal miners dependent on the CWHSP, not injuries arising from the employment terminations, in contrast to the recent cases cited by the Defendants involving other challenges to the Trump Administration's terminations of large numbers of civil servants with little process. It is patently absurd to suggest that an illegal agency action that includes termination of employees

is unreviewable.   That federal law provides a different procedural avenue for relief for employees aggrieved by the unlawful closure of these programs is irrelevant to the relief available to other stakeholders.   Firing people does not insulate arbitrary and capricious agency action from review. The Court finds that the Plaintiff is likely to succeed in establishing that this Court has jurisdiction over his APA and due process claims.

## PRELIMINARY INJUNCTION FACTORS

As explained above, the Court finds that the Plaintiff has made a clear showing that he is likely to succeed on the merits of his claims.   The Court previously addressed the harm Mr. Wiley will suffer in the absence of relief to some extent in addressing his injury for standing purposes. He is unable to access additional testing or to submit outside tests for review by NIOSH, and he is unable to seek the right to transfer to a low-dust job.   Absent preliminary relief, he will be exposed to coal dust for 40+ hours every week during his employment as a mine electrician.   The damage to his lungs cannot be reversed.   The Defendants' actions force Mr. Wiley, and miners like him, into choosing between their health and livelihood, despite Congress's efforts to spare them that choice by establishing the job transfer program.   In enacting the relevant provisions of the Mine Act, Congress recognized that ongoing exposure to dust in miners with black lung causes the disease to progress.   Dr. Laney and Dr. Hall testified that they are seeing more miners with black lung, and more cases that progress quickly.   They also testified that their work, and the work of the CWHSP as a whole, saves lives.   The necessary inverse of that testimony is that cancelling the CWHSP will cost lives.   Remaining in a dusty job may reduce the years in which Mr. Wiley can walk and breathe unassisted, in addition to hastening his death.   It is difficult to imagine a clearer case of irreparable harm.

26

Importantly, while this case centers on the impact closure of the CWHSP has on the Plaintiff and other miners, the testimony at the preliminary injunction hearing highlighted the work of NIOSH employees. The employees and former employee who testified were deeply knowledgeable and evinced a deep commitment to the miners they serve. Ms. Wolfe, who retired in 2020 but continued to work as a consultant for NIOSH until recently and has served as something of a self-appointed spokesperson for the CWHSP and the RHD since the shut-down of those programs, testified that she viewed her decades-long career as a tribute to honor her late father, a miner who died of black lung. Dr. Laney became emotional when he explained that he would soon have to find other work, and, given his specialization and likely role in another lab, he would be unlikely to be in a position to return to government service if, a few months from now, the RHD returned to operation. Each of the NIOSH employees testified that their work saves miners' lives, and they were visibly distraught when explaining that miners' diseases would progress unchecked without these programs. The federal government, the Defendants, and most importantly, the miners served by the CWHSP, within the RHD at NIOSH, are fortunate to have the professional skills of these highly qualified public servants. Losing the services of these experienced and dedicated employees is an aspect of the irreparable harm to the miners and the public that cannot and should not be ignored.

This case involves governmental Defendants, and so the balance of equities and the public interest tests merge. The Court finds a strong public interest in maintaining miners' access to the CWHSP and Part 90. Other miners are impacted by the same harms as Mr. Wiley. Thousands of miners will go without screening for black lung, and those with black lung will be deprived of access to the Part 90 transfer option. Halting research that helps ensure effective, targeted, and

efficient preventative measures harms the public both by increasing the prevalence of black lung and by increasing the costs of preventative measures and of treatment and benefits.

The Defendants argue that "the public has a strong interest in permitting the President to take decisive action when it comes to setting his policy priorities for HHS." (Defs.' Resp. at 30.) They also express concern that an injunction in this case "would invite similar emergency litigation any time an agency undertakes a restructuring or similar programmatic change with virtually any potential downstream effects on public services." (*Id.* at 31.)[3]  However, concerns about separation of powers and proper use of federal funds cut against the Defendants in this case. Congress passed the Mine Act, established NIOSH, and appropriated funds for the duties fulfilled by the CWHSP, and the Defendants lack the authority to unilaterally cancel the CWHSP. There is "no public interest in the perpetuation of unlawful agency action." *Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *17 (D.R.I. May 6, 2025) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)) (granting a preliminary injunction to prohibit attempts to dismantle the Institute of Museum and Library Services, the Minority Business Development Agency, and the Federal Mediation and Conciliation Service). As the District Court for the Northern District of California recently found, "the President may broadly restructure federal agencies only when authorized by Congress." *American Federation of Government Employees, AFL-CIO v. Trump*, 3:25-cv-03698, (N.D. Cal.) (May 9, 2025 TRO) (Document 85 at 28) (further explaining, at 39, that the temporary restraining order "does not prevent the President

---

3 The ship has sailed regarding proliferation of emergency litigation in cases of this nature. *See, e.g.*, *Litigation Tracker: Legal Challenges to Trump Administration Actions*, Just Security, https://www.justsecurity.org/107087/tracker-litigation-legal-challenges-trump-administration/ (visited May 12, 2025 at 11:37 a.m.). Another option for reducing emergency litigation would be compliance with the Administrative Procedure Act and other laws and legal principles that constrain executive branch authority.

from exercising his Article II powers, it prevents him from exercising Congress' Article I powers").[4]  To the extent this Order constrains any lawful authority of the Defendants, the Court finds that the balance of equities and the public interest tip decidedly in favor of the Plaintiff.

### SCOPE OF RELIEF

The Defendants argue that the orders requested by the Plaintiff are not narrowly tailored to remedy the alleged harm.   Uncontroverted evidence before the Court overwhelmingly establishes that the mandatory statutory duties cannot effectively be fulfilled without an injunction terminating the RIFs.   Testing for, diagnosing, preventing, and researching black lung is a highly specialized field—it simply is not possible to transfer the duties of the RHD employees to others without a period of transition and training.   The Plaintiffs presented credible testimony that the functions of the CWHSP require the work of all employees within the NIOSH Respiratory Health Division. The Defendants presented no evidence to contradict the witness testimony indicating that CWHSP's work is not duplicated elsewhere in government.   Nor did the Defendants present evidence that employees with the qualifications necessary to operate the mobile screening unit, certify B-Readers, or interpret chest x-rays or spirographs for evidence of black lung exist elsewhere in HHS.   The Defendants also presented no evidence that individual employees or groups of employees could be terminated without impacting NIOSH's ability to perform the mandatory duties set forth in the Mine Act and associated regulations.   They offered no specific

---

4 This case exemplifies the importance of Congress's role in allocating federal funds and establishing federal programs.   Mining is concentrated in certain regions in the United States, and congressional representatives from those regions are likely to be more familiar with the needs of their constituents who work in the mining industry and with the health and occupational safety issues specific to their regions.   When Congress acts on a budget or bill impacting miners, representatives and senators who represent miners can advocate for their interests.   The executive branch has no similar geographic representation.   Apart from maintaining separation of powers and avoiding concentration of power in a single branch, permitting the executive alone to determine which health programs to prioritize deprives the people of representation.

narrower form of relief that would effectuate the purposes of the proposed injunction.    Therefore, the Court finds that an injunction requiring full restoration of the NIOSH Respiratory Health Division, rescission of the RIFs, and compelling continued health surveillance through the CWHSP and the job transfer program under 30 U.S.C. § 843 is necessary and appropriate.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the Plaintiff's *Motion for Preliminary Injunction* (Document 7) be **GRANTED**.

## PRELIMINARY INJUNCTION

The Court **ORDERS** that the RIFs in the NIOSH Respiratory Health Division be enjoined and, therefore, rescinded to facilitate the full restoration of the NIOSH Respiratory Health Division including health surveillance through the Coal Workers Health Surveillance Program and the job transfer program.    Further, in the event of reorganization, the Court **ORDERS** that there be no pause, stoppage or gap in the protections and services mandated by Congress in the Mine Act and the attendant regulations for the health and safety of miners.    Lastly, the Court **ORDERS** that the Defendant Secretary submit written certification to this Court within twenty (20) days of the entry of this Order that compliance with the same is complete.

In light of the Court's findings regarding the absence of any meaningful harm to the Defendants related to this injunction preserving the status quo, as well as the high likelihood that the Plaintiff will prevail on the merits, the Court **ORDERS** that the security required by Federal Rule of Civil Procedure 65(c) be set at **ZERO**.    *See, e.g., Doe v. Pittsylvania Cty., Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012).

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:      May 13, 2025

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

31