# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

HARRY WILEY and
MATTHEW WARD, individually and on
behalf of all others similarly situated,

     Plaintiffs,

v.                                          Case No: 2:25-cv-00227

ROBERT F. KENNEDY, JR., in his official
Capacity as Secretary of Health and Human
Services, and U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

     Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

     Defendants, by and through undersigned counsel, respectfully file this Memorandum of

Law in Support of Defendants' Motion to Dismiss. For the reasons discussed below, the Court

should dismiss this civil action.

### INTRODUCTION

     Plaintiffs bring a claim under the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 706(2)(A), and seek declaratory judgment under the same, challenging the alleged closure of the

Respiratory Health Division ("RHD") of the National Institute for Occupational Safety and Health

("NIOSH") facility in Morgantown, West Virginia, and the U.S. Department of Health and Human

Services' ("HHS" or "the Department") alleged inability to carry out the Coal Workers' Health

Surveillance Program ("CWHSP") in accordance with the Coal Mine Health and Safety Act of

1969 ("Coal Act"), as amended by the Federal Mine Safety and Health Act of 1977 ("Mine Act"),

and the Mine Improvement and New Emergency Response Act of 2006 ("Miner Act"), and their implementing regulations. *See generally* 30 U.S.C. § 843; 30 C.F.R. pt. 90; 42 C.F.R. pt. 37. Plaintiffs purport to bring their claims on behalf of themselves and a class of others similarly situated. (ECF No. 59 ¶¶ 5, 48-49.)

Plaintiff Wiley alleges that he developed coal workers' pneumoconiosis in 2024 and, in November 2024, submitted a form and chest radiograph to NIOSH required to apply for transfer to a non-dusty job under the Part 90 regulatory program. (*Id.* ¶¶ 14, 16-17.) Plaintiff Wiley further alleges that he never received a response from NIOSH regarding his application. (*Id.* ¶ 18.) Despite that allegation, he recognizes that the CWHSP did in fact adjudicate his Part 90 application but claims that he plans to submit additional medical information in support of his application and take advantage of additional medical screenings if made available. (*Id.* ¶¶ 19-26.) Although he does not appear to allege, as he has previously, that the CWHSP is unable to review and decide whether his additional medical evidence qualifies him for a job transfer under Part 90, he alleges instead that free medical imaging is not being provided to coal miners like him. (*Id.* ¶¶ 27-28.)

Plaintiff Ward alleges that he was diagnosed with complicated black lung disease earlier this year. (*Id.* ¶ 31.) Based on that information, he applied for Part 90 rights through the CWHSP. (*Id.* ¶ 32.) He alleges that he has not received any response regarding that application. (*Id.* ¶ 33.) He further alleges that he wants to utilize mobile health screening services but that they are not currently being offered. (*Id.* ¶ 36.) However, the CWHSP notified Plaintiff Ward in a letter dated May 15, 2025, of the results of the CWHSP's review and determination regarding his eligibility for a Part 90 transfer based on his x-ray taken on March 10, 2025. (ECF No. 52-1 ¶ 8.)

Ultimately, Plaintiffs allege that due to Reduction in Force ("RIF") notices sent to certain employees at the Morgantown NIOSH facility and within the RHD, HHS no longer has the

capacity to comply with its statutory duties to maintain the CWHSP, process Part 90 applications, or conduct the necessary research and approval activities to which coal miners are entitled under the Mine Act. (ECF No. 59 ¶¶ 55-56, 60-67.)

To be sure, the Executive Branch has broad discretion to manage its personnel and order its priorities. Plaintiffs theorize throughout the Complaint that the restructuring of HHS and associated RIF plans have resulted and will result in a violation of certain statutory duties. Setting aside that HHS is not violating any of its duties, Plaintiffs' arguments amount to the extraordinary proposition that they, rather than the Executive, should get to dictate how the Department orders its prerogatives and conducts its day-to-day operations. Such micromanagement would be judicial overreach.

The Court should decline Plaintiffs' demands for the following reasons. First, Plaintiffs lack Article III constitutional standing to pursue this case. They seek redress for nonexistent injuries—all of Plaintiffs' submissions to NIOSH, including their original Part 90 applications and subsequent medical evidence, have been adjudicated, and the RHD is offering mobile health screening services. This alone necessitates dismissal of the Complaint as all Plaintiffs' claims are derivative from those allegations. Second, the counts in the Complaint are barred by sovereign immunity. Notably, APA review is precluded because HHS administrative reforms are committed to agency discretion. Plaintiffs do not seek review of a discrete, final agency decision, and their predictions about the future of the NIOSH RHD are purely speculative at this juncture. In essence, the United States has not waived its sovereign immunity via the APA on issues of general employment and organizational reform decisions.

Further, notwithstanding Plaintiffs' lack of standing and the sovereign immunity bar, Plaintiffs demand an injunction to "restor[e] all personnel in the [RHD] of [NIOSH] who are

3

integral to carrying out the epidemiological surveillance and job transfer provisions of the federal [Mine Act]." (*Id.* ¶ 5.) But Plaintiffs similarly lack standing to seek this type of relief. If these sorts of speculative claims regarding an executive agency's ability to execute its duties and responsibilities gave rise to standing, virtually any American could sue over administrative cuts at any federal agency. Indeed, the Supreme Court recently stayed an injunction in an analogous challenge to the termination of probationary employees that would allegedly result in diminished public services, explaining that "under established law, those allegations are presently insufficient to support . . . standing." *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 1914, 2025 WL 1035208, at *1 (Apr. 8, 2025) (mem.) [hereinafter *OPM v. AFGE*]. *See also Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025) (Sotomayor, J., concurring) ("The plans themselves are not before this Court, at this stage, and we thus have no occasion to consider whether they can and will be carried out consistent with the constraints of law.") (staying district court's preliminary injunction that paused implementation of large-scale RIFs and requiring the government to produce agency RIF and reorganization plans—including those for HHS and NIOSH—on an expedited basis); *McMahon v. New York*, No. 24A1203 (U.S. July 14, 2025) (granting application for stay).

The Supreme Court has made clear that until a final reorganization plan is before this Court for consideration, any challenge to its process or anticipated effects is improper. The Supreme Court's recent interim orders "squarely control[]" here because they necessarily "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025). Additionally, any attempt to seek an injunction that extends outside the geographical jurisdiction of this Court, such as an order affecting facilities in Spokane, Washington, or Pittsburgh, Pennsylvania—facilities at which no RHD employees work—is

inappropriate given another recent Supreme Court decision.[1] *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550, 2554, 2560 (2025) (holding that under the Judiciary Act of 1789, federal courts lack authority to issue universal injunctions).

Setting aside these threshold and jurisdictional defects, Plaintiffs' claim about staffing at the NIOSH facility in Morgantown fails on the merits. Any decision to better align HHS with its core statutory duties, and consolidate duplicative and overlapping functions, is not arbitrary and capricious. HHS has stated that the restructured agency will continue carrying out its statutory functions. Just because it is not doing so in the way Plaintiffs prefer does not mean it is violating applicable law. Moreover, Plaintiffs cannot meet the mandamus-like standard of 5 U.S.C. § 706(1). As such, the APA claim fails.

All Plaintiffs' submissions to the CWHSP were resolved prior to the filing of the operative Complaint. The CWHSP is fully operational. All RHD RIF notices were revoked and all contracts and communications needed to carry out RHD's responsibilities under the Mine Act similarly were restored prior to the operative Complaint's filing. Plaintiffs suffer from no remediable harm from the current operations of the RHD and its CWHSP. As such, the Court should decline Plaintiffs' invitation to direct and micromanage HHS's administrative reforms—particularly given that the RHD is operating at its pre-suit level—and dismiss this civil action.

---

[1] Because such injunctive relief is improper, this Court lacks jurisdiction to adjudicate Plaintiffs' allegations encompassing NIOSH activities occurring outside of West Virginia. (*See* ECF No. 59 ¶¶ 45, 46, 56, 67.) Even assuming Plaintiffs could pursue claims regarding NIOSH's mining research and approval activities, Plaintiffs fail to allege a concrete and particularized injury with respect to those activities. (*See generally id.*) They do not allege a discrete, final agency action as to those activities that could establish an APA claim, and their bare allegations about these functions do not meet the mandamus-like standard of 5 U.S.C. § 706(1) or the arbitrary and capricious standard of § 706(2). Thus, Plaintiffs' attempt to add claims beyond the CWHSP and RHD is insufficient to survive dismissal under Federal Rule of Civil Procedure 12(b)(6).

## STATUTORY AND REGULATORY BACKGROUND

The Mine Act was enacted to improve and promote safety and health in mines throughout the country. *See* 30 U.S.C. § 801. It set forth a health surveillance program to be administered by HHS for miners working in a coal mine. *See id.* § 843. That program, also known as the CWHSP, *see generally* 42 C.F.R. pt. 37, has four main components:

    a) Periodic medical examinations including chest radiographs and spirometry (a type of breathing test) provided to active coal miners at mine operators' expense through healthcare facilities approved by NIOSH to participate in the CWHSP. The chest radiographs and spirometry tests are sent to NIOSH for evaluation as specified in 42 C.F.R. Part 37;

    b) a mobile health surveillance team and unit that travels to coal mines and mining communities across the U.S. providing chest radiographs, spirometry, and blood pressure screening to current and former miners at government expense;

    c) an internationally recognized training and certification program (the B Reader Certification Program) for physicians to perform standardized evaluations (classifications) of chest radiographs for findings of pneumoconiosis (a medical term describing diseases like black lung that are caused by inhaling mineral dust); and

    d) a program providing autopsies limited to the chest for deceased coal miners' next of kin.

(ECF No. 14-1 ¶ 2.) *See also* 30 U.S.C. § 843(a), (c), (d). Results of radiographic films are read and classified according to HHS regulations and confidentially submitted to miners along with a description of any applicable rights under the Mine Act. *See* 30 U.S.C. § 843(a). (*See also* ECF No. 14-1 ¶ 6.)

Importantly, "any miner who, in the judgment of the Secretary of [HHS] based upon such reading or other medical examinations, shows evidence of the development of pneumoconiosis shall be afforded the option of transferring from his position to another position in any area of the mine, for such period or periods as may be necessary to prevent further development of such disease . . . ." 30 U.S.C. § 843(b)(1)-(2). If a miner exercises his right to transfer to a low-dust

6

position in the mine, he must be paid at least what he was receiving prior to the transfer. *See id.* § 843(b)(3).

When a miner participates in the CWHSP, he receives a chest x-ray, lung function test (spirometry), and blood pressure screening. (*See* ECF No. 14-1 ¶ 6.) Almost all chest x-rays of coal miners received by NIOSH are digitally transmitted and evaluated by physicians specially qualified in recognizing and classifying pneumoconiosis in accordance with 42 C.F.R. § 37.51. *See* 42 C.F.R. § 37.52(b) (providing requirements for qualification and approval as an A Reader and B Reader). (*See also* ECF No. 14-1 ¶ 6 ("Chest x-rays are sent to a panel of specialized physicians (B Readers) to classify the x-ray according to the International Labour Office's International Classification of Radiographs of Pneumoconiosis ('black lung').").) The method for definitive evaluations of digital chest x-rays received by NIOSH is detailed in 42 C.F.R. § 37.53. If a coal miner is determined to show evidence of the development of pneumoconiosis based on a chest x-ray, he is notified of his right to exercise the transfer option pronounced in 30 U.S.C. § 843(b), known as the Part 90 option (named after the implementing regulations in 30 C.F.R. Part 90).[2] *See* 30 C.F.R. §§ 90.102 (describing the miner's transfer options), 90.104 (providing that a miner may waive his rights under Part 90 but re-exercise them at any time). (*See also* ECF No. 14-1 ¶ 7 ("The CWHSP provides medical screening to miners, evaluates results, and determines if

---

[2] Part 90 provides, in part, as follows:

> Any miner employed at a coal mine who, in the judgment of the Secretary of HHS, has evidence of the development of pneumoconiosis based on a chest X-ray, read and classified in the manner prescribed by the Secretary of HHS, or based on other medical examinations shall be afforded the option to work in an area of a mine where the average concentration of respirable dust in the mine atmosphere during each shift to which that miner is exposed is continuously maintained at or below the applicable standard. Each of these miners shall be notified in writing of eligibility to exercise the option.

30 C.F.R. § 90.3(a). *See also* 42 C.F.R. § 37.102.

miners are medically eligible for the Part 90 option. The CWHSP mails miners their medical results and determinations regarding their Part 90 eligibility.").)

If a coal miner submits a chest x-ray that NIOSH determines not to show evidence of pneumoconiosis, the miner may submit other medical examinations for review, "such as [a] computed tomography scan of the chest or lung biopsies, as evidence of the development of pneumoconiosis." *See* 42 C.F.R. § 37.102. (*See also* ECF No. 14-1 ¶ 8.) A later submitted chest x-ray is evaluated in the same manner as chest x-rays submitted under an operator's plan. *See* 42 C.F.R. § 37.100. (*See also* ECF No. 14-1 ¶ 8.) If a miner submits a chest CT scan, the CWHSP's chest radiologist reviews it and makes a pneumoconiosis determination. (ECF No. 14-1 ¶ 8.) Once a final determination is made regarding the submitted other evidence, the CWHSP sends a letter with the results to the miner. (*Id.*) Results of the independently submitted examinations may similarly trigger the miner's transfer rights under the Mine Act. *See* 42 C.F.R. § 37.103. And if the submitted examination indeed shows evidence of the development of pneumoconiosis, the miner is notified of his right to exercise the Part 90 option. (ECF No. 14-1 ¶ 8.) There is no limit to the number of times a miner can submit other evidence for a Part 90 eligibility determination. (*Id.*)

## FACTUAL BACKGROUND

### I.    Plaintiff Wiley

Plaintiff Wiley's first interaction with the CWHSP was in 2010, when the CWHSP sent him a letter notifying him that he was eligible to participate in a CWHSP respiratory screening at approved facilities. (ECF No. 14-1 ¶ 9; ECF No. 29, Attach. A.) The CWHSP sent him other notification letters about his eligibility to receive CWHSP screenings in 2014, 2017, and 2018. (ECF No. 14-1 ¶ 9; ECF No. 29, Attachs. B, C.)

Plaintiff Wiley had his first CWHSP respiratory health screening on May 15, 2018, at the CWHSP mobile unit. (ECF No. 14-1 ¶ 10.) Plaintiff Wiley underwent a chest x-ray and spirometry test. In accordance with the CWHSP, Plaintiff Wiley's chest radiograph was evaluated by doctors specially trained and certified to recognize and accurately classify pneumoconiosis on chest radiographs. Plaintiff Wiley was notified of his radiograph results via letter dated September 10, 2018, which showed no evidence of pneumoconiosis. (*Id.*; ECF No. 29, Attach. E.) Further, Plaintiff Wiley's baseline spirometry testing indicated results within normal limits, and the CWHSP sent a separate letter to Plaintiff Wiley dated July 6, 2018, explaining the spirometry results. (ECF No. 14-1 ¶ 10; ECF No. 29, Attach. F.) Because Plaintiff Wiley's chest radiograph and spirometry testing exhibited no evidence of pneumoconiosis, Plaintiff Wiley was not eligible for a transfer option under Part 90 after that screening.

Plaintiff Wiley had a chest computed tomography ("CT") scan on October 12, 2023, which he attempted to submit to the CWHSP in November 2024, through his attorney in this case, as other evidence in support of his previous Part 90 application. (*See* ECF No. 14-1 ¶ 11; ECF No. 29, Attachs. G, H.) The scan eventually was uploaded into PICOM (cloud-based software for sharing, viewing, and managing diagnostic studies) for review on December 6, 2024. (ECF No. 14-1 ¶ 11.) Plaintiff Wiley's chest CT scan was evaluated by Robert J. Tallaksen, MD, Senior Consultant Fellow, RHD, NIOSH, a physician qualified to identify pneumoconiosis. (*See id.* ¶ 12.) Dr. Tallaksen found that the CT scan showed no signs of pneumoconiosis. (*Id.*; ECF No. 29, Attachs. I, J.) The CWHSP created a results letter in their database dated December 10, 2024, which stated as follows: "Your CT scan shows NO findings consistent with black lung." (ECF No. 14-1 ¶ 12; ECF No. 29, Attach. K.) That results letter would have been mailed to Plaintiff Wiley via first class USPS mail by December 13, 2024. (ECF No. 14-1 ¶ 12.)

In May 2025, Plaintiff Wiley provided information in the form of x-rays and CT scans to the CWHSP for review. (*See* ECF No. 52-1 ¶ 7.) The CWHSP's chest radiologist reviewed the information to determine whether Plaintiff Wiley's lungs had changes consistent with coal workers' pneumoconiosis. (*Id.*) The CWHSP sent the results of that review to Plaintiff Wiley in a letter dated May 27, 2025. (*Id.*; ECF No. 60, Attach. A.)

On July 8, 2025, Plaintiff Wiley submitted an interpretation of an August 1, 2022, chest x-ray in support of his Part 90 application. (ECF No. 52-1 at 3 n.4.) The CWHSP informed Plaintiff Wiley that it does not accept those types of interpretations as medical evidence and recommended that he obtain a more recent chest x-ray or CT scan to submit to the CWHSP for review. (*Id.*) The CWHSP also sent an email dated July 10, 2025, to Plaintiff Wiley's counsel in this case explaining that a recent CD submitted to the CWHSP purporting to contain an image from August 1, 2022, did not contain any images. (*Id.*) The CWHSP reiterated to Plaintiff Wiley's attorney that a more recent image from the last six months would be helpful in determining any progression of disease. (*Id.*)

As of the date of this filing, the CWHSP has no pending correspondence or submission of medical information from Plaintiff Wiley to resolve. Based on the above factual recitation, Plaintiff has experienced no issues receiving the services to which he is entitled under the CWHSP. (*See also id.* ¶ 7.) And if Plaintiff Wiley wishes to take advantage of black lung screening at no cost to him through NIOSH-approved health facilities or its mobile health unit, he can do so. (*See id.* ¶ 6.)

## II.   **Plaintiff Ward**

Plaintiff Ward applied for the Part 90 program in April 2025. (*See* ECF No. 59 ¶ 32.) In a letter dated May 15, 2025, the CWHSP informed Plaintiff Ward that his x-ray taken on March 10, 2025, was evaluated, and the CWHSP communicated the results of that review and determination

10

regarding his eligibility for a Part 90 transfer. (*See* ECF No. 52-1 ¶ 8; ECF No. 60, Attach. B.) As of this filing, the CWHSP has no outstanding requests related to Plaintiff Ward, and the documentation showing that CWHSP provided Plaintiff Ward with all services to which he is entitled under the CWHSP was previously submitted to the Court. (*See* ECF No. 52-1 ¶ 8; ECF No. 60, Attach. B.)

## III.    RHD Personnel and Operations

Three months prior to the Complaint's filing, HHS revoked all RHD RIF notices and restored all other functions of the CWHSP. The process of revoking the RIF notices began prior to the Court's preliminary injunction order dated May 13, 2025, (ECF No. 36). (*See* ECF No. 52-1 ¶ 3.) HHS provided RIF revocation notices to more than 300 NIOSH employees, including RHD employees, via email on May 13, 2025, that they were no longer subject to the RIF. (*See id.*) One NIOSH RHD employee who works on the CWHSP did not receive a RIF revocation notice on that day due to an administrative error, but that employee received a RIF revocation notice on June 26, 2025. (*Id.* at 2 n.3.) Ultimately, all NIOSH RHD full-time civilian employees received notices from HHS that their RIF notices were revoked, and none of those employees have separated from HHS due to that planned RIFs. (*Id.* ¶ 5.)

Further, operations under contracts needed for RHD to carry out its responsibilities under the CWHSP and the Part 90 job transfer program have been restored. (*Id.*) RHD is communicating with partners and constituents as needed to carry out RHD's work under the Mine Act. (*Id.*) The CWHSP is providing black lung screenings to coal miners at no cost to the miners through NIOSH-approved health facilities and its mobile health unit. (*Id.*) Regarding the mobile health unit, RHD has scheduled several mobile unit surveys through the end of the fiscal year. (*Id.*) Given these actions, the CWHSP, which is part of the RHD, is operational at pre-suit levels. (*Id.*)

## ARGUMENT

**I.**  <u>**Plaintiffs Do Not Have Standing to Pursue This Case, and It Should Be Dismissed.**</u>

Article III of the United States Constitution constrains the judicial authority of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2; *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009) (citations omitted). Embedded in this limitation is the requirement of standing to sue, which "ensure[s] that federal courts do not exceed their authority" and "confines the federal courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016). In other words, the standing doctrine ensures that "'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society' is vindicated, by ensuring decisions meant for the political process are left to the political process." *Coal. for Humane Immigrant Rts. v. Dep't of Homeland Sec.*, Civ. A. No. 25-0943 (TNM), 2025 WL 1078776, at *4 (D.D.C. Apr. 10, 2025) (quoting John Roberts, *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1220 (1993)).

The Supreme Court has reiterated the following when determining whether a plaintiff has standing to bring a claim:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *accord Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 230–31 (4th Cir. 2008).

In other words, "[p]roper standing requires that a plaintiff assert a direct injury that can be traced to the defendant's conduct and from which relief to the plaintiff will likely follow from a favorable adjudication to the plaintiff." *Gilbert Imported Hardwoods, Inc. v. Holland*, 176 F. Supp.

2d 569, 576 (S.D. W. Va. 2001) (citations omitted). "Federal courts can only review . . . executive actions when necessary 'to redress or prevent actual or imminently threatened injury to persons . . . .'" *Murthy v. Missouri*, 603 U.S. 43, 56–57 (2024) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009)). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). "And the Court has identified the doctrine of standing as a means to implement that [case or controversy] requirement." *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (citing *Carney v. Adams*, 592 U.S. 53, 58 (2020)). Plaintiffs who file their complaint in federal court bear the burden of establishing all three of the requirements espoused in *Friends of the Earth, Inc.*, 528 U.S. at 180–81. *See Sommerville v. Union Carbide Corp.*, --- F.4th ----, 2025 WL 2383496, at * 3 (4th Cir. Aug. 18, 2025); *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 753 (4th Cir. 2013).

The "[f]irst and foremost" of standing's three elements concerns injury in fact. *See Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted). To be "particularized," an injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. And to be "concrete," an injury *"must actually exist."* *Spokeo, Inc.*, 578 U.S. at 340 (emphasis added) (citing *Black's Law Dictionary* 479 (9th ed. 2009)). *See also Sommerville*, 2025 WL 2383496, at *5 ("[A] plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a person a right and purports to authorize that person to sue to vindicate

that right." (cleaned up) (quoting *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024)

(quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021)))).

Here, no injury exists, and neither Plaintiff can establish a concrete injury necessary to

have constitutional standing to bring this case. The entire foundation of Plaintiff Wiley's claims

rests on the following allegations:

> 16.    On November 7, 2024, Mr. Harry Wiley took the initial step in applying for transfer to a non-dusty job under Part 90 by completing Form 0920-0020.

> 17.    On November 8, 2024, Mr. Wiley mailed the form and a radiographic image of his chest by certified mail to the NIOSH Coal Workers' Health Surveillance Program, 1000 Frederick Lane M/S LB208, Morgantown, WV 26508.

> 18.    As of the filing of this Complaint, Mr. Wiley has received no response from the CWHSP.

> . . .

> 26.    As of the filing of this Complaint Mr. Wiley still intends to take advantage of DHHS provided medical imaging if it is made available.

> . . .

> 28.    Upon information and belief, at the time of the filing of this Second Amended Complaint, DHHS is not providing free medical imaging to coal miners such as Mr. Wiley.

(ECF No. 59 ¶¶ 16-18, 26, 28.) Similarly, all Plaintiff Ward's claims rest on these allegations:

> 32.    In April 2025, Mr. Ward applied for a Part 90 job transfer program through DHHS, sending his application by certified mail.

> 33.    Mr. Ward has not received any response to his application from DHHS.

> . . .

> 36.    Mr. Ward would like to use the DHHS mobile health screening services but is unable because they are not currently being offered.

14

(*Id.* ¶¶ 32-33, 36.)

However, the foundation on which this whole case is built crumbles with the incontrovertible sworn facts in the multiple declarations and supporting documentation previously submitted that belie the above allegations. Plaintiff Wiley first had imaging and testing conducted by the CWHSP in 2018. (*See* ECF No. 14-1 ¶ 10.) At that time, Plaintiff Wiley's chest x-ray and spirometry results showed no evidence of pneumoconiosis. (*See id.*) Therefore, Plaintiff Wiley was not eligible in 2018 for the Part 90 option to transfer. (*See id.*) In accordance with HHS policy and regulations, Plaintiff Wiley submitted other evidence in late 2024 to determine whether he was eligible for the Part 90 option. (*Id.* ¶ 11.) Plaintiffs inaccurately refer to this as "the initial step in applying for transfer to a non-dusty job under Part 90," (ECF No. 59 ¶ 16), but until the CWHSP makes a determination that a miner's examination or testing shows evidence of pneumoconiosis, a miner is not eligible for the Part 90 option, *see* 30 U.S.C. § 843(b); 30 C.F.R. § 90.102. Nevertheless, Plaintiff Wiley's CT scan received by the CWHSP in December 2024 was evaluated pursuant to policy and regulations, and the CWHSP chest radiologist determined that the CT scan showed no signs of pneumoconiosis. (*See* ECF No. 14-1 ¶ 12.) Thus, the CWHSP sent a letter to Plaintiff Wiley stating those findings. (*Id.*; ECF No. 52-1 ¶ 7.) Plaintiff Wiley still remains ineligible for the transfer option in Part 90, there are no pending examinations or testing of Plaintiff Wiley for the CWHSP to review, and the CWHSP has provided Plaintiff Wiley with all services to which he is entitled. (ECF No. 52-1 ¶ 7. *See also* ECF No. 60, Attach. A.)

Because the CWHSP evaluated and adjudicated "the form and radiographic image of his chest" Plaintiff Wiley submitted in November 2024, (ECF No. 59 ¶ 17), as well as all additional medical evidence submitted after this litigation's commencement, (*see* ECF No. 52-1 ¶ 7), and because Plaintiff Wiley can take advantage of the monthly mobile unit surveys that are scheduled

through the fiscal year and will continue uninterrupted now that all operations under contracts needed for RHD to carry out its responsibilities under the CWHSP and the Part 90 program have been restored, (*id.* ¶¶ 5-6), Plaintiff Wiley has no concrete injury for the Court to remedy or standing to pursue his desired relief.

Likewise, Plaintiff Ward first submitted his application under Part 90 in April 2025. (*Id.* ¶ 8.) The CWHSP timely evaluated Plaintiff Ward's application and communicated the results of that review and determination regarding Plaintiff Ward's eligibility for a Part 90 transfer. (*Id.*; ECF No. 60, Attach. B.) As with Plaintiff Wiley, the CWHSP has no outstanding requests related to Plaintiff Ward, and the CWHSP has provided Plaintiff Ward with all services to which he is entitled. (ECF No. 52-1 at ¶ 7.) As such, Plaintiff Ward has no concrete injury for the Court to remedy or standing to pursue his claims.

Now that the CWHSP is fully restored and operational and Plaintiffs are able to access all services required by statute and regulation to be available to them, there is no case or controversy for this Court's consideration. In short, there is no injury to remedy. Plaintiffs seek a declaration from this Court to the following effect:

> [T]hat Defendants comply with their statutory duties under 30 U.S.C. § 843 (requiring examinations of coal miners and affording job transfer rights); 30 U.S.C. § 811(a)(7) (providing authority for examinations of all miners generally); 30 U.S.C. § 811(a)(9) (anti-backsliding provisions providing that no Administration may weaken protections for miners); and with the requirements of their own existing regulations, 30 C.F.R. Part 90, and cease depriving [Plaintiffs] of due process of law, by restoring all personnel in the Respiratory Health Division of the National Institute for Occupational Safety and Health who are integral to carrying out the epidemiological surveillance and job transfer provisions of the Mine Safety and Health Act of 1977.

(ECF No. 59 ¶ 5.) But HHS is complying with all the duties Plaintiffs cite, and all RHD personnel responsible for carrying out the CWHSP and Part 90 program have been restored. (*See generally* ECF No. 52-1.) The RHD is operating as Plaintiffs claim to desire, and under Article III, Plaintiffs

cannot bring an amorphous challenge to HHS's restructuring based on speculation that the Department's employees will be unable to perform its statutory functions.

At minimum, a handful of particularized allegations of some delay or disruption in a government service cannot justify sweeping relief reinstating hundreds of employees across an entire Department or freezing in place an entire restructuring effort. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 402 (2024) (Thomas, J., concurring) (reasoning that "no party should be permitted to obtain an injunction in favor of nonparties"). Were the Court to find that Plaintiffs are entitled to particular services that they did not timely receive, they would at most have standing to seek provision of such information or services—not an order requiring HHS to provide it in a particular fashion or with particular staff. Courts may not grant relief for supposed injuries that goes far beyond redressing the injury itself. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (reiterating that injunctive relief should be no more burdensome than necessary to provide "complete relief" to the plaintiff).

As set forth above, neither Plaintiff has standing to seek relief. Without standing to seek relief for themselves, Plaintiffs equally cannot seek relief on behalf of a putative class. *See, e.g., O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.") (*See also* ECF No. 52 at 6–7 (citing cases supporting the same proposition).)

Therefore, without standing for Plaintiffs' individual claims, this Court lacks subject matter jurisdiction over this civil action, and it must be dismissed.

## II.    Plaintiffs' Claims Are Barred by Sovereign Immunity.

The Complaint contains two counts: (1) Count I – Declaratory Judgment, 5 U.S.C. §§ 702, 706; and (2) Count II – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Arbitrary, Capricious, and Unlawful Agency Action. (*See* ECF No. 59 ¶¶ 51-67.) The threshold questions that must first be answered by the Court are (1) has there been a waiver of sovereign immunity to allow these claims, and (2) does this Court have subject matter jurisdiction over these claims. *See Lancaster v. Sec'y of Navy*, 109 F.4th 283, 288 (4th Cir. 2024) ("[W]e must first address—even if the parties do not—whether federal courts, including the district court, could properly exercise jurisdiction."). As explained above, the second question regarding whether the Court has subject matter jurisdiction should be answered in the negative. *See supra* pp. 12–17. Thus, the following analysis is made in the alternative.

As federal courts are courts of limited jurisdiction, they have only the powers and jurisdiction authorized by the Constitution and by Congress through statute. Federal courts are not free to expand their jurisdiction by judicial decrees. Rather, it is presumed that a case lies outside the jurisdiction of a federal court. The party asserting federal court jurisdiction has the burden of proving that a federal district court has jurisdiction over the facts and legal issues involved in a case. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The plaintiff carries this burden throughout the litigation and at all stages of the proceedings. If the allegations of jurisdiction are challenged, the plaintiff must prove those allegations of jurisdiction by competent proof. Even if the defendant does not challenge those allegations of jurisdiction, the federal district court may do so. *See Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936).

"It is elementary that 'the United States, as sovereign, is immune from suit save as it consents to be sued[.]'" *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). *See also F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). It is further axiomatic that the existence of consent to sue the United States "is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).

Under federal law, "[w]aivers of sovereign immunity must be unequivocal and are to be strictly construed." *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33–34 (1992). Accordingly, courts "must first decide" whether "[sovereign] immunity has been waived." *Meyer*, 510 U.S. at 475. "For that reason, it is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists. . . . If the plaintiff fails to meet this burden, then the claim must be dismissed." *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005). *See also Lancaster*, 109 F.4th at 292 (noting a plaintiff has the burden to show that an unequivocal waiver of sovereign immunity exists). Even if the United States is not named as a defendant, "[a]n action against a federal agency or official will be treated as an action against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act.'" *Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983) (quoting *Dugan v. Rank*, 372 U.S. 609, 620, (1963) (citations omitted)). Consequently, sovereign immunity bars monetary claims against officers in their official capacity since such suits effectively operate against the sovereign itself." *Lancaster*, 109 F.4th at 292 (footnote omitted).

"A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Mitchell*, 445 U.S. at 538 (quoting *United States v. King*, 395 U.S. 1, 4 (1969)).

Further, ambiguity must be construed in favor of immunity. *F.A.A. v. Cooper*, 566 U.S. 284, 290–91 (2012). "Ambiguity exists if there is a plausible interpretation of the statute that would *not* authorize [the relief sought]." *Id.* (emphasis added). *See also Lane v. Peña*, 518 U.S. 187, 192 (1996).

### A.    The Basis for Count I, the Declaratory Judgment Act, Does Not Constitute a Waiver of Sovereign Immunity, Nor Does It Serve to Create Jurisdiction.

The Declaratory Judgment Act ("DJA"), 5 U.S.C. § 702, does not create a basis of jurisdiction or act as a waiver of sovereign immunity. It has long been recognized that the DJA "is not one which adds to the jurisdiction of the court, but is a procedural statute which provides an additional remedy for use in those cases and controversies of which the federal courts already have jurisdiction." *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 323 (4th Cir. 1937). *See also Schilling v. Rogers*, 363 U.S. 666, 677 (1960) ("[T]he [DJA] is not an independent source of federal jurisdiction . . . ; the availability of such relief presupposes the existence of a judicially remediable right. No such right exists here."); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937 ) ("Thus the operation of the [DJA] is procedural only.").

Moreover, the DJA "plainly does not operate as an express waiver of sovereign immunity . . . because it 'neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief.'" *Muirhead v. Mecham*, 427 F.3d 14, 17 n.1 (1st Cir. 2005) (quoting *Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1230 (1st Cir. 1996) (citation omitted) (internal quotation marks omitted)). *See also Goldstein v. Moatz*, 364 F.3d 205, 219 (4th Cir. 2004) ("If a declaratory judgment proceeding actually constitutes a suit against the sovereign, it is barred absent a waiver of sovereign immunity."); *Fatmi v. Chertoff*, No. 07-0786, 2007 WL 9805723, at *1 (E.D. Va. Nov. 30, 2007)

("Similarly, neither the Mandamus Act nor the [DJA] serves as a waiver of sovereign immunity and this [c]ourt similarly lacks jurisdiction to entertain these claims.").

Since the DJA does not constitute a waiver of sovereign immunity and does not create subject matter jurisdiction, Count I of the Complaint should be dismissed.

### B.    The APA Does Not Waive Sovereign Immunity in This Case, and Count II Must Be Dismissed.

While the APA does create a limited waiver sovereign of immunity, Congress has created several exceptions to that waiver. Those exceptions apply in this case. Thus, sovereign immunity has not been waived with regard to Count II of the Complaint, and it should be dismissed.

The crux of Plaintiffs' APA claim rests on the CWHSP's alleged failure to adjudicate their Part 90 applications and on RIF notices sent to certain NIOSH employees. (*See* ECF No. 59 ¶¶ 60-65.) They ultimately ask the Court to permanently enjoin those employment decisions and "fully restore the NIOSH [RHD] in Morgantown, West Virginia," and "[c]ompel Defendant[s] to continue conducting health surveillance through the CWHSP and the job-transfer program under 30 U.S.C. § 843 by operating the [RHD] of NIOSH in Morgantown, West Virginia[.]" (*Id.* at 17 ("Prayer for Relief").) Despite that this requested relief is already in place, Plaintiffs' APA claim fails for three discrete reasons: (1) Congress has precluded district court review of such federal employment claims; (2) HHS's administrative reforms are committed to agency discretion; and (3) Plaintiffs are not seeking review of a discrete, final agency action.

(1)    <u>Federal personnel statutes divest this Court of subject matter jurisdiction to consider claims concerning the employment of HHS employees.</u>

Congress has precluded district court review of the type of broad federal employment claims Plaintiffs are asserting related to staffing at the Morgantown NIOSH facility. Such claims must proceed in another forum because Congress has "established a comprehensive system" that

21

provides the "exclusive means" for reviewing challenges to the employment decisions of federal agencies. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012) (internal quotation marks omitted).

The Civil Service Reform Act ("CSRA"), together with the Federal Service Labor-Management Relations Statute ("FSL-MRS"),[3] "creates an integrated scheme of administrative and judicial review, wherein Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2023) (cleaned up). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, with limitations imposed by Congress on the kinds of claims and remedies available. *See Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019) [hereinafter *AFGE v. Trump*]. The purpose of this statute was to "replace the haphazard arrangements for administrative and judicial review of personnel action, part of the outdated patchwork of statutes and rules built up over almost a century that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (citation omitted) (internal quotation marks omitted).

When such a comprehensive remedial scheme permits only some plaintiffs to seek review, the scheme implicitly precludes judicial review by other individuals who are not authorized to bring claims. The Supreme Court recognized this in *Block v. Community Nutrition Institute*, 467

---

[3] The CSRA establishes the "comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Under the CSRA, most civilian employees can appeal a major adverse personnel action to the Merit Systems Protection Board ("MSPB"). 5 U.S.C. §§ 7512, 7513(d), 7701. Employees subject to a RIF may also pursue relief before the MSPB. *See* 5 C.F.R. § 351.901. The CSRA empowers the MSPB to order relief, including reinstatement. 5 U.S.C. §§ 1204(a)(2), 7701(g). An employee aggrieved by a final decision of the MSPB may obtain judicial review. *Id.* § 7703(a)(1). *See also id.* § 7703(b) (providing the Federal Circuit with exclusive jurisdiction over most final MSPB decisions). In addition, the FSL-MRS governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The Federal Labor Relations Authority ("FLRA") is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Review of the FLRA's decisions is available in the courts of appeals. *Id.* § 7123(a).

U.S. 340, 347 (1984), where it considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding." *Id.* at 347. In the "complex scheme" Congress had provided, "the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* Accordingly, the statute's "structure . . . indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* The "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other result, the Court said, would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

In *Fausto*, the Supreme Court applied the same reasoning to the CSRA itself. The Court explained that the "exclusion" of a party "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "*prevents* [the party] from seeking review" under other provisions. 484 U.S. at 455 (emphasis added). The Court emphasized that the CSRA's "comprehensive nature," its express provisions for different kinds of review for different kinds of plaintiffs, and its exclusion of those in the plaintiffs' position from the comprehensive scheme, reflected a "considered congressional judgment" that those employees "should not have statutory entitlement to review for" that type of personnel action covered by the CSRA. *Id.* at 448. *See Grosdidier v. Chairman*, 560 F.3d 494, 497 (D.C. Cir. 2009) (Kavanaugh, J.) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.").

Those principles likewise foreclose this Court's exercise of subject matter jurisdiction over Plaintiffs' employment-related claims.[4] Just as Congress "intentionally foreclosed judicial review to" certain employees under the CSRA, *see Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984), it intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief. As in *Fausto*, it would turn the CSRA's comprehensive structure "upside down" for Plaintiffs, who are strangers to the federal government's employment relationships, to challenge HHS employment decisions in federal district court, "free" from any of the restrictions that would apply if the claim were brought by the HHS employees themselves. *See* 484 U.S. at 449–50. The exclusion from the CSRA's review scheme reflects Congress's considered judgment limiting who may challenge a personnel decision and on what grounds—rather than providing carte blanche for those excluded to sue outside the CSRA's comprehensive scheme. *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (explaining that "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of the specific remedies" that precludes jurisdiction).

The Supreme Court's more recent decisions in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175, 186 (2023), reflect these same principles. Those cases underscore that where, as here, Congress has established a "comprehensive" review scheme, district courts lack subject matter jurisdiction over a claim where it is, as here, "of the type Congress intended to be reviewed within" the statutory structure. *See Axon Enters., Inc.*, 598 U.S. at 186 (quoting *Thunder Basin Coal Co.*, 510 U.S. at 212).

---

[4] As argued *infra* at pages 30–36, the RIFs and restructuring at issue in this case do not constitute a discrete, final agency action in the sense required for APA review. However, if the Court disagrees on that point, the argument in this section provides an independent alternative basis for dismissing the case as to the RIF notices discussed in the Complaint.

24

Congress did not establish an implausible scheme in which employees must litigate their employment actions through a comprehensive, integrated scheme, but others are left free to challenge those same employment actions directly in federal district court with "greater rights" than the affected employees themselves. *See Graham*, 358 F.3d at 934. Instead, Congress limited review of federal employment actions to actions by affected employees themselves, in a different forum. And as then-Judge Roberts summed up, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005).

Multiple courts, including recent decisions applicable to the allegations in this case, have declined jurisdiction on this ground. *See, e.g.*, *AFGE v. Trump*, 929 F.3d at 752; *see also, e.g.*, *Am. Fed'n of Gov't Emps. v. Ezell*, No. 25-10276-GAO, 2025 WL 470459, at *1–2 (D. Mass. Feb. 12, 2025) (finding no jurisdiction to consider plaintiffs' claims to enjoin the Office of Personnel Management from enforcing the deadline for its "Fork in the Road" offer); *Nat'l Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1, 6–10 (D.D.C. 2025); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 19–24 (D.D.C. 2025); *Maryland v. U.S. Dep't of Agric.*, Nos. 25-1248, 25-1338, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) (ordering stay of district court's preliminary injunction and explaining that the government is likely to show that the district court lacked jurisdiction over plaintiff States' claims, where the government had argued, among other things, that the "[CSRA] provides the exclusive means for review of personnel actions taken against federal employees"—and observing that "[t]he Supreme Court has stayed a similar preliminary injunction issued by the United States District Court for the Northern District of California" (citing *OPM v AFGE*, 2025 WL 1035208, at *1)).

Here, much of the relief Plaintiffs seek (other than adjudication of their Part 90 applications, which has already occurred) is at its core a challenge to HHS employment policies,

25

including the recent implementation of a RIF (which will not be carried out in NIOSH RHD). That Plaintiffs have framed their alleged injuries under the APA does not allow them to sidestep the CSRA's mandatory channeling regime. Were their theory correct, downstream consumers of government services and benefits could always go directly to court to raise such challenges, notwithstanding Congress's determination that federal employees must first pursue relief administratively. It would be an odd result indeed if claims that cannot be raised in district court by those most directly affected—the employees themselves—could be raised by plaintiffs whose asserted injuries are entirely derivative. The Court therefore lacks jurisdiction over these employment and RIF related claims because they must be litigated in another forum.

        (2)      <u>APA review is precluded because HHS's administrative reforms are committed to agency discretion.</u>

The APA grants a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. But it withdraws that cause of action "to the extent that . . . agency action is committed to agency discretion by law." *Id.* § 701(a). "Agency action is committed to agency discretion by law when 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Steenholdt v. F.A.A.*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). HHS is undergoing a reorganization pursuant to executive decisions by consolidating redundant personnel and functions to save costs. The HHS Secretary has taken the first steps in right-sizing the Department through a [RIF] and other programmatic decisions.

Here, RIF decisions and reorganization of HHS incorporate the type of actions that are

"committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Markland v. Off. of Pers. Mgmt.*,

140 F.3d 1031, 1033 (Fed. Cir. 1998) ("We accord an agency wide discretion in conducting a

reduction in force; absent a clear abuse of that discretion, a substantial departure from applicable

procedures, a misconstruction of governing statutes, or the like, we do not upset a final agency

decision." (cleaned up)). "In determining whether a matter has been committed solely to agency

discretion, [courts] consider both the nature of the administrative action at issue and the language

and structure of the statute that supplies the applicable legal standards for reviewing that action."

*Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002).

As noted above, the Court lacks jurisdiction over challenges to HHS's workforce

reductions, which Congress has channeled to other forums. *See supra* pp. 21–26. Congress vested

with the Secretary of HHS "broad authority to reorganize the department through the redistribution

of functions for which he is responsible." *See* Darrel J. Grinstead, *Statutory Framework for the

Organization and Management of the U.S. Department of Health and Human Services*, *in* HHS IN

THE 21ST CENTURY: CHARTING A NEW COURSE FOR A HEALTHIER AMERICA 209, 211 (Leonard D.

Schaeffer et al. eds., 2009) (discussing Reorganization Plan No. 1 of 1953 and Reorganization

Plan No. 3 of 1966). And staffing and organizational decisions are squarely in the realm of actions

that courts have traditionally found committed to agency discretion. *See e.g.*, *Lincoln v. Vigil*, 508

U.S. 191, 193 (1993) (holding that the Indian Health Service's 1985 decision to "reallocate the

[Indian Children's] Program's resources" from "handicapped Indian children in the Southwest,"

who had been served since the late 1970s and early 1980s, to a "nationwide effort to assist such

children" was "committed to agency discretion by law" and "therefore not subject to judicial

review under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2)"); *Local 2855 v. United*

*States*, 602 F.2d 574, 579 (3d Cir. 1979) ("The existence of broad discretionary power in an agency often suggests that the challenged decision is the product of political, military, economic, or managerial choices that are not really susceptible to judicial review."); *see also* 5 U.S.C. § 301 ("The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."); 5 C.F.R. § 351.201(a)(1) ("Each agency is responsible for determining the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated. This includes determining when there is a surplus of employees at a particular location in a particular line of work."); *General Counsel*, B- 199491 (Comp. Gen.), 1980 WL 16137, at *1 (Aug. 14, 1980). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler*, 470 U.S. at 831–32.

Plaintiffs point to no statute limiting HHS's inherent discretion to reorganize. They state that the RHD and CWHSP are essentially shuttered (which has been refuted by evidence on the record), and any speculation as to their future is nothing more than guesswork at this posture. *See also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (noting that "allegations of possible future injury are not sufficient" to establish Article III standing (cleaned up) (citation omitted)). Plaintiffs offer no judicially manageable standard for the Court to second-guess the Secretary's judgment about what staffing levels or office structures are the "right" ones to best accomplish the agency's statutorily mandated programs such as the CWHSP. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (noting that agencies generally have broad discretion to determine how to implement a statute). To override these principles and enjoin

agency leadership from exercising control over their own staffing would be an extraordinary violation of the separation of powers. Those decisions, therefore, are not subject to APA review.

But even if this Court were to conclude that the Department's explanation for the RIFs or the reorganization of the Department is insufficient to withstand judicial review, that would in no way justify the injunctive relief that Plaintiffs seek. Rather, "the proper course" would be "to remand to [HHS] for additional . . . explanation," not any type of injunctive relief. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

     (3)    <u>Plaintiffs' claims are not reviewable under the APA because they do not seek judicial review of a discrete, final agency action.</u>

"The federal courts are not authorized to review agency policy choices in the abstract." *Fund for Animals v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006). Rather, the APA "provides a generic cause of action to '[a] person suffering legal wrong because of *agency action*, or adversely affected or aggrieved by *agency action.*'" *Id.* (emphasis in original) (quoting 5 U.S.C. § 702). Review under the APA is further limited to "*final agency action* for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added).

The APA's definition of "action" is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.). Rather, the "agency action" limitation prevents plaintiffs from "seek[ing] wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. at 891. That is, "[u]nder the terms of the APA, [plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Id.* at 891. And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) [hereinafter *SUWA*].

"Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

        a.    *Plaintiffs do not seek judicial review of a discrete agency action.*

As a threshold matter, the operative Complaint still does not identify a discrete and circumscribed agency action that HHS has taken and that could specifically be redressed by a federal court.[5] Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan*, 497 U.S. at 891, 899; *SUWA*, 542 U.S. at 62. These final agency actions must be "circumscribed [and] discrete." *SUWA*, 542 U.S. at 62. The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, *operating a program, or performing a contract*," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (emphasis added). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). Again, "[b]ecause 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell*, 455 F.3d at 307 (citation omitted).

---

[5] The issue of whether there was a discrete agency action that is final implicates the jurisdiction of the federal courts, and such final action is normally a prerequisite to judicial review. *See, e.g., Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021). As such, this argument is properly viewed as one for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). But whether the issue is analyzed as a jurisdictional issue—as Defendants believe is appropriate—or as a Rule 12(b)(6) defect in Plaintiffs' attempt to state a claim, the Court should dismiss for lack of discrete, final agency action because such action is a baseline requirement for APA reviewability. *See id.*; *see also* 5 U.S.C. § 704 (providing that "final agency action for which there is no other adequate remedy in a court are subject to judicial review").

Indeed, the D.C. Circuit recently affirmed the application of *Lujan* and *SUWA. See Nat'l Treasury Emps. Union v. Vought*, --- F.4th ----, 2025 WL 2371608, at **10–13 (D.D.C. Aug. 15, 2025) [hereinafter *NTEU v. Vought*]. In a challenge to the alleged dismantling of the Consumer Financial Protection Bureau ("CFPB"), the D.C. Circuit affirmed the "APA does not make federal courts 'roving commissions' assigned to pass on how well federal agencies are satisfying their statutory obligations." *Id.* at *10. Accordingly, the D.C. Circuit found the plaintiffs' challenge to the purported shutdown of the CFPB was not agency action as there had been no formal pronouncement of such a shutdown and as a result, plaintiffs were merely challenging "a constellation of then-ongoing actions—the February 10 email, firing employees, cancelling contracts, declining additional funding, and terminating the lease for the Bureau's current headquarters." *Id.* at *12, 13. The court further noted that plaintiffs' challenge was further prohibited by *SUWA* given that it sought "an order compelling the CFPB to keep providing its mandatory services," even though the relevant statute "gives the agency 'a great deal of discretion in deciding *how*' to provide them." *Id.* at *13 (emphasis in original) (quoting *SUWA*, 542 U.S. at 66).

Here, Plaintiffs' APA claim and requested relief present exactly the type of impermissible wholesale challenges, i.e., the sort of "broad programmatic attack" rejected in *Lujan*, that the APA forbids. Plaintiffs challenge a collection of past and potential future actions—reductions of staff, transfer of functions, reorganization of various offices, and so on. They do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of HHS's management and restructuring of NIOSH and staffing decisions. Instead of presenting the Court with a "narrow question to resolve," *Cobell*, 455 F.3d at 307, Plaintiffs challenge a host of individual actions—

31

RIF notices mailed in April 2025, the alleged inability to carry out the CWHSP, the purported

shutting down of the RHD, and the ongoing restructuring of NIOSH.

In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can

proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting
> *principally of the many individual actions referenced in the complaint, and
> presumably actions yet to be taken as well*—cannot be laid before the courts for
> wholesale correction under the APA, simply because one of them is ripe for review
> and adversely affects [a plaintiff].

497 U.S. at 892–93 (emphasis added). *See also Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50

(D.D.C. 2014) (rejecting plaintiffs' attempt to "attach[] a 'policy' label to their own amorphous

description of the [agency's] practices" because "a final agency action requires more"). Indeed,

the purpose of the APA's discrete agency action requirement is "to protect agencies from undue

judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract

policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542

U.S. at 62.

Addressing this type of claim would require the Court to supervise all the agency's

activities and determine how the agency would accomplish each statutorily-mandated function—

an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan*. *See* 497

U.S. at 892–93. Such a claim would completely circumvent the purpose of the APA's discrete

agency action requirement, which is to "protect agencies from undue judicial interference with

their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which

courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66–67.

b.    *Plaintiffs do not identify a final agency action.*

Alternatively, even assuming Plaintiffs can show a discrete agency action in this case, it was not final for APA purposes. For an agency action to be "final" within the meaning of the APA, two considerations must be met. "First, the action must mark the 'consummation' of the agency's decision-making process—[i]t must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citation omitted). "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Id.* at 178 (citation omitted).

In *NTEU v. Vought*, the D.C. Circuit affirmed that a purported decision to shut down the CFPB was not a final agency action. *See* 2025 WL 2371608, at *13. The court reasoned there was no formal decision to shut down the agency, and any such decision did not produce any legal consequences, since for instance, agency leadership still required the CFPB to remain open and perform statutorily required functions. *See id.* The *NTEU v. Vought* Court noted "an agency plan is unreviewable insofar as it reflects only a nonbinding statement of something the agency intends to do in the future." *Id.* at *8. *See also id.* ("Because such a plan has no immediate effect, a plaintiff cannot challenge the plan itself but instead must await further agency actions implementing it."). Likewise, Plaintiffs here fail to identify any final agency action.

First, Plaintiffs fail to allege that HHS's actions "mark the consummation" of its decision-making process regarding the RIFs and restructuring of NIOSH. *See Bennett*, 520 U.S. at 178. To be sure, the Complaint does not specifically allege a "final action" for purposes of establishing a cause of action under the APA. If Plaintiffs rely on the RIF notices sent to employees in the NIOSH RHD as final agency action, that is contrary to APA law as those notices indicated the following: "Should the circumstances of the RIF otherwise change, *this notice may be withdrawn*." (ECF No.

10-1 at 2 (emphasis added).) And, in fact, those notices have been withdrawn, showing their indefinite nature. (*See* ECF No. 52-1 ¶¶ 3-4.)

By the terms of the March 27, 2025, Press Release, the agency's "decisionmaking process" is ongoing and evolving. (*See* ECF No. 33-1.) For example, the March 27, 2025, Press Release describes "specific contents of the restructuring plan that have been announced so far." (*Id.*) It simply describes a series of steps, across HHS's various components, that the agency was separately overtaking. And the accompanying Fact Sheet notes that while "[n]o additional cuts are currently planned" beyond those described in the sheet, the Department "will continue to look for further ways to streamline its operations and agencies." (*See* ECF No. 33-2.) These statements underline the developing nature of the agency's actions. HHS's operating divisions have worked diligently toward completing their Agency RIF and Reorganization Plans as required by the President's Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," issued February 11, 2025, and the joint memorandum issued by the Office of Personnel Management and the Office of Management and Budget on February 26, 2025, *see* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025); Off. of Personnel Mgm't, *Memorandum re: Guidance on Agency RIF & Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf, with the goal of implementation by the September 30, 2025, deadline. An unfolding reorganization plan that remains subject to changes based on circumstances is quintessentially non-final. *See NTEU v. Vought*, 2025 WL 2371608, at *8 ("[A]n agency plan is unreviewable insofar as it reflects only a nonbinding

statement of something the agency intends to do in the future."); *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, --- F. Supp. 3d ----, 2025 WL 1568301, at *6 (D.D.C. June 3, 2025) ("To the extent that unilateral dismantlement (or large-scale reorganization) is underway, it is not challengeable as a final agency action[.]").

The actions taken so far reflect a decision by HHS leadership that agency functions need to be streamlined and reorganized. And HHS has begun taking steps to address that need. Those steps are "preliminary" in nature and "not directly reviewable." *See* 5 U.S.C. § 704. They "may be . . . step[s], which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the individual programmatic actions themselves the "consummation of the administrative process" of reevaluating the agency's priorities to reorganize HHS. *Id.* at 113. Indeed, since the press release mentioned above, HHS has reversed some of the RIFs, including those at issue in the Complaint. HHS has responded to facts on the ground in a way that courts are not able to quickly accomplish and that litigation-driving judicial management would impede.

Not only do Plaintiffs fail to identify any final agency action in the operative Complaint, but they also fail to allege any rights or obligations that have been determined as a result of HHS's announcement of RIFs and restructuring beyond speculation regarding the future of the RHD and CWHSP. HHS has given no indication that it does not intend to carry out its statutory duties under the Mine Act. Plaintiffs therefore fail to identify a cognizable final agency action. *Cf. Shank v. U.S. Dep't of Interior*, 907 F. Supp. 285, 289 (C.D. Ill. 1995) ("There is no dispute that [the Office of Surface Mining and Reclamation Enforcement] had discretion to implement a RIF . . . . Therefore, the decision to implement the RIF is not reviewable under the APA. Consequently, the [c]ourt does not have jurisdiction over [p]etitioners' Motion for Preliminary Injunction.").

Because there is no final agency action in this case, there is nothing for this Court to analyze under the arbitrary and capricious standard of the APA. *Cf. Springs v. Stone*, 362 F. Supp. 2d 686, 703 (E.D. Va. 2005) ("[T]here are no readily identifiable standards by which to evaluate the alleged arbitrariness and capriciousness of the RIF. This case represents one of those rare instances when judicial review is precluded."). Thus, it is impossible to find that any HHS decisions at this point are contrary to law as there have been no final agency decisions.

    c.  *There are adequate alternative remedies available.*

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Importantly, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing a putative APA claim under Federal Rule of Civil Procedure 12(b)(6) because the decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit). As already described above, this is, in essence, an employment action, and there are CSRA and FSL-MRS remedies. Further, to the extent this case rests on contract claims, then the Court of Federal Claims provides an adequate alternative remedy under the Tucker Act. *See Randall v. United States*, 95 F.3d 339, 346–48 (4th Cir. 1996).

**III.    The Complaint Does Not State a Claim for Violation of the APA.**

### A.    Plaintiffs Seek to Compel Agency Action But Cannot Meet the Mandamus-Like Standard.

A significant aspect of Plaintiffs' allegations is that the restructuring and RIF notices violate the law because they will cause (or have caused) HHS to cease performing functions mandated by statute. (*See, e.g.*, ECF No. 59 ¶¶ 40 ("[B]ecause of the [RHD] [c]losure, Defendants, among other things, are unable to effectively discharge their mandatory statutory duties to administer the low-dust job transfer program as required by the Mine Act."), 41 ("Defendants, among other things are not offering mobile health screening services, or otherwise complying with their mandatory statutory duty to offer free health screenings, in the form of chest X-rays convenient to every coal miner at an interval not to exceed 5 years."), 55 ("By closing the [RHD], Defendants are violating their nondiscretionary mandatory statutory duties to conduct health surveillance and the job-transfer program under 30 U.S.C. § 843.").) Such allegations are governed by the APA's provision permitting courts to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1).[6] Plaintiffs cannot succeed under § 706(1)'s mandamus-like standard.

"The only agency action that can be compelled under the APA is action legally *required*." *SUWA*, 542 U.S. at 63 (emphasis in original). In 5 U.S.C. § 706(1), "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through" writs like mandamus, a remedy "normally limited to enforcement of a specific, unequivocal command, the ordering of a precise, definite act . . . about which [an official] had no discretion whatever." *Id.*

---

[6] The Complaint purports to bring the APA cause of action under § 706(2), but that is not applicable based on their allegations. Plaintiffs based their challenge on allegations that HHS allegedly no longer takes actions or provides services that are legally required under the Mine Act. In such a scenario—where an agency allegedly does not do what a statute requires, "§ 706(1) is the appropriate provision." *Sheldon v. Vilsack*, 538 F. App'x 644, 649 n.3 (6th Cir. 2013); *accord Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 933 (9th Cir. 2010) (recognizing that a claim based on the Forest Service not following a statutory command would be cognizable under § 706(1)).

(alterations in original) (citations omitted) (internal quotation marks omitted). Thus, "Section 706(1) permits judicial review of agency inaction, but only within strict limits," mirroring "the common law writ of mandamus." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). Those strict limits mean that plaintiffs challenging "federal agency *inaction*" must show that the agency "failed to take a *discrete* agency action that it is *required to take.*" *Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 99 (1st Cir. 2012) (emphasis in original) (quoting *SUWA*, 542 U.S. at 64). *See also In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (holding that § 706(1) relief "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act" (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000))).

Several significant hurdles limit the availability of § 706(1) relief. Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *In re Bluewater Network*, 234 F.3d at 1315 (quoting 5 U.S.C. § 706(1)). Even once there has been an "unreasonable delay" in fulfilling the required statutory duty, the Court evaluates "whether the agency's delay is so egregious as to warrant mandamus." *In re Core Commc'ns, Inc.*, 531 F.3d at 855 (quoting *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) [hereinafter *TRAC*]). The *TRAC* standard for determining whether an agency's delay is sufficiently egregious "is very deferential to administrative agencies." *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Env't Prot.*, 163 F.3d 74, 82 n.9 (1st Cir. 1998) [hereinafter *AAMA*]. *See also Towns of Wellesley, Concord & Norwood v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987) (applying the *TRAC* standard). And even where performance of a required duty is delayed sufficiently to satisfy that deferential standard, courts must still be

careful not to "enmesh[]" the judiciary "in the minutiae of agency administration." *Cobell v. Norton*, 240 F.3d 1081, 1108–09 (D.C. Cir. 2001) (citation omitted). If a court does find a violation after applying the proper deference, *see AAMA*, 163 F.3d at 82 n.9, "[i]t is proper . . . to allow the government the opportunity to cure" that violation, *Cobell v. Norton*, 240 F.3d at 1108–09 (citation omitted).

And even to the extent that Plaintiffs may have identified any discrete and statutorily required action that HHS is withholding, which Defendants are not, any relief would have to accord with the remedial principles applicable under § 706(1). Yet Plaintiffs do not identify any "specific, unequivocal command" to which the Department is subject such that the Court could "order[] . . . a precise, definite act." *SUWA*, 542 U.S. at 63 (citations omitted). They describe no "transparent violations of a clear duty to act," let alone one that has been withheld so long as to be "unreasonably delayed." *In re Bluewater Network*, 234 F.3d at 1315. Indeed, several instances where Plaintiffs purport to identify required departmental activities, (*see, e.g.,* ECF No. 59 ¶ 41 (alleging that mobile health screening services are not being offered)), do not involve a ministerial duty, and HHS enjoys discretion in how to act. And even statutorily prescribed activities, such as "research and approval duties regarding the prevention and control of respirable coal-mine dust exposure," (*id.* ¶ 45), which have historically been conducted by NIOSH, are not required to be conducted in a particular manner. Instead, the Secretary has discretion to "enter into contracts with, and make grants to, public and private agencies and organizations and individuals," to carry out these projects. *See* 30 U.S.C. § 951(c).

Finally, issuing a permanent injunction would not "allow the government the opportunity to cure" any statutory violation the Court may find. *Cobell v. Norton*, 240 F.3d at 1108–09 (citations omitted). *Cf. NTEU v. Vought*, 2025 WL 2371608, at *14 (citing *FTC v. Standard Oil*

*Co.*, 449 U.S. 232, 242 (1980)) (recognizing that immediate judicial review is inappropriate when an agency has shown willingness to change course). In sum, this case is a poor candidate for the mandamus-style relief afforded by § 706(1). And because § 706(1) is the most logical avenue for Plaintiffs' theory of harm, the Court should dismiss their complaint.

### B.    Plaintiffs Fail to State an Arbitrary and Capricious Claim.

Even if analyzed under Section 706(2), Plaintiffs' claims fail. Plaintiffs do not present a coherent argument in support of their APA arbitrary and capricious claim. They do not allege, for example, that any decisions were made without reason or explanation. The sole allegation speaking to the basis for Plaintiffs' arbitrary and capricious claim is that "Defendants' decision to terminate the staff at the [RHD] and thereby stop implementing the mandatory Section 843 programs (CWHSP and Part 90) was arbitrary and capricious." (ECF No. 59 ¶ 61.) This is insufficient to sustain a claim under the APA that a certain decision was arbitrary and capricious. The claim appears to rest on nothing more than Plaintiffs' disagreement with policy decisions being made. But Plaintiffs' dissatisfaction with the degree of analysis underlying certain decisions does not support their APA claim.

"Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423; *see also Littlefield v. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 1117 (2024). "As the Supreme Court has 'repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.'" *Scarborough Citizens Protecting Res.*, 674 F.3d at 101 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007)). Thus, the Court must review only to ensure "that the agency has acted within a zone of reasonableness[.]" *Prometheus Radio Project*, 592 U.S.

at 423; *cf. Lincoln*, 508 U.S. at 192 (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way"). Defendants' actions satisfy this deferential review. As demonstrated by the evidentiary record established earlier in this case, the RHD and CWHSP are functioning at pre-suit level, and Plaintiffs' other alleged harms regarding the future of the RHD are purely speculative.

Plaintiffs may disagree with HHS's cost-benefit analysis, but they are not entitled to judicial relief "dictating to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 545 (citation omitted). "The decision to undertake a reorganization necessitating a [RIF] is within the discretion of the agency." *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993) (unpublished table decision) (citation omitted). And any other programmatic decisions regarding HHS's handling of its statutorily required duties or responsibilities are likewise committed to agency discretion. *See Lujan*, 497 U.S. at 891; *SUWA*, 542 U.S. at 62. To override these principles and enjoin agency leadership from exercising control over their own staffing and organizational issues would be an extraordinary violation of the separation of powers.

In particular, RIFs are exactly the type of action that is "committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2); *Markland*, 140 F.3d at 1033 (stating that "[w]e accord an agency wide discretion in conducting a reduction-in-force" (cleaned up)). Staffing decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191–92 (citation omitted). After all, the point of HHS's actions is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Id.*

at 192. As the Supreme Court has held, "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities," *Heckler*, 470 U.S. at 831–32, and "the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs," *Sampson v. Murray*, 415 U.S. 61, 83 (1974). Moreover, Plaintiffs point to no statute limiting the agency's inherent discretion to reduce headcount.

## IV.    **Plaintiffs Cannot Bring a Claim Under the Impoundment Control Act.**

Although not included as a separate cause of action in the Complaint, Plaintiffs make allegations (and have argued numerous times throughout the course of this litigation) that Defendants have impounded funds specifically appropriated to them by Congress. (*See* ECF No. 59 ¶¶ 43, 63-65.) Such a claim is not appropriate for consideration in this case.

Under the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 333 (1974) (codified as amended at 2 U.S.C. § 681, *et seq.*), under 2 U.S.C. § 687, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b). But the Impoundment Control Act enforces Congress's power over the purse in relation to the Executive. *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982). It provides for enforcement by the Comptroller General (an official in the Legislative Branch), not private parties under 2 U.S.C. § 687. Accordingly, courts have held that private plaintiffs cannot bring suit for alleged violations of the Impoundment Control Act. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734 (S.D. Tex. 2024) (citing 2 U.S.C. § 687) ("In short, an alleged [Impoundment Control Act] violation has only one proper plaintiff: the Comptroller General."); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 & n.1 (D.D.C. 1981). So, too, should this Court. *Gen. Land Off.*, 722 F. Supp. 3d at 735 (finding such a claim "unreviewable").

Indeed, the D.C. Circuit recently affirmed that grantees suing over the freezing of their grant funding "have no cause of action to undergird their APA contrary-to-law claim" premised on violations of the Impoundment Control Act. *Glob. Health Council v. Trump*, --- F.4th ---, No. 25-5097, 2025 WL 2326021, at *11 (D.C. Cir. Aug. 13, 2025), *stay denied*, No. 25-5097 (D.C. Cir. Aug. 20, 2025) (per curiam). The D.C. Circuit reasoned that the grantee's APA claims were precluded by the Impoundment Control Act's complex statutory scheme, which permits only the Comptroller General to bring suit related to any violations of the statute. *See id.* Thus, likewise, the Court should find that Plaintiffs here cannot ground their APA claims based on purported violations of the Impoundment Control Act or raise any separate claims under the Impoundment Control Act.

Even if Plaintiffs' Impoundment Control Act theory had merit, they still could not obtain the broad relief they seek here. At most, Plaintiffs allege that HHS's ongoing restructuring constituted a deferral of budget authority for which the requisite "special message" was not communicated to Congress. *See* 2 U.S.C. § 684. In that scenario, the remedy would be a directive to communicate the special message—not a broad injunction interfering with the Executive's lawful discretion to enact RIFs and restructure HHS and NIOSH.

## CONCLUSION

For these reasons, Plaintiffs' Complaint, (ECF No. 59), should be dismissed.

Respectfully submitted,

**LISA G. JOHNSTON**
**Acting United States Attorney**

**s/Fred B. Westfall, Jr.**
WV State Bar No. 3992
Assistant United States Attorney
Attorney for United States
300 Virginia Street East, Room 4000
Charleston, WV  25301
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: fred.westfall@usdoj.gov