## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

HARRY WILEY and MATTHEW WARD, individually
and on behalf of all others similarly situated,

      Plaintiffs,


        v.                                         Civil Action No. 2:25-cv-227
                                               Honorable Judge Irene C. Berger

ROBERT F. KENNEDY, JR., in his
official capacity as Secretary of Health
and Human Services, and
U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

      Defendants.

## PLAINTIFFS' MEMORANDUM IN RESPONSE TO MOTION TO DISMISS

On August 28, 2025, the Defendants filed a new Motion to Dismiss this case, renewing several arguments this Court has previously rejected and should reject again. First, Defendants argue that Plaintiffs lack standing, but this argument is misplaced because Defendants focus on the incorrect moment in time (i.e. the time of their motion, rather than the outset of the litigation). Moreover, since the Defendants rejected Mr. Wiley's Part 90 application, he still presently possesses an especially acute and concrete legal interest in accessing Defendants' health screening services to confirm the development of his pneumoconiosis so he may exercise his Part 90 rights and avoid fatal complications of black lung. Defendants also argue the CWHSP is "operational to the same degree it was pre-suit," yet the Defendants have not conducted any health screening services that are reasonably accessible to the Plaintiffs since the commencement of this action.

As set forth below, the other grounds for dismissal proffered by Defendants are unavailing.

1

## FACTS

Plaintiffs incorporate the Court's findings of fact regarding Mr. Wiley and Mr. Ward in the Preliminary Injunction Order. (ECF 36 at 3-4).

Mr. Ward testified by verified statement (ECF 47-2) that, as of July 8, 2025, he had still not received a response to his Part 90 application. Mr. Wiley's Part 90 application has been denied by NIOSH, leaving him with the need to seek additional medical review by NIOSH of his radiographic records (chest x-rays and CT images) in aid of his ongoing current efforts to obtain a job transfer under the Part 90 program (ECF 47-1 at § 25). The medical dispute issue underlying this case relates to whether Mr. Wiley has established that he suffers from simple clinical pneumoconiosis, whose progression towards the complicated stage of the disease he seeks to avert by exercising a Part 90 transfer to a low-dust job. This is the very sort of high-risk miner whom Part 90 is supposed to protect before the disease reaches the totally-disabling, complicated stage.

## ARGUMENT

As a preliminary matter, Defendants cite to a number of recent cases in their introduction. All are readily distinguishable. For example, on p. 4 of their Memorandum, Defendants cite to *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.,* 145 S. Ct. 1914, 2025 WL 1035208, at *I (Apr. 8, 2025) and *Trump v. Am. Fed'n of Gov't Emps.,* No. 24Al174, 2025 WL 1873449 (U.S. July 8, 2025). *See* ECF No. 66 at 4.  Unlike the plaintiffs in those cases, Plaintiffs Wiley and Ward have shown specific examples of how Defendants' failures to fulfill non-discretionary duties have caused them concrete and particularized harm. Moreover, unlike the facts at issue in *Am. Fed'n of Gov't Emps.*, the Reductions in Force ("RIFs") representing a discrete agency action are before the Court. *Trump v. Am. Fed'n of Gov't Emps.,* No. 24Al174, 2025 WL 1873449 (U.S. July 8,

2025) ("We express no view on the legality of any Agency RIF and Reorganization Plan produced or approved pursuant to the Executive Order and Memorandum. The District Court enjoined further implementation or approval of the plans based on its view about the illegality of the Executive Order and Memorandum, not on any assessment of the plans themselves. Those plans are not before this Court."). Moreover, none of those decisions, including *McMahon v. New York,* 145 S.Ct. 2643 (2025) provide a reasoned explanation for decision which can serve as precedent in this case and all were decided in the context of appeals from a preliminary injunction—which Defendants did not appeal in this matter.

Although the Court did state in *Trump v. Boyle,* No. 25Al 1, 2025 WL 2056889 (U.S. July 23, 2025) that a recent decision "squarely controlled" (a convenient phrase for Defendants), the Supreme Court's citation was to a case that does not appear in Defendants' brief. Moreover, the issues in *Boyle* and the case cited therein, *Trump* v. *Wilcox*, 145 S.Ct. 1415 (2025), pertain to the question of presidential authority to fire heads of independent agencies—not agency decision-making, which is at issue here. Defendants also cite to the case of *Trump v. CASA, Inc.,* 606 U.S. 831 (2025). *See* ECF No. 66 at 5 for the prospect that this Court has limited power to issue broad injunctions for the benefit of an individual plaintiff. The *CASA* decision, however, specifically contemplated the use of class actions for injunctions that may span multiple states or districts, especially where there were discernable, common governmental functions that merited class relief such as there are in this case involving the Mine Act programs within NIOSH. Further, Defendants appear to ignore the fact that this case has been filed as a class action and Plaintiffs intend to pursue certification prior to judgment.

## I.    Plaintiffs Have Standing and This Case Is Not Moot.

Defendant's argument that Plaintiffs lack standing is accurately summarized in their statement: "Now that CWHSP [the Coal Workers' Health Surveillance Program] is fully restored and Plaintiffs are able to access all services required by statute and regulation to be available to them, there is no case or controversy for this Court's consideration." Putting aside for the moment that Plaintiffs do *not* have access to all required services, the Defendant's argument focuses on the wrong point in time. "Unlike questions of mootness and ripeness, the standing inquiry asks whether the plaintiff had a requisite stake in the in the outcome of a case 'at the outset of litigation.'") *Deal v. Mercer County Bd. of Education*, 911 F.3d 183, 187 (4th Cir. 2018) (quoting *Laidlaw*, 528 U.S. at 180 ). As recently explained by the U.S. Court of Appeals for the Sixth Judicial Circuit, this is true even when the original complaint is superseded by an amended complaint: "[W]hen a plaintiff has filed an amended complaint, standing is measured by when the plaintiff initiated the suit, but as explained by allegations in the operative complaint." *Patton v. Fitzhugh,* 131 F.4th 383, 391–92 (6th Cir. 2025); *see also, Southern Utah Wilderness Alliance v. Palma,* 707 F.3d 1143, 1152–53 (10th Cir. 2013) ("[A]lthough we examine the allegations in [Plaintiff's] Amended Complaint, our inquiry focuses on whether [Plaintiff] had standing when the original complaint was filed in April 2007"); *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 803 (9th Cir. 2020) ("Although we look to the amended complaint to determine jurisdiction subject-matter jurisdiction depends on the state of things at the time of the action brought, i.e., at the time the plaintiff commenced suit.") (cleaned up); *Lutter v. JNESO*, 86 F.4th 111, 125 (3d Cir. 2023) ("[A]n amended complaint provides additional information that can be used to evaluate standing as of the date that the lawsuit was filed.") (citing *Conolly v. Taylor*, 27 U.S. (2 Pet.) 556, 565, 7 L.Ed. 518 (1829)).

In contrast to standing, mootness is the correct doctrine to analyze whether subsequent events divest a court of jurisdiction. *Patton* 131 F.4th at 392 (6th Cir. 2025) ("if a plaintiff possesses standing from the start, later factual changes cannot deprive the plaintiff of standing. Those changes instead will create 'mootness' issues and trigger that doctrine's more forgiving rules.") (cleaned up); *see also, Deal,* 911 F.3d at 191 (4th Cir. 2018) (Unlike standing, which is determined at the commencement of a lawsuit subsequent events can moot an otherwise validly raised claim. . . When a defendant voluntarily ceases a challenged program, however, the analysis requires additional rigor.) (cleaned up). The Supreme Court briefly described the important differences between standing and mootness in the landmark case *Friends of the Earth v. Laidlaw*: "Careful reflection on the long-recognized exceptions to mootness . . .reveals that the description of mootness as 'standing set in a time frame' is not comprehensive. [A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." 528 U.S. 167, 190 (2000).

### A. Plaintiffs have standing to pursue this action

As this Court has already determined, Mr. Wiley presented evidence demonstrating that he had standing at the relevant time-period. ECF No. 36 at 17. There the Court found that Mr. Wiley, at the preliminary injunction hearing, "presented evidence of an actual, concrete, particularized, imminent injury, causally connected to the Defendants' actions in indefinitely "pausing" the CWHSP, and that injury would likely be redressed by the relief sought." *Id.* These facts are supported by statements in Plaintiffs' Second Amendment Complaint relevant to the status quo on April 7, 2025—the date on which this action was filed. Paragraph 38 describes how nearly all workers at the Respiratory Health Division of were terminated and/or placed on

administrative leave on April 1, 2025; paragraphs 39 and 40 describe how this decision left the
Defendants unable to fulfill their mandatory duties related to the job transfer provisions of the
Mine Safety and Health Act. Second Amend. Compl. ECF No. 59 at ¶¶ 38–40. These allegations
were supported by evidence at the May 7th hearing showing that at that time the Part 90
application program was closed and/or paused and that clinics had been informed that NIOSH
was not accepting applications for the program. ECF No. 36 at 9. As stated in the Second
Amended Complaint, and as this Court recognized in its initial standing determination, Mr.
Wiley may submit additional medical evidence, with no limit on the number of submissions, in
support of his Part 90 claim. ECF No. 59 at ¶¶ 24–25; ECF No. 36 at 9. Moreover, Mr. Wiley
intended to take advantage of free medical screening, but could not at the time of filing because
Defendants were not offering such services. ECF No. 59 at ¶¶ 26–28. Contrary to Defendants'
assertions, their actions after the initiation of this case, and post-dating the preliminary injunction
hearing, have no basis in a standing inquiry. As such, there is no reason to reverse this Court's
earlier decision that Plaintiffs have satisfied the standing requirements at this stage of litigation.

As Chief Judge Volk, recently explained, "in cases where each plaintiff seeks identical
relief, the presence of one party with standing is sufficient to satisfy Article III's case or
controversy requirement." *Ctr for Biological Diversity v. U.S. Forest Service,* 764 F.Supp.3d 349,
(S.D. W.Va. 2025) (cleaned up) (citing *Elrod v. WakeMed,* No. 21-2203, 2023 WL 1256601, at *3
(4th Cir. Jan. 31, 2023) (quoting *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.,* 547 U.S.
47, 52 n.2 (2006)); *see also, Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 217* (4th Cir.
2017) (noting various decisions where the Court declined to assess the standing of each plaintiff
in multiple-plaintiff cases where identical relief was requested). Consequently, Mr. Wiley's

standing is sufficient for jurisdiction and for denial of the Defendants' motion. Mr. Matthew Ward, however, also had standing at the time he entered the lawsuit.

Mr. Ward's act to initiate litigation was on July 9, 2025, when Plaintiffs' submitted their motion for leave to file a Second Amended Complaint. Allegations contained in the complaint and supported by a declaration from Mr. Ward show that in April of this year (during the time when the CWHSP was paused) he corresponded with DHHS regarding the Part 90 job transfer program based on his diagnosis of complicated black lung in March of this year. ECF No. 59 at ¶¶ 31–32. At the time of filing he had received no reply from DHHS. *Id.* at ¶ 33; ECF No. 59-1. To the extent Defendants' dispute this, such dispute creates an issue of material fact unsuited for resolution at this time. Additionally, Mr. Ward alleged that he would like to take advantage of mobile health screenings, but they were not being offered. ECF No. 59 at ¶ 36. While some mobile health screenings, may have been offered since the time of Mr. Ward's initial filing, there is no evidence to contradict his assertions that such screening was not available at the time he filed. Indeed, the only evidence in the record on the start of mobile black lung screenings (in limited areas) states that such screenings did not start until July 16, 2025. ECF No. 54-1 ("The CWHSP will be providing black lung screenings in PA, WV, and MD starting July 16.")

Even if the incorrect premise of Defendants' standing challenge—that subsequent events could undermine standing—were true, dismissal would *still* not be appropriate. As NIOSH Director, John Howard's, declaration makes clear, Mr. Wiley is still engaged in an ongoing process to seek his Part 90 job transfer. ECF No. 52-1 at 3 n. 4. As Mr. Wiley reasserted in Plaintiffs' newly filed Second Amended Complaint, he is still employed as a coal miner and still facing exposure to hazardous dust. ECF No. 59 at ¶ 29. Moreover, both Mr. Wiley and Mr. Ward still intend to take advantage of free health screening that must be provided or arranged by the Defendants at no cost

to Plaintiffs and "in the locality where the miner resides." 30 U.S.C. § 843(c). Although Defendants assert that mobile health screenings have resumed, none are available near eastern Kanawha County, West Viriginia where Mr. Wiley resides or the southern part of Mingo County, where Mr. Ward resides. *See* Ex. 1 (showing mobile health screenings for only northern West Virginia and Ohio); Ex. 2 (showing limited amount of private-pay, NIOSH-approved x-ray facilities in southern West Virginia); ECF No. 61-1 (showing mobile health screening for northern West Virginia, Ohio, and Maryland); ECF No. 54-1 (showing mobile health screenings only in northern West Virginia, Pennsylvania, and Maryland).[1]

Both Messrs. Wiley and Ward have an ongoing interest in accessing the cost-free mobile health screenings—none of which have occurred anywhere near southern West Virginia since the cessation of the program on April 1, 2025. While NIOSH may have scheduled screenings in other states or in other parts of West Viginia, and other states, Wiley and Ward retain an abiding interest in securing permanent relief from this Court to ensure the program remains operable and actually visits the Central Appalachian coalfields of southern West Virginia where they reside. The entire premise of the mobile health screenings is that working miners struggle to travel away from their job sites while working long shifts, often in evenings or overnight. Plaintiffs have a specific, particularized interest in accessing the free screenings via the NIOSH mobile unit to which they are entitled by statute and regulation. If the free screenings are not available through the NIOSH mobile unit, Plaintiffs will also face financial and logistical barriers to obtain x-rays at their own expense at the limited number of NIOSH-approved facilities outside of the limited timeframe within which their employer may offer exams. Plaintiffs would consequently be unlikely to receive

---

[1] Plaintiffs note that this will be the third filing where they have pointed out that Defendants are not offering black lung screenings in southern West Virginia and the situation still has not been addressed.

screening at all for prolonged periods to monitor their disease progression or obtain Part 90 eligibility, jeopardizing both their health and their statutory interest in the screenings and the low-dust job transfer.

Finally, despite this Court's preliminary injunction clearly directing the Defendants "that there be no pause, stoppage or gap in the protections and services mandated by Congress in the Mine Act and the attendant regulations for the health and safety of miners," Defendants have made no attempt to show that they are fulfilling mandatory duties related to their review and approval for sampling devices and research into respirable dust control under the Mine Act, which are mandated by the Mine Act to protect active miners such as Harry Wiley and Matthew Ward. ECF No. 59 at ¶¶ 44–47

**B. This case is not moot.**

As explained in the previous section, the proper standard for evaluating whether subsequent events divest a court of jurisdiction is mootness, not standing. *Deal,* 911 F.3d at 191 (4th Cir. 2018). When a defendant voluntarily ceases challenged conduct, the mootness inquiry "requires additional rigor." *Id.* The voluntary cessation exception to mootness, was developed in recognition that "a party should not be able to evade judicial review, or defeat a judgment, by temporarily altering questionable behavior," courts have developed the voluntary cessation exception. *Porter v. Clarke,* 852 F.3d 358, 363–64 (4th Cir. 2017) (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 274, 284 n.1 (2001)). Accordingly, Defendants may not "automatically moot a case by the simple expedient of suspending [their] challenged conduct after [they are] sued." *Federal Bureau of Investigation v. Fikre,* 601 U.S. 234, 241 (2024) ("*Fikre*"). Instead, the case is not moot "unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Lackey,* 145 S. Ct. at 669 (internal quotation

marks omitted) (citing *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Humans Resources,* 523 U.S. 598, 609 (2001)). The burden to make such showing is on Defendants. *Fikre*, 601 U.S. at 241 ("To show that a case is truly moot a defendant must prove no reasonable expectation remains it will return to its old ways.") (internal citations omitted). That "holds for governmental defendants no less than for private ones." *Id.* The Supreme Court has consistently described that burden as a "formidable" one. *Id.* (quoting *Friends of the Earth, Inc.*, 528 U. S. at 190 (2000)).

In the past few years, the U.S. Supreme Court has clarified just how formidable that burden is. In *West Virginia v. EPA*, the United States informed the Court that it had no intention to enforce the Clean Power Plan, which was the challenged action in that case, and that it intended to promulgate a new rule. 597 U.S. 697, 719–720 (2022). Despite that explicit assurance the Court found the case was not moot because "the Government nowhere suggests that if this litigation is resolved in its favor it will not reimpose emissions limits" and had vigorously defended its approach. *Id.* at 720.

Last year, the Supreme Court further illustrated the degree to which the government must provide assurances in order to avoid the voluntary cessation exception to mootness. In *Fikre,* the plaintiff had been placed on the government's "No Fly List" and sued the Federal Bureau of Investigation ("FBI") and other government officials. *Fikre*, 601 U.S. at 239. The government pointed to several pieces of evidence which it claimed showed there was no reasonable expectation it would return to its old ways. First, the government had removed Mr. Fikre from the No Fly List and he had remained off of the list for years. *Id.* at 243. Second, it submitted a sworn declaration that Mr. Fikre "will not be placed on the No Fly List in the future based on currently available information." *Id.* at 242–243. The Court accepted the truth of that declaration.

*Id.* Despite that evidence, the Court found that the case was not moot because the government had failed to satisfy the "formidable standard" that it bore to establish mootness due to the voluntary cessation of its activities.

Here there is far less evidence to support mootness than existing inin *West Virginia* or *Fikre.* The government has vigorously defended this action opposing preliminary injunction, filing multiple motions to dismiss, opposing a proposed amendment based on futility futility, and has maintained—even in its current brief—that its actions are beyond judicial review. *See* ECF Nos. 14, 18, 22, 52, 55. It relies on behavior taken after the filing of this action and the Court's issuance of a preliminary injunction to demonstrate its adherence to the law. ECF No. 56 at 9–11. While it proffers that agency programs have been restored—it provides no assurances that it will continue those programs. The Defendants' action in this case is akin to EPA's cessation or enforcement of the Clean Power Plan, or the FBI's removal of Mr. Fikre from the federal No Fly List. The government here has not even made attempt to provide an assurance that it will not resume its illegal action if this case is resolved in its favor. As such, the Court should find the voluntary cessation doctrine applies and that this case is not moot.

Lastly, Defendants have not submitted any evidence to contravene the allegations that the agency is not performing necessary research and approval for protective equipment or to reduce the exposure of miners to respirable dust. *See* ECF No. 59 at ¶¶ 44–47. As such, there is no basis for finding these claims moot. Consistent with the relief articulated by this Court in the May 13 order (ECF 36 at 30), the Plaintiffs seek "no pause, stoppage or gap in the protections and services mandated by Congress in the Mine Act and the attendant regulations for the health and safety of miners" regarding the following services within the NIOSH Mining Research Division ("MRD"): 1) NIOSH programs to review and approve devices for the sampling of respirable dust in coal

mines, 30 U.S.C. § 842, 2) NIOSH programs to identify toxic effects of substances found in mines in response to the request for such information by any mine operator or authorized representative of miners, 30 U.S.C. § 951(a)(11), and 3) NIOSH programs to perform specified research functions in support of respirable dust control and disease prevention.

First, Messrs. Wiley and Ward cannot obtain the low-dust protections of the Mine Act if adequate dust sampling units are not approved and available. Currently, the only Continuous Personal Dust Monitors (CPDMs) approved for use in underground mines do not have the capability of sampling for silica dust at all---and yet excessive, uncontrolled levels of silica dust comprise a principal factor that NIOSH and the U.S. Department of Labor Mine Safety and Health Administration have associated with increasing rates of morbidity from occupational pneumoconiosis among American miners. 89 Fed. Reg. 28263-65. Consequently, the Plaintiffs have an abiding and time-sensitive interest in permanently enjoining the stoppage of NIOSH research and approval of CPDMs for silica, along with other mining hazard prevention research, which continue to be suspended and their funding impounded.

Second, Wiley and Ward cannot secure the respiratory dust protections afforded by the Mine Act if NIOSH refuses to assist them in identifying the toxic effects of respirable dusts at their mines. Upon information and belief, some or all of the toxic hazard identification services within the NIOSH office in Morgantown, West Virginia continue to be suspended and their funding impounded. Third, Wiley and Ward cannot obtain protection from emerging respiratory threats such as silica dust if the ongoing research regarding silica exposure and other hazards and exposures at NIOSH ceases, which it has ever since April 1, 2025. Upon information and belief, the NIOSH MRD has halted all research activities at its Pittsburgh and Spokane facilities

12

continuously since April 1, 2025, ceasing all silica exposure and monitoring research and approval services.

These three specified protections and services offer concrete protection for the health and safety of Messrs. Wiley and Ward. Just like the rest of the statutorily-mandated protections, these three additional NIOSH services are a critical part of the Federal Coal Mine Health and Safety Act, as amended (the "Mine Act"). Harry Wiley and Matt Ward, benefit directly from each of those protections and services insofar as the services prevent or mitigate their ongoing exposure to toxic respirable dust and hazards encountered in the mines.

## II.    The Amended Complaint Properly States a Violation of the APA.

The federal Administrative Procedure Act ("APA") provides for relief when an agency refuses to perform Congressionally-mandated duties. Under § 706, courts may compel "agency action" that has been "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Contrary to the Defendants' mischaracterizations, the Plaintiffs do not seek to "dictate how the Department orders its prerogatives and conducts its day-to-day operations." ECF 66 at 3. Consistent with § 706 and the terms of this Court's injunction, which have not been challenged on appeal, the Plaintiffs simply seek to ensure the Defendants have not ceased carrying out their Congressionally-mandated duties and day-to-day operations as to which the Plaintiffs have a concrete and particularized interest.

In the Fourth Circuit, courts "ordinarily adopt a presumption of reviewability of agency action." *Gonzalez v. Cuccinelli*, 985 F.3d 357, 365 (4th Cir. 2021). In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 124 S.Ct. 2373 (2004), the Supreme Court explained certain limits to the scope of review under § 706. It instructed that a § 706 claim "can proceed only where

a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Id*. at 64, 124 S.Ct. 2373; cited by *Gonzalez*, 985 F.3d at 366.

"Where an agency 'fails to take a discrete agency action that it is required to take,' the APA creates a private cause of action for a party aggrieved by that agency's unreasonable delay to compel such action." *Fed. Energy Regul. Comm'n v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 903 (4th Cir. 2020) (emphasis omitted) (quoting *Norton*, 542 U.S. at 64, 124 S.Ct. 2373). Such authority to review agency action does not apply when "statutes preclude judicial review," 5 U.S.C. § 701(a)(1); see also 8 U.S.C. § 1252(a)(2)(B)(ii), or when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here, no ground for declining judicial review under the APA has been presented by the Defendants. For the reasons below, the Plaintiffs have stated a claim for review of the Defendants conduct under the APA.

### A.  Plaintiffs' Claims Are Not Barred by Sovereign Immunity

The APA contains a clear wavier of sovereign immunity. Specifically, it provides,

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States.

5 U.S.C. § 702. Defendants argue that this waiver is not applicable as to Count I because the Declaratory Judgment Act does not independently waive sovereign immunity and as to Count II because Plaintiff's claims fall within exceptions to the waiver. As explained below, and as already found by the Court in granting the Preliminary Injunction, neither of these arguments is persuasive.

### 1.    Plaintiffs are permitted to seek both declaratory and injunctive relief on their Administrative Procedure Act claims.

14

The Parties agree that the Declaratory Judgment Act does not independently grant jurisdiction to courts when there is no other legal right invoked. Where, as here, however, when a party seeks nonmonetary relief, including declaratory relief, the APA provides the necessary waiver of sovereign immunity. *Perry Capitol LLC. v. Mnuchin*¸ 864 F.3d 591, 618 (D.C. Cir. 2017). Mr. Wiley is therefore permitted to seek declaratory relief on his APA claim.

> **2.    Plaintiff's claims are squarely within the APA and not subject to exceptions to the waiver of immunity.**

Defendants raise three separate arguments in their contention that Plaintiff does not fall within the APA's clear waiver of sovereign immunity: 1) that federal employment claims must be brought specific to personnel statutes; 2) that the Defendants' action was within their discretion and free from judicial review; and 3) that Plaintiffs' allegations are generalized and do not relate to discrete, final agency action. ECF No. 66 at 21. As it did when it granted the Preliminary Injunction the Court should reject each of these arguments. *See generally,* ECF No. 36.

> **a.    Federal personnel statutes do not divest this Court of jurisdiction.**

As the Court has already recognized, "It is patently absurd to suggest an illegal agency action that includes termination of employees is unreviewable." ECF No. 36 at 25–26. Plaintiff Harry Wiley falls squarely within the grant of jurisdiction under the APA. The statute provides "A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by an agency action within the meaning of a relevant statute, is entitled to review thereof." 5 U.S.C. 702. As described above, Plaintiff Harry Wiley is undoubtedly a person aggrieved by the Defendant's action of functionally eliminating required services. He is not a federal employee, and his concerns are that the DHHS fulfill its statutory and regulatory duties—not the employment of specific individuals. These facts place this action in contrast to recent decisions involving other challenges

to the Executive's termination of large numbers of employees as well as the specific facts underlying the cases cited by the Defendants.

This case is also inherently distinguishable from the recent Fourth Circuit decision in *Maryland v. U.S. Dep't of Agriculture.* No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025). There, in a single page order the court stayed a district court injunction requiring the reinstatement of probationary government employees. *Id.* The court described the nature of the claims as challenges to the terminations of "thousands of probationary employees without following the procedures required for a reduction in force." Here in contrast, Plaintiff is not challenging the manner of the terminations, but rather the curtailment of agency functions and the failure of the agency to comply with statutory and regulatory obligations.

The flaw in Defendants' logic is best exemplified by its argument that "[i]t would be an odd result indeed if claims that cannot be raised in district court by those most directly affected—the employees themselves—could be raised by plaintiffs whose asserted injuries are entirely derivative." ECF 66 at 26. The fired employees are no doubt affected by this agency action, but they are not affected in the same way as the miners being forced to continue working in jobs that are worsening their lung diseases. That worsening lung disease is, in a strict sense, "derivative" of the elimination of the effective part of the CWHSP staff. It is not the kind of thing, however, that Congress intended to be reviewed under the procedures of the CSRA, or that Congress could have reasonably intended to be challenged only through the administrative procedures that individual federal employees can use to challenge their own employment decisions. *See Block v. Community Nutrition Institute*, 467 U.S. 340, 346-47 (1984) (holding that "the preclusion issue turns ultimately on whether Congress intended for that class [in this case, federal employees] to be relied upon to

16

challenge agency disregard of the law"). Instead, the miners' claim is properly brought under the APA.

    **b.**  **Non-compliance with the Administrative Procedure Act and the mandatory duties of substantive statutes are not within agency discretion.**

  As alleged in the Second Amended Complaint, Defendants effectively closed the RHD and stopped implementing programs required by the Mine Act. *See* ECF No. 59 at ¶¶ 37–47. At the Preliminary Injunction hearing, Plaintiffs presented "overwhelming evidence that the CWHSP has ceased operations." Mem. Op. & Order at 21.

  An agency action "is committed to agency discretion by law" only "where a statute is drawn in such broad terms that in a given case there is no law to apply, and the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 592 (1988); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *INOVA Alexandria Hosp. v. Shalala,* 244 F.3d 342, 346 (4th Cir. 2001) (holding that the § 701(a)(2) exception applies when "there is truly no law to apply"). Courts must "read the exception in § 701(a)(2) quite narrowly, restricting it to 'those *rare circumstances* where the relevant statute is drawn so that a court would have *no meaningful standard* against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil,* 508 U.S. 182, 191 (1993)) (emphasis added). Even when Congress intended to create a wide zone within which decisions are committed to an agency's discretion, the agency still must meet "permissible statutory objectives." *Lincoln*, 508 U.S. at 183.

  The applicable standard here is as follows: whether the Defendants are fulfilling (or were fulfilling at the time this action was filed) their statutory and regulatory obligations, and whether they have made a decision which is arbitrary and capricious or otherwise contrary to law. *See* 5

U.S.C. § 706(a)(2) (requiring a court to set aside a decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). In granting Plaintiff's Motion for Preliminary Injunction, the Court identified a litany of duties and functions that the Defendants are failing to fulfill with the closure of the Respiratory Health Division. (Mem. Op. & Order at 10–12.) The exercise of these duties is not discretionary, and those duties provide a meaningful standard upon which to judge the Defendants' action.

Moreover, even with the benefit of an evidentiary hearing and months to develop plans, Defendants have not presented any rational explanation for the curtailment of necessary functions under the Mine Act within NIOSH. Neither have they attempted to explain how this Court's issuance of a preliminary injunction has impeded their actions. Indeed, Defendants have done little more than gesture towards vague plans for reorganization in support of its action and complain that the Court lacks jurisdiction to hear the dispute. ECF No. 66 at. at 22. That is a far cry from the APA standard requiring an agency to "examine relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made." *ArkInitiative v. Tidwell,* 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Ins. Co.* 463 U.S. 29, 43 (1983)). While Plaintiffs have identified clear statutory duties that have been violated and continue to be violated and explained how those violations directly affected miners like the Plaintiffs, Defendants proffer no evidence or rationale as to how their "reorganization" of NIOSH is compatible with their mandatory duties under the Mine Act.

Finally, Defendants have provided no argument nor evidence to support the notion that they have discretion to impound funds congressionally allocated to NOISH for operating the CWHSP. Congress has specifically appropriated $362,800,000.00 *to NIOSH* for the express

18

purpose of carrying out the purposes of the Mine Act, including Section 203 (codified at 30 U.S.C. § 843), which implements the CWHSP and job transfer programs. The Department has no authority to decline the use of funds for that purpose. *See, e.g., J. Does 1-26 v. Musk*, No. 25-0462-TDC, 2025 WL 840574 at *25 (D. Md. March 18, 2025) ("[I]t is for the congress in the responsible exercise of its legislative power to make provisions for terminations of a program and until those provisions are made the function of the Executive is to administer the program in accordance with the legislative purpose.") (internal quotation marks omitted) (quoting *Local 2677, Am. Federation of Gov't Employees v. Phillips*, 358 F. Supp. 60, 72 (D.D.C. 1973)).

> **c.    Plaintiff's allegations are not generalized grievances against agency reorganization but a specific challenge to the Defendants' actions to functionally eliminate the Respiratory Health Division and thereby failing to deliver statutorily mandated services to Plaintiffs.**

Defendants argue that they are engaged in an ongoing process of reorganization and thus claim that their actions are not final, and that Plaintiff has presented only generalized grievances. ECF No. 36 at 29-36. They do not dispute that services of the CWHSP and the Respiratory Health Division halted.[2] Despite the Defendants' unsupported argument that a temporary "pause" is unreviewable, several courts have recently held that pauses to programs that provide critical services are reviewable final agency actions. *See e.g. Nat'l. Council of Nonprofits v. Office of Management and Budget*, No. 25 - 239 (LLA), 2025 WL 597959 at *13 (D. D.C. February 25, 2025) (finding an OMB "Pause Memorandum" caused legal consequences to Plaintiffs and others and was a reviewable final agency action); *Woonasquatucket River Watershed Council v. Dep't of Agriculture*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157 at *15-16 (D.R.I. April 15, 2025)

---

[2] To the degree that any of these programs have been revived, they are operating only as a consequence of this court's preliminary injunction or as a voluntary response – the shutdown of the programs is therefore still reviewable. *See supra*, Part I.

(holding that a "breadth of caselaw" supports the conclusion that a pause in programs constitutes final agency action) (citing *Louisiana v. Biden* 622 F. Supp. 3d 267, 291–92 (W.D. La 2022)); *Aids Vaccine Advocacy Coalition v. U.S. Dept. of State*, Nos. 25-00400 (AHA), 25-00402 (AHA), 2025 WL 752378 at *10 (D. D.C. March 10, 2025) ("The desire to review programs for efficiency or consistency, and to access information in one place, does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid."); *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 715621 at *8 (D. R.I. March 6, 2025).

Indeed, in granting the Preliminary Injunction, the Court concluded, "[n]o evidence in the record suggests that the Defendants have any plan to provide the services that they have terminated. Therefore, the Court finds that the challenged actions are not merely tentative or interlocutory." Mem. Op. & Order at 21-22 (footnote omitted). That total shutdown contrasts this case with the *NTEU* case cited by Defendants, in which a D.C. Circuit panel found that plaintiffs challenging a variety of agency decisions suggesting a shutdown of the agency "point to no regulation, order, document, email, or other statement, written or oral, purporting to shut down the CFPB. Instead, they *infer* such an overarching decision from various discrete 'actions' taken by agency leadership to downsize the Bureau." *National Treasury Employees Union v. Vought*, — F.4th —, 2025 WL 2371608 at *11 (D.C. Cir. August 15, 2025) (emphasis added). Here, there is nothing to infer— Defendants stopped providing the services that Plaintiffs depend on and fired the only staff that could carry them out. The shutdown of the relevant programs was complete, final, and redressable by the cancellation of the relevant RIFs and the restoration of the functionality of the programs. The Court already found as much:

> [At the preliminary injunction hearing,] [t]he Plaintiff presented overwhelming evidence that the CWHSP has ceased operations. Employees necessary to its operation received RIF notices and are on administrative leave pending their termination dates. Approved community facilities received notice that the CWHSP

> is paused and not accepting x-rays or spirometry. Mr. Wiley's calls to check the
> status of his submission went unanswered, and another miner did not receive the
> return receipt for his submission, sent via certified mail. . . . [T]he only evidence
> before the Court is that the CWHSP and the RHD have been shut down.

ECF No. 36 at 21

     Defendants continually make claims to the effect that "HHS has given no indication that it does not intend to carry out its statutory duties under the Mine Act," and therefore has not taken any final action. *See* ECF No. 36 at 35. This conveniently ignores the fact that HHS *did* stop carrying out its duties under the Mine Act, and have only claimed that they resumed some of them after the beginning of this lawsuit. Based on Plaintiff's allegations in the Second Amended Complaint, supported by evidence educed at the hearing, the Court should once again find that the Defendants' termination of services at the Respiratory Health Division through reductions in force constituted a discrete, final agency action.

### B. Mandamus relief is appropriate because Defendants terminated the entire workforce capable of carrying out their specific, non-discretionary duties.

     Mandamus relief under the APA is authorized by 5 U.S.C. § 706, which allows courts to compel agency action unlawfully withheld or unreasonably delayed. Similarly, 28 U.S.C. § 1361 provides district courts with original jurisdiction to compel an officer or employee of the United States or any agency to perform a duty owed to the plaintiff. The standards for relief under both statutes are identical, requiring plaintiffs to identify a discrete, nondiscretionary duty to act and demonstrate that the agency has failed to fulfill that duty. *Norton*, 542 U.S. 55, 64, 124 S. Ct. 2373, 2379 (2004).

     The Mine Act provides a very specific and non-discretionary duty to the Secretary of Health and Human Services which is known as the Part 90 program:

Effective three years after December 30, 1969, *any miner who, in the judgment of the Secretary of Health and Human Services based upon such reading or other medical examinations, shows evidence of the development of pneumoconiosis shall be afforded the option of transferring from his position to another position in any area of the mine, for such period or periods as may be necessary to prevent further development of such disease,* where the concentration of respirable dust in the mine atmosphere is not more than 1.0 mill[i]grams of dust per cubic meter of air, or if such level is not attainable in such mine, to a position in such mine where the concentration of respirable dust is the lowest attainable below 2.0 milligrams per cubic meter of air.

30 U.S.C. § 843(b)(2)(emphasis added)

Regarding the mandatory provision of cost-free medical testing, the Mine Act requires:

All chest roentgenograms shall be given in accordance with specifications prescribed by the Secretary of Health and Human Services and shall be supplemented by such other tests as the Secretary of Health and Human Services deems necessary. … The Secretary shall also submit such results to such miner and advise him of his rights under this chapter related thereto. … Where such examinations or tests cannot be given, due to the lack of adequate medical or other necessary facilities or personnel, in the locality where the miner resides, arrangements shall be made to have them conducted, in accordance with the provisions of this subchapter, in such locality by the Secretary of Health and Human Services, or by an appropriate person, agency, or institution, public or private, under an agreement or arrangement between the Secretary of Health and Human Services and such person, agency, or institution.

30 U.S.C. § 843(a), (c).

The Secretary of Health and Human Services has determined by regulation that these requirements include the x-ray and medical testing provided by the Coal Workers' Health Surveillance Program (CWHSP). 42 C.F.R. § 37.92 (pursuant to rulemaking authority under 30 U.S.C. §§ 951(b), 957).

This Court previously credited the testimony in finding the RIF jeopardized the essential functions of the mandatory program: "Both Ms. Wolfe and Dr. Laney indicated that all of the NIOSH employees who performed duties related to the CWHSP were necessary to maintain the essential functions of the program, and the Defendants did not present contrary evidence." ECF No. 36 at 7.

22

Defendants do not and cannot dispute they have a specific, non-discretionary duty to process all Part 90 applications. This Court has held that they do.. Yet, they assert they have resumed taking the appropriate steps that they are required to take. As set forth above, the operative timeframe for assessing compliance with their duties is at the outset of the litigation. At a minimum, Plaintiffs have stated a claim that they failed to exercise their specific non-discretionary duties as of the outset of this litigation due to laying off the entire workforce that could have possibly carried out those duties.

Additionally, Defendants do not even attempt to argue that they are conducting any—not any—of the review and approval for sampling devices and research into respirable dust control under the Mine Act, as alleged in the Amended Complaint. ECF No. 59 at ¶¶ 44–47.

### C. Defendants' actions are arbitrary and capricious.

Defendants' actions of eliminating the entire workforce that carries out the mandatory programs under the Mine Act is paradigmatic of arbitrary and capricious action under the APA. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A)). There is a presumption in favor of finding the agency action valid. *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir.1993). However, courts may set aside actions under the APA if the agency cannot demonstrate reasoned decision-making that is supported by the administrative record. *See generally Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856 (1983). For example, courts may set aside an agency action if it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905 (1997) (internal quotations omitted); *see also*

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215 (1945); *Kentuckians for the Commonwealth v. Rivenburgh*, 317 F.3d 425, 439 (4th Cir. 2003).

In this case, the only evidence whatsoever that the agency offered in support of its decision-making were two print-outs from the DHHS website that failed to mention or acknowledge any of the specific duties under the Mine Act that are at issue in this case. (ECF 33-1, 33-2, 34 (list of exhibits). The utter and total lack of reasoned decision-making to cease carrying out its own statutorily- and regulatorily-mandated programs.

The Fourth Circuit has consistently interpreted the arbitrary and capricious standard to require agencies to examine relevant data and articulate a satisfactory explanation for their actions, including a "rational connection between the facts found and the choice made." *See State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239 (1962)). When reviewing the agency's explanation, the reviewing court "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc*., 419 U.S. 281, 285 (1974)). "[A]n agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856).

"[A] court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. Nonetheless, the arbitrary and capricious standard "is not meant to reduce

judicial review to a 'rubber-stamp' of agency action." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co*., 556 F.3d 177, 192 (4th Cir. 2009). The reviewing court must "engage in a 'searching and careful' inquiry of the record." *Id*. (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814 (1971)).

Here, the record regarding the agency's deliberations behind the termination of the NIOSH workforce is haltingly truncated. Two website print-outs that make absolutely no mention of the affected programs utterly fail---at least---to demonstrate that Plaintiffs have not stated a claim under the APA. Accordingly, the Motion to Dismiss should be denied as to the alleged failure to state a claim for arbitrary and capricious conduct under the APA.

**D.  There are no remedies in court other than this one.**

The Mine Act does not make the Defendants' denial of a Part 90 application reviewable in federal district court. Insofar as a final denial of the Part 90 claim on the merits would be reviewable under the APA, this action is an appropriate vehicle for doing so. However, the proper course would be for Mr. Wiley to submit additional evidence to NIOSH before the case is reviewed by this Court. That is what he attempted to do, and the review of such medical information was exactly the mandatory duty that NIOSH had refused to perform at the time of the filing of this lawsuit.

**III.    Plaintiffs Can Obtain Relief Under the APA For Defendants' Illegal Impoundment**

The Defendants object to the identification of their actions as an illegal impoundment. Specifically, they argue that "Plaintiffs cannot bring a claim under the Impoundment Control Act." ECF No. 66at 42. In doing so, Defendants have both misinterpreted the second amended complaint and misapplied existing case law.

To start, the second amended complaint does not bring a claim under the Impoundment Control Act (ICA). *See* ECF No 59 at ¶¶ 63-65. Rather, the complaint states that the decision to stop implementing the CWSHP was unlawful because, among other flaws, it defied the Congressional mandate in the appropriations bill for 2024 (and its continuance into 2025) to spend requisite funds on the CWHSP. The decision therefore violated the appropriations legislation on its own terms and violated the constitutional separation of powers. Defendants neither invoked nor attempted to comply with the ICA, which provides a legal pathway for the executive branch to obtain congressional approval of the rescission or deferral of budgetary authority, meaning that the failure to spend funds on the CWHSP was a straightforwardly unconstitutional and therefore unlawful act. As such, it is a proper object of the Plaintiffs' APA claim. The fact that the Plaintiffs have identified the defendants' failure to invoke or follow the procedure contained in the ICA does not somehow convert Plaintiffs' APA claim into an ICA claim.

The Defendants do raise a recent (and subsequently amended) decision in *Global Health Council v. Trump*, in which the D.C. Circuit held that grantees of and advocates for federal foreign aid spending that had been suspended or terminated by executive branch officials had "no cause of action to undergird their claim that the [executive branch] defendants have acted contrary to law by violating the ICA." *See* — F.4th —, No. 25-5097, 2025 WL 2480618 at *11 (D.C. Cir. August 28, 2025). The D.C. Circuit reached its conclusion in two steps: first, by collapsing all of the plaintiffs' impoundment-related claims – including freestanding constitutional claims based on the separation of powers and the Take Care clause and claims under the APA based on unlawful violations of the Constitution and the ICA – into a statutory

26

claim; second, by holding that the ICA's specific scheme for enforcement by the Comptroller General was exclusive and therefore disallowed claims under the APA. *Id.* at *6-11.

The Defendants here do not address how this opinion in *Global Health* affects the Plaintiffs' argument that the Defendants' decision was unlawful, focusing instead on the notion that "that Plaintiffs here cannot ground their APA claims based on purported violations of the Impoundment Control Act or raise any separate claims under the Impoundment Control Act." ECF No. 66 at 43. The Defendants also do not address the fact that the amended D.C. Circuit opinion in *Global Health* specifically declined to address APA claims based on violations of the appropriations acts themselves. *Global Health*, WL 2480618 at *11, n. 17. On remand, the D.C. District Court decided that such claims *could be brought under the APA. AIDS Vaccine Advocacy Coalition v. United States Department of State*, — F.Supp.3d — 2025 WL 2537200 at *5-9 (D.D.C. Sept. 3, 2025). Here, the Plaintiffs' unchallenged APA claim based on violations of the 2024 appropriations and its continuance into 2025 should therefore be allowed to continue.

The amended panel decision in *Global Health* is nevertheless relevant for Plaintiffs' APA claims based on the constitutional separation of powers, however, because the panel in that case ultimately concluded that such claims can only be evaluated under the ICA. It should first be noted that, as the D.C. District Court explained, the D.C. Circuit only denied *en banc* review of the amended panel decision so that the district court could first evaluate the plaintiffs' likelihood of success on APA claims based on violations of the appropriations acts themselves. *Id.* at *5. The panel's conclusions on the constitutional impoundment claims therefore await an *en banc*

hearing and likely Supreme Court review – furthermore, they are not binding on this court, and should not be followed.[3]

Regardless, it is worth considering the panel's conclusions in *Global Health*. The relevant parts of that decision are based on *Dalton v. Specter*, in which the Supreme Court decided that a claim that the executive violated the Defense Base Closure and Realignment Act of 1990 could not be brought as a constitutional claim that the executive had violated the separation of powers doctrine by exceeding its authority under the Act. *Dalton v. Specter*, 511 U.S. 462, 471-74 (1994). In doing so, the Court acknowledged a "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other." *Id.* at 474. The claim in *Dalton* was therefore unlike the challenge to unconstitutional executive action in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), because, in *Youngstown*, "no statutory authority was claimed, [so] the case necessarily turned on whether the Constitution authorized the President's actions." *Dalton*, 511 U.S. at 473.

In short, a claim that the executive violated the statute under which it claims to be acting cannot be reframed as a constitutional challenge merely to avoid the fact that "[w]here a statute, such as the 1990 Act, commits decision-making to the discretion of the President, judicial review of the President's decision is not available." *Id.* at 477. *Dalton* thus offers a limited conclusion –

---

[3] The unsettled nature of the panel's conclusions in *Global Health* is heightened by the fact that they are premised on a disputed interpretation of the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994) – as the *Global Health* Court acknowledged, their reinterpretation of *Dalton* created a circuit split with the 9th Circuit (specifically its decision in *Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023)). *Global Health*, 2025 WL 2480618 at *9, n. 15. The D.C. Circuit discounted this split because *Mercy Co.* was itself based on the 9th Circuit's conclusions in *Sierra Club v. Trump*, 963 F.3d 874, 887 (9th Cir. 2020), which the *Global Health* panel believed would have been overturned by the Supreme Court had a change in administrations and federal policy not mooted the case before the Court could take it up. *Global Health*, 2025 WL 2480618 at *9, n. 15. Beyond its procedural suppositions, the panel provided no argument against *Mercy Co. Id.*

when the executive acts on statutory authority, its compliance with that statute must be evaluated on that statute's terms, including limitations on judicial review contained in the statute (such as the grant of discretion in the act at issue in *Dalton*). Appeal to the Constitution does not open up unlimited judicial review of statutory violations.

In *Global Health*, the panel took this conclusion to mean that "alleged statutory violations must be the predicate acts for the constitutional [impoundment] claims because without an appropriations statute there could be no improper impoundment." WL 2480618 at *7.[4] The impoundment claims, therefore, could only be brought as violations of the ICA. *Id.* at *9.

There are two main problems with this conclusion. First, unlike in *Dalton*, the challenged actions were not brought under any statute in particular – as the panel acknowledged, the grants at issue were suspended or revoked under an executive order that "relied on the President's authority under 'the Constitution *and the laws of the United States of America*.' " *Id.* at *7 (emphasis in original). The panel decision does not further describe what statutory authority the executive was operating under, although the district court initially ruled that the executive had violated the 2024 appropriations act, the ICA, and the Anti-Deficiency Act, as well as the Constitution. *Id.* at *4. Presumably, however, the panel meant that a general invocation of statutory authority sufficiently implied that the executive was acting under authority granted by the statutes identified by the district court, even though the executive had not invoked or attempted to comply with the procedures outlined in those acts. *See id.* There is, however, no reason to assume that the executive is acting under the authority granted by a particular statute

---

[4] This sentence may also imply that *Dalton* is relevant when the executive acts *in direct opposition* to a statute (here, the appropriations acts) rather than *under the authority* of a statute. Because the amended decision explicitly avoids the issue of APA claims based on the appropriations acts themselves, however, this conclusion cannot be relevant to the panel's holding.

when, as was the case in *Global Health* and is the case here, the executive makes no indication that it is attempting to act under that statutory authority and takes none of the actions described in that statute.

Furthermore, the ICA at least does not give the executive any authority under which to unilaterally impound funding, regardless of how it does so. Instead, it provides a mechanism by which the President can *propose* that budget authority be rescinded or deferred. *See* 2 U.S.C. §§ 683, 684. Unless Congress takes action on that proposal, its spending decisions remain in effect and the executive must comply with them. *See id.* When the executive proposes a rescission or deferral of funds to Congress, it is acting under the ICA and must comply with its terms. When the executive unilaterally impounds funds, it is not doing so under the authority of any statute, and its actions can be challenged as unconstitutional. Claims of unconstitutional impoundment are not, therefore, statutory claims as described in *Dalton*.

The ICA also does not properly limit suits brought under the APA for unconstitutional impoundment. It is true that judicial review under the APA is not available when "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), and that "when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Global Health*, WL 2480618 at *10 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).

Because the ICA provides for a scheme by which the executive can propose budget recissions and deferrals to Congress, *see* 2 U.S.C. § 683, 684, and provides for enforcement of the Act by the Comptroller General following an explanatory statement to Congress, *see* 2 U.S.C. § 687, the *Global Health* panel held that "it does not make sense that the Congress would craft a

30

complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits to enforce the ICA at any time and without notice to the Congress of the alleged violation." *Global Health*, WL 2480618 at *10. According to the panel, therefore, violations of the ICA cannot be the basis for an APA claim. *Id.* at *10-11.

As explained above, the problem with this conclusion as applied to the facts of *Global Health* (and the facts of this case) is that illegal impoundments are independently reviewable as unconstitutional acts – the fact that the executive did not choose to take the only available, legal route to rescind or defer budget authority (the ICA) is merely evidence of the action's unconstitutionality. The impoundment at issue here is not a rescission or deferral "under this chapter [the ICA]" for which Congress provided a specific mechanism for obtaining relief. *See* 2 U.S.C. § 687. Instead, it is an unconstitutional impoundment made without reference to any statute. This stands in stark contrast to the decision challenged in *Block*, which was formal rule explicitly made under the authority of an act of Congress. 467 U.S. at 343. Congress may have intended the Comptroller General to ensure that the complex scheme outlined in the ICA was followed once that process was invoked,[5] but it did not intend for the Comptroller General "to be relied upon to challenge agency disregard" of the constitutional strictures on impoundment. *Id.* at 347.

For the same reasons, the Defendants' attempts to restrict relief for their illegal impoundments are inappropriate. The ICA allows the executive to propose the deferral of budget authority to Congress – nothing allows the executive to unilaterally impound funds. *See* 2 U.S.C. § 684. If the executive believes that the CWSHP can be carried out without spending the money

---

[5] Although, even if this were the case, violations of appropriation acts themselves would be reviewable under the APA if Congress did not respond favorably to an executive proposal under the ICA, as explained above.

appropriated for it, it can make such a proposal to Congress. It cannot withhold the funds on its own authority, nor unilaterally dismantle programs for which funding has been provided. This Court can properly order the reinstatement of the programs for which Congress has provided funds.

## CONCLUSION

As set forth above, and for any other reasons appearing the to the Court, the Plaintiffs humbly urge the Court to deny the Defendants' Motion to Dismiss.

**Plaintiffs,**
**HARRY WILEY and**
**MATTHEW WARD,**
**individually and on behalf of all others similarly situated,**
**By counsel:**

*/s/ Samuel B. Petsonk*
Samuel B. Petsonk (WVSB #12-418)
PETSONK PLLC
PO Box 1045
Beckley, WV 25802
(304) 900-3171 (phone)
(304) 986-4633 (fax)
sam@petsonk.com

Bren J. Pomponio (WVSB #7774)
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier Street
Charleston, West Virginia 25301
(304) 344-5565
(304) 344-3145 (fax)
bren@msjlaw.org

J. Michael Becher (W. Va. Bar # 10588)
APPALACHIAN MOUNTAIN ADVOCATES
PO Box 507
Lewisburg, WV 24901
(304) 382-4798
mbecher@appalmad.org