IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

HARRY WILEY and
MATTHEW WARD, individually and on
behalf of all others similarly situated,

    Plaintiffs,

v.   Case No: 2:25-cv-00227

ROBERT F. KENNEDY, JR., in his official
Capacity as Secretary of Health and Human
Services, and U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

    Defendants.

### REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

To be sure, the Court has not rejected any argument set forth in Defendants' pending Motion to Dismiss, (ECF No. 63). (*But see* ECF No. 70 at 1 (arguing that Defendants are "renewing several arguments this Court has previously rejected and should reject again").) As the Court itself recently stated, "judicial economy and fairness to the parties will be better served in this case by saving a full analysis of any defenses for a fully briefed motion to dismiss, given that the Court has not yet addressed a motion to dismiss." (ECF No. 36 at 3 n.1.) Plaintiffs' attempt to frame the issues before the Court as predetermined is disingenuous and ignores the threshold matter of ensuring the Court is acting within its limited role of deciding only cases and controversies. *See* U.S. Const. art. III; *accord Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009). But even if this Court had subject matter jurisdiction over this case, Plaintiffs fail to state an adequate claim under

the Administrative Procedure Act ("APA"). Ultimately, their response, (ECF No. 70), is unavailing,[1] and the Court should grant Defendants' Motion to Dismiss, (ECF No. 63).

I. **Plaintiffs Lacked Standing at the Time They Filed (or Sought to File) Their Respective Pleadings.**

Defendants' analysis of Plaintiffs' lack of standing, (*see* ECF No. 66 at 14–16), focuses on the correct moment in time, and Plaintiffs' effort to steer the Court's attention elsewhere, (*see, e.g.*, ECF No. 70 at 1, 4, 6), is unproductive. Further, despite Plaintiffs' assertion to the contrary, (*see id.* at 1, 5), this Court did not previously conclude that Plaintiff Wiley has standing to pursue his claims. The Court's Memorandum Opinion and Order of May 13, 2025, was issued in the context of a motion for preliminary injunction. (*See generally* ECF No. 36.) Thus, the Court's previous analysis sought to resolve whether Plaintiff Wiley could demonstrate, as the Court itself stated, whether he "is *likely to establish* that he has standing to pursue his claims." (*Id.* at 16 (emphasis added).) No determination was made that Plaintiff Wiley does, in fact, have standing. (*See also* ECF No. 58 at 3 n.1.) As Defendants have illustrated, he does not, and even if Plaintiff Wiley had standing at the time this litigation was commenced, the claims he pursues are moot or beyond this Court's jurisdiction. The same is true for Plaintiff Ward.

Defendants agree with Plaintiffs' contention that "when *a plaintiff* has filed an amended complaint, standing is measured by when *the plaintiff* initiated the suit . . . ." (ECF No. 70 at 4 (emphasis added) (quoting *Patton v. Fitzhugh*, 131 F.4th 383, 391–92 (6th Cir. 2025), *petition for cert. filed*, No. 25-50 (U.S. July 11, 2025)).) But Defendants disagree with Plaintiffs' apparent position that the quote stands for the proposition that whether Plaintiff Ward has standing should be assessed as of "April 7, 2025—the date on which this action was filed," (*id.* at 5),

---

[1] Defendants note that Plaintiffs failed to seek leave of the Court before filing a response exceeding the limitation set forth in Local Rule of Civil Procedure 7.1(a)(2) by a dozen pages. Nevertheless, in the event the Court considers information past the twentieth page of Plaintiffs' brief, Defendants' reply addresses the entire response.

notwithstanding that Plaintiff Ward did not seek to file his own claims until July 9, 2025. (*But see id.* at 7 ("Mr. Ward's act to initiate litigation was on July 9, 2025, when Plaintiffs' submitted their motion for leave to file a Second Amended Complaint.").) In any event, the positions of Plaintiff Wiley and Plaintiff Ward at the times they first acted to "initiate[] the suit," (*id.* at 4 (quoting *Patton*, 131 F.4th at 392)), confirm they had no injury in fact on which to base their respective original complaints.[2]

Plaintiff Wiley filed his suit against Defendants on April 7, 2025. (ECF No. 1.) The original complaint, like the Second Amended Complaint, was based on the Coal Workers Health Surveillance Program's ("CWHSP's") alleged failure to respond to his November 2024 application for transfer under Part 90. (*Compare id.* ¶¶ 14-17, *with* ECF No. 59 ¶¶ 16-18.) However, as Defendants previously established, the CWHSP, in accordance with policy and regulation, evaluated and adjudicated Plaintiff Wiley's submission in December 2024. (*See* ECF No. 14-1 ¶ 12; ECF No. 52-1 ¶ 7.) As such, Plaintiff Wiley's jurisdictional allegations underpinning both the original complaint and Second Amended Complaint must be rejected because he had no concrete injury at the time he initiated this litigation in April 2025.

Plaintiff Ward first sought to bring his suit against Defendants on July 9, 2025, "when Plaintiff[ Wiley] submitted [his] motion for leave to file a Second Amended Complaint." (ECF No. 70 at 7. *See also* ECF No. 47.) Plaintiff Ward's claims are based on the CWHSP's alleged failure to respond to his Part 90 application submitted in April 2025. (*See* ECF No. 59 ¶¶ 32-33.) But as

---

[2] Notably, Plaintiffs have had months to find an individual plaintiff and putative class representative to demonstrate an alleged lack of access to the Coal Workers Health Surveillance Program ("CWHSP"). The fact that they have not done so further highlights that the CWHSP is adequately functioning as intended.

Additionally, Plaintiff Wiley tries to frame this case as involving a "medical dispute issue." (ECF No. 70 at 2.) This case, however, is not about the underpinnings of either Plaintiff's eligibility or ineligibility for a Part 90 transfer. Rather, it is a process case focused on whether the Respiratory Health Division and its CWHSP are functioning so that the U.S. Department of Health and Human Services is able make the statutorily required determinations under Part 90, which it has actively proven the ability to do throughout this litigation.

Defendants have shown, the CWHSP, in accordance with policy and regulation, evaluated and adjudicated Plaintiff Ward's submission in May 2025. (*See* ECF No. 52-1 ¶ 8.) Therefore, Plaintiff Ward's jurisdictional allegations in the Second Amended Complaint must be rejected because he had no concrete injury at the time he first attempted to initiate his litigation in July 2025.[3]

The Court should reject Plaintiffs' assertion that "[t]o the extent Defendants[] dispute [any of the jurisdictional allegations in the operative pleading], such dispute creates an issue of material fact unsuited for resolution at this time." (ECF No. 70 at 7.) In other words, Plaintiffs improperly urge the Court to ignore the threshold question of whether it actually has jurisdiction and, instead, blindly maintain a proceeding for which it has no authority to adjudicate.[4] *See State of Maryland v. U.S. Dep't of Agric.*, --- F.4th ----, 2025 WL 2586795, at *4 (4th Cir. Sept. 8, 2025) ("[The threshold question of standing] is no 'troublesome hurdle' to be cleared with the most whimsical of attempts on the way to the merits. Rather, Article III standing is an integral component of our nation's system of checks and balances and a key mechanism of judicial restraint." (internal citations omitted)). If Plaintiffs' reasoning were acceptable, what would be the purpose of a jurisdictional challenge under Federal Rule of Civil Procedure 12(b)(1) contesting the jurisdictional allegations in a complaint? It is axiomatic that the Court may consider documents outside of the pleadings when considering such a motion to dismiss if the documents are integral to the complaint and their authenticity is not disputed. *See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009); *Evans v. B.F. Perkins Co.*¸166 F.3d 642, 647

---

[3] Because neither Plaintiff has standing here, the proposition that "the presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement," (ECF No. 70 at 6 (quoting *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 764 F. Supp. 3d 349, 358 (S.D. W. Va. 2025) (cleaned up in original) (citations omitted))), is not applicable and does not save this case from dismissal.

[4] Plaintiffs seem to suggest that by alleging they never received the CWHSP's December 2024 and May 2025 determination letters, (*see* ECF No. 59 ¶¶ 18, 33), the Court should find they had standing at the time they commenced this suit, (*see* ECF No. 70 at 7). But because Plaintiffs' standing arguments are predicated upon factual inaccuracies, those demonstrably false jurisdictional allegations do not and cannot provide a basis for standing in and of themselves.

4

(4th Cir. 1999) ("When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" (citation omitted)). Tellingly, Plaintiffs do not dispute the authenticity of the letters resolving both Plaintiff Wiley and Plaintiff Ward's Part 90 submissions, which were mailed prior to the introduction of their first complaints. It is incontrovertible evidence proving Plaintiffs lacked standing when they initiated their claims. Plaintiff Wiley similarly does not contest that the CWHSP has timely addressed all submissions he has made since this litigation began. As such, the Second Amended Complaint should be dismissed.

Although Plaintiffs have expanded the scope of their *factual* allegations outside the context of the CWHSP's functions (knowing that their Part 90 applications were adjudicated prior to the filing of their respective initial pleadings), the *jurisdictional* allegations on which the entire case rests remain focused on Plaintiffs' individual submissions to the CWHSP under Part 90 and the National Institute for Occupational Safety and Health's ("NIOSH's") alleged failure and/or inability to adjudicate them. (*See* ECF No. 59 ¶¶ 16-18, 32-33.) As explained above, at the times Plaintiff Wiley and Plaintiff Ward brought their suit against Defendants, respectively, they suffered from no concrete or particularized injury as is necessary to establish Article III standing because their submissions to NIOSH had already been adjudicated. Thus, the Court lacks subject matter jurisdiction over this civil action.

II. **Even If Plaintiffs Originally Had Standing to Pursue the Second Amended Complaint, They Have Lost Standing as Their Claims Are Moot.**

A threshold issue to filing an initial pleading in federal district court is that a plaintiff must have standing. *See Spokeo, Inc. v. Robbins*, 578 U.S. 330, 337–38 (2016). While Defendants maintain that Plaintiffs do not have standing, even if the Court were to find otherwise, Plaintiffs

5

have since lost standing under the related doctrine of mootness. Regardless of whether jurisdiction is analyzed under the doctrine of standing or mootness, however, either doctrine independently divests this Court of jurisdiction. Finally, Plaintiffs' insinuation that they have standing in perpetuity and that this Court should indefinitely monitor their medical evidence submissions to the CWHSP until a Part 90 transfer is secured should be rejected. The Court cannot preserve jurisdiction based on baseless speculations about future actions.

Like standing, the doctrine of mootness "constitutes a part of the constitutional limits of federal court jurisdiction." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (quoting *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018) (quoting *Simmons*, 634 F.3d at 763). "Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). This issue, which is raised in the alternative if the Court were to find that Plaintiffs had standing at the time they first raised their claims against Defendants, is properly the subject of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).

As Plaintiffs note, an exception to the mootness doctrine is the principle of voluntary cessation. However, it does not apply here. Although "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000), a governmental defendant satisfies

this burden when the entity "has not asserted its right to enforce [the challenged policy] at any future time," *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1231 (4th Cir. 1989).

"When . . . it is a governmental authority that changes its policy, there is a presumption that it acts in good faith under the voluntary cessation exception." *Beahn v. Gayles*, 550 F. Supp. 3d 259, 272 (D. Md. 2021) (citing *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("The government's change of policy presents a special circumstance in the world of mootness.")). *See also Telco Commc'ns, Inc.*, 885 F.2d at 1231 ("State officials have shown no inclination to enforce this statute . . . and we decline to indulge any presumption with respect to their conduct other than one of good faith."). And an analysis of the voluntary cessation argument "always requires a 'factual inquiry' into the *actual* 'likelihood of recurrence of the offending behavior.'" *Eden, LLC v. Justice*, 36 F.4th 166, 172 (4th Cir. 2022) (emphasis added) (quoting *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 164 & n.6 (4th Cir. 2021)). *See also Incumaa v. Ozmint*, 507 F.3d 281, 288 (4th Cir. 2007); *Cochran v. Ballard*, No. 2:17-cv-04312, 2019 WL 2323742, at *10–13 (S.D. W. Va. May 8, 2019) ("The Fourth Circuit has previously found that 'formal assurances' by the defendants alone were sufficient to establish that it was not reasonably likely the challenged conduct would recur, at least when there was 'no hint' from the record that the defendants had any indication of restarting the challenged activities as soon as the lawsuit was dismissed." (citations omitted)), *report and recommendation adopted*, 2019 WL 2323882, at *1 (S.D. W. Va. May 30, 2019).

To argue that the voluntary cessation exception applies here, Plaintiffs first rely on *Federal Bureau of Investigation v. Fikre*, 601 U.S. 234 (2024). There, the plaintiff's claims were based on the Transportation Security Administration's ("TSA's") decision to assign him to the No Fly List and spanned several causes of action, "namely constitutional claims regarding his substantive due

7

process right to international travel, rights to counsel and against self-incrimination, freedom of association, right against unreasonable searches and seizures, and torts of false arrest and imprisonment, assault and battery, and torture." *Moharam v. TSA*, 134 F.4th 598, 608 (D.C. Cir. 2025) (discussing the complaint giving rise to *Fikre*). Because Fikre was seeking prospective remedies, simply removing his name from the No Fly List did not alter the Court's view "that the challenged conduct (e.g., unconstitutionally listing him for his religious identity) could be expected to recur." *Id.* (citing 601 U.S. at 242–43). Unlike in *Fikre*, the Court here is analyzing a Second Amended Complaint filed under the APA concerning particular agency decisions (that are not discrete or final) based on static administrative records. Thus, even if the conduct giving rise to this lawsuit were to recur—despite no reasonable basis to believe that it will—such conduct would necessarily create a new administrative record underlying those orders. The administrative record related to the specific orders giving rise to this litigation would be of no continuing legal consequence. *Cf. Wall v. TSA*, No. 21-1220, 2023 WL 1830810, at *2 (D.D.C. Feb. 9, 2023) (per curiam) ("That said, Wall's challenge *to the administrative record* underlying the TSA's expired orders is moot. That is because, even if the TSA reissues its masking directives, it will necessarily create a new administrative record underlying those orders. So it is certain that the administrative records before us now will not have any continuing legal consequence." (emphasis in original)). Thus, *Fikre* is inapposite.

Plaintiffs also rely on *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022), a case where the Supreme Court noted "the Government nowhere suggests that if this litigation is resolved in its favor it will not [return to the challenged conduct]; indeed, it vigorously defends the legality of such an approach. We do not dismiss a case as moot in such circumstances." *Id.* at 720 (internal citation omitted) (internal quotation marks omitted). That situation is a far cry

8

from what is before this Court. Defendants here began a process to revoke reduction in force ("RIF") notices affecting the NIOSH Respiratory Health Division ("RHD") employees even before this Court entered its preliminary injunction order on May 13, 2025. (*See* ECF No. 52-1 ¶ 3.) Defendants did not challenge the preliminary injunction order through a motion for reconsideration or an appeal. Defendants have fully restored RHD operations, including the CWHSP, and have never suggested that it may repeat the conduct originally giving rise to this lawsuit. Consequently, the actions of Defendants here are easily distinguishable from those in *West Virginia v. Environmental Protection Agency*.

At this juncture, Plaintiffs have been able to submit additional medical evidence to the CWHSP in the form of x-rays and CT scans even after the litigation's commencement, and the CWHSP reviewed and responded to all those submissions. Plaintiffs do not contend otherwise in their response. Currently, with the CWHSP restored, Plaintiffs have been provided with all services to which they are entitled under it, and there is no outstanding or pending correspondence or information for the CWHSP to resolve as to Plaintiffs. (*See* ECF No. 52-1 ¶¶ 7-8.) Plaintiffs can continue submitting additional medical evidence to NIOSH for consideration.

Plaintiff Wiley, specifically, argues this litigation must persist because he "is still engaged in an ongoing process to seek his Part 90 job transfer." (*See* ECF No. 70 at 7.) Defendants encourage him to do so, and as this litigation has demonstrated, the CWHSP is able to accommodate those efforts. However, the fact that he continues to seek a Part 90 transfer (via a functioning CWHSP) does not prevent dismissal of this case under the doctrine of mootness. If that were so, every coal miner who is found ineligible for a Part 90 transfer could simply introduce litigation in federal district court to monitor in perpetuity his or her continued bids to qualify for such a transfer. Such a proposition is untenable.

Now that the RHD and CWHSP are fully restored and operational and Plaintiffs are able to access all these services, there is no injury to remedy. Plaintiffs seek a declaration from this Court to the following effect:

> [T]hat Defendants comply with their statutory duties under 30 U.S.C. § 843 (requiring examinations of coal miners and affording job transfer rights); 30 U.S.C. § 811(a)(7) (providing authority for examinations of all miners generally); 30 U.S.C. § 811(a)(9) (anti-backsliding provisions providing that no Administration may weaken protections for miners); and with the requirements of their own existing regulations, 30 C.F.R. Part 90, and cease depriving him [sic] of due process of law, by restoring all personnel in the Respiratory Health Division of the National Institute for Occupational Safety and Health who are integral to carrying out the epidemiological surveillance and job transfer provisions of the Mine Safety and Health Act of 1977.

(ECF No. 59 ¶ 5.) As stated in the previously filed Second Declaration of John J. Howard, the U.S. Department of Health and Human Services ("HHS") is complying with all the relevant duties Plaintiffs cite, and all RHD personnel responsible for carrying out the CWHSP and Part 90 program have been restored. (*See* ECF No. 52-1.)

HHS has asserted no intention to reinstate the revoked RIF notices, discontinue the receipt and evaluation of medical information, or end the offering of black lung screenings to miners as part of the CWHSP's implementation of the Part 90 program. Dr. Howard's Second Declaration provides the "formal assurance" necessary "to establish that it not reasonably likely the challenged conduct w[ill] recur . . . ." *Cochran*, 2019 WL 2323742, at *13 (citation omitted). As Defendants have not expressly stated they could "return to the old ways" that led to this litigation and have shown a good faith effort—without reluctance—to restore RHD and the CWHSP to its pre-suit operations, dismissal for mootness is appropriate. *See Porter*, 852 F.3d at 365 (citation omitted); *Beahn*, 550 F. Supp. 3d at 272; *see also Friends of the Earth, Inc.*, 528 U.S. at 190; *Telco Commc'ns, Inc.*, 885 F.2d at 1231.

### A.     The deployment of a mobile screening unit is not mandated by the Mine Act.

Plaintiffs' focus on NIOSH's Mobile Screening Unit is irrelevant to the Court's mootness analysis. As a preliminary matter, HHS is *not* legally required to provide free health screenings or x-rays to miners, through the mobile health unit or otherwise.[5] Section 843 of the Mine Act and its implementing regulation legally require *mine operators*, *not HHS*, to provide for periodic screenings as follows:

1. Mine operators must make available to their miners mandatory chest x-rays within thirty days of employment, at three years' employment, and then, if there is evidence of disease, an optional x-ray two years later. *See* 42 C.F.R. § 37.3(b).

2. Mine operators must also offer their miners the opportunity for free screenings at an approved facility approximately every five years (within an established six-month eligibility window). *See* 42 C.F.R. § 37.3(a).

*See* 30 U.S.C. § 843; 42 C.F.R. § 37.3. Miners are able to obtain screenings for free during their eligibility window at the NIOSH-approved facility with which their mine operator has contracted or at the miner's own expense outside of this eligibility window at any of the facilities approved by NIOSH pursuant to 42 C.F.R. § 37.43 or § 37.44. *See* 42 C.F.R. § 37.103; *see also NIOSH-Approved Health Facility Search & Map*, Ctrs. for Disease Control & Prevention, https://wwwn.cdc.gov/niosh-rhd/cwhsp/FacilityMap.aspx (last visited Sept. 17, 2025). In other words, miners are only entitled to optional "free" screenings (i.e., at the mine operator's expense) approximately every five years and only at the facility that has a contract with their mine operator.[6] Miners are not entitled to unlimited free health screenings as Plaintiffs seem to suggest throughout their response.

---

[5] Financial responsibility for miners' screenings required by the Mine Act falls to the *mine operators* who must submit to NIOSH a plan for making these periodic screenings available to their employee miners at one or more NIOSH-approved facilities at a convenient time and place. *See* 30 U.S.C. § 843(a), (c); 42 C.F.R. §§ 37.3, 37.40(a), 37.43, 37.44.

[6] Under the circumstances listed in 42 C.F.R. § 37.4 (e.g., where the mine operator has not submitted or is not following an approved plan), there is a process by which HHS and NIOSH can provide the miner a chest x-ray with reimbursement from the mine operator.

11

The NIOSH Mobile Screening Unit is a tool used by the CWHSP for surveillance and to provide supplemental free screenings to miners. Its surveys focus on areas where there is low participation in routine surveillance and aim to increase participation in areas that are known or suspected to be "hot spots" of black lung disease. The Mobile Screening Unit serves to assist miners who miss their regular screenings or former miners who are not eligible to have medical examinations at an operator's expense. Nevertheless, the Mobile Screening Unit is not intended to replace the "free" screenings the mine operators are required to provide for under 30 U.S.C. § 843. Plaintiffs' belief that the Mobile Screening Unit is something to which they are statutorily entitled is incorrect.

### B. Plaintiffs' focus on the Mining Research Divisions conflates issues and fails to save their case.

Because Plaintiffs have been able to take advantage of the CWHSP's functions and the RHD has been restored, Plaintiffs have shifted their focus to another NIOSH section, the Mining Research Divisions ("MRDs"), (*see* ECF No. 59 ¶¶ 45-47, 56, 67; ECF No. 70 at 9, 11–13), in an effort to save this litigation. There are two NIOSH Mining Research Divisions—one located in Spokane, Washington (Spokane Mining Research Division or "SMRD"), and one located in Pittsburgh, Pennsylvania (Pittsburgh Mining Research Division or "PMRD"). Plaintiffs claim that allegations related to the MRDs, which clearly are outside the scope of the Court's preliminary injunction order,[7] (*see* ECF No. 36 at 29–30 (limiting the scope of relief to the RHD and CWHSP)),

---

[7] Plaintiffs state in the response that "despite this Court's preliminary injunction clearly directing the Defendants 'that there be no pause, stoppage or gap in the protections and services mandated by Congress in the Mine Act and the attendant regulations for the health and safety of miners,' Defendants have made no attempt to show that they are fulfilling mandatory duties related to their review and approval for sampling devices and research into respirable dust control under the Mine Act, which are mandated by the Mine Act to protect active miners such as Harry Wiley and Matthew Ward." (ECF No. 70 at 9 (quoting, without citing, ECF No. 36 at 30).) First, that sentence comes after the qualifying phrase, "in the event of reorganization," (ECF No. 36 at 30), which has not occurred at this time. Second, the Court's order setting forth the preliminary injunction in this case clearly focuses on the RHD and CWHSP only. (*See id.* at 29–30 ("The Court **ORDERS** that the RIFs in the NIOSH Respiratory Health Division be enjoined and, therefore, rescinded to facilitate the full restoration of the NIOSH Respiratory Health Division including health

must go forward as "Plaintiffs intend to pursue [class] certification prior to judgment" regarding the programs carried out by this other NIOSH division, (*see* ECF No. 70 at 3). But Plaintiffs' argument conflates the issue of Article III's case or controversy requirement with class certification. Class certification is inappropriate here given the Court's lack of subject matter jurisdiction over Plaintiffs' individual claims.

"Without individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001) (citation omitted). *See also, e.g.*, *In re Facebook Privacy Litig.*, 192 F. Supp. 3d 1053, 1058 (N.D. Cal. June 28, 2016) (concluding "Ms. Pohl, therefore, lacks standing and cannot represent the putative class in this case"); *Cassese v. Wash. Mut., Inc.*, 262 F.R.D. 179, 183 (E.D.N.Y. 2009) (noting that "[w]ithout standing, one cannot represent a class"). And "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). As set forth above, neither Plaintiff here has standing to seek relief (or any such standing has been lost). Without standing to seek relief for themselves, Plaintiffs equally cannot seek relief on behalf of a putative class. *See also Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 582 (6th Cir. 2016) ("Plaintiffs are not absolved of their individual obligation to satisfy the injury element of Article III just because they allege class claims."). Thus, Plaintiffs cannot preserve their allegations related to NIOSH programs outside the RHD simply because they view them as "discernable, common

---

surveillance through the Coal Workers Health Surveillance Program and the job transfer program.").) The programs that carry out "duties related to [Defendants'] review and approval for sampling devices and research into respirable dust control," (ECF No. 70 at 9), do not fall within the RHD. They are outside the plain language of the preliminary injunction's scope and the previous two operative complaints. Thus, those alleged duties are not subject to the preliminary injunction order.

governmental functions that merit[] class relief . . . ." (ECF No. 70 at 3.) Such an argument conflates the issues and should be ignored.

In sum, Plaintiffs are receiving all the benefits to which they are entitled through the CWHSP and RHD. Their voluntary cessation theory does not prevent the case's dismissal for mootness given Defendants' representations—even assuming Plaintiffs had standing at the time the litigation was commenced. Because there is no live case or controversy for the Court to adjudicate, the Court lacks subject matter jurisdiction over the Second Amended Complaint, and it should be dismissed.

### III. Plaintiffs Fail to State a Claim Under the APA.

Plaintiffs' response underscores why their claims are inappropriate for review under the APA. Plaintiffs emphasize they "simply seek to ensure the Defendants have not ceased carrying out their Congressionally-mandated duties and day-to-day operations . . . ." (*Id.* at 13.) In furtherance of that goal, they assert that "[t]he applicable standard here is as follows: whether the Defendants are fulfilling (or were fulfilling at the time this action was filed) their statutory and regulatory obligations . . . ." (*Id.* at 17.) That standard is irrelevant in reviewing their alleged APA claim. In essence, Plaintiffs ask the Court to monitor agency actions—the operations of the RHD and CWHSP—now and into the future rather than decide whether a prior, alleged agency action was lawful. Again, Plaintiffs seek standing in perpetuity, and such a widespread request is not appropriate under the APA.

An APA case "only presents the court with a narrow question to resolve . . . ." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.D.C. 2006) (citations omitted). *See also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (noting that final agency actions must be "circumscribed [and] discrete") [hereinafter *SUWA*]. Pertinent here, "an on-going program or policy is not, in itself,

14

a 'final agency action' under the APA." *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.D.C. 2001) (citing *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 890 (1990)). Plaintiffs' desire for the Court to delve into the current and future operations of the RHD and CWHSP is not the type of claim the APA was designed to remedy. *See Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (noting that review of an agency's day-to-day operations, such as "operating a program, or performing a contract," is not appropriate under the APA); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (noting that the APA's definition of "action" is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency").

Most significant to analyzing Plaintiffs' failure to state an APA claim is the fact that there is no final agency action here for the Court to review, *see* 5 U.S.C. § 704, let alone one preventing Plaintiffs from exercising their Part 90 rights or obtaining determinations on their eligibility for the same.[8] Defendants' actions both before and after this litigation began represent the flux of the expected reorganizational process. Every recent decision Plaintiffs cite in support of the proposition that "several courts have recently held that pauses to programs that provide critical services are reviewable final agency actions," (ECF No. 70 at 19–20), either is on appeal facing reversal or has already been vacated. *See Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239 (LLA), 2025 WL 597959, at *1 (D.D.C. Feb. 25, 2025), *appeal docketed*, No. 25-5148

---

[8] Plaintiffs inflammatorily state or insinuate at various times in their response that Defendants terminated all employees within the RHD. (*See, e.g.*, ECF No. 70 at 16 (referring to "[t]he fired employees"), 20 ("Here, there is nothing to infer—Defendants stopped providing the services that Plaintiffs depend on and fired the only staff that could carry them out."); 21 ("Defendants terminated the entire workforce capable of carrying out their specific, non-discretionary duties."), 23 (arguing that claims persist "due to [Defendants] laying off the entire workforce that could have possibly carried out those duties"), 25 ("Here, the record regarding the agency's deliberations behind the termination of the NIOSH workforce is haltingly truncated.").) Of course, using terms such as "terminate," "lay off," or "fire," leads to the belief that a final action has occurred. But Plaintiffs and this Court are well aware that no employee in the RHD who received a reduction in force notice was separated from HHS based on that notice. In fact, all of those notices have been rescinded, which highlights the provisional nature of the notices. Plaintiffs' chosen language only acts to blatantly and unnecessarily misrepresent the record in this case.

15

(D.C. Cir. Apr. 25, 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *1 (D.R.I. Apr. 15, 2025), *appeal docketed*, No. 25-1428 (1st Cir. May 1, 2025); *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 121 (D.D.C. 2025), *vacated and remanded by Global Health Council v. Trump*, --- F.4th ----, 2025 WL 2480618, at *1 (D.C. Cir. Aug. 28, 2025); *New York v. Trump*, 769 F. Supp. 3d 119, 119 (D.R.I. Mar. 6, 2025), *appeal docketed*, No. 25-1236 (1st Cir. Mar. 10, 2025). Plaintiffs have provided no support that the temporary issuance of RIF notices (later rescinded) represents a discrete, final agency action under the APA. Even so, an administrative record explaining such a decision would not provide the Court any guidance in assessing the current operations of the RHD and CWHSP as Plaintiffs request, highlighting the unsuitability of conducting an APA review in this case.

Additionally, Plaintiffs claim that all they must do to obtain mandamus relief under 5 U.S.C. § 706(1) is "identify a discrete, nondiscretionary duty to act and demonstrate that the agency has failed to fulfill that duty." (ECF No. 70 at 21.) Plaintiffs must show more. "[A]n agency's mere failure to act is usually not a final agency action triggering judicial review . . . ." *Hassan v. Bitter*, 748 F. Supp. 3d 722, 739 (D. Neb. 2024). While the APA allows courts to "compel agency action unlawfully withheld or unreasonably delayed," § 706(1), both prongs of § 706(1) require proof that "Congress has specifically provided a deadline for performance." *See Infracost Inc. v. Blinken*, 732 F. Supp. 3d 1240, 1251 n.5 (S.D. Cal. 2024) (citations omitted). Plaintiffs continually rely on generalities regarding the actions they claim are unlawful; they have yet to point to a discrete agency action Defendants were "required" to take.

The action leading to this lawsuit was the alleged nonresponse by the CWHSP to Plaintiffs' Part 90 submissions. (*See* ECF No. 59 ¶¶ 16-18, 32-33.) However, there is no statutory (or

16

regulatory) deadline by which the CWHSP must issue a decision on Part 90 submissions. *See generally* 30 U.S.C. § 843; 42 C.F.R. pt. 37. Without a specific deadline prescribed by Congress, there is no statute or regulation requiring HHS to take a discrete agency action. *See SUWA*, 542 U.S. at 64. Thus, Plaintiffs have not stated a claim for violation of § 706(1), and mandamus relief is not available.

Finally, Plaintiffs seem confused about the procedural posture of this case and Defendants' responsibilities at this juncture. Their Second Amended Complaint was filed on August 14, 2025. (ECF No. 59.) In response, Defendants filed their Motion to Dismiss, arguing jurisdictional defenses as well as Plaintiffs' failure to state a claim. (ECF No. 63.) In the following passage, however, Plaintiffs fault Defendants for not already addressing the merits of the alleged APA claim, which does not survive on its face, and suggest the Court should not dismiss this litigation because of it:[9]

> [E]ven with the benefit of an evidentiary hearing and months to develop plans, Defendants have not presented any rational explanation for the curtailment of necessary functions under the Mine Act within NIOSH. Neither have they attempted to explain how this Court's issuance of a preliminary injunction has impeded their actions. Indeed, Defendants have done little more than gesture towards vague plans for reorganization in support of its action and complain that the Court lacks jurisdiction to hear the dispute. ECF No. 66 at. [sic] at [sic] 22. That is a far cry from the APA standard requiring an agency to "examine relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made."

(ECF No. 70 at 18 (citation omitted).) At this point, Plaintiffs' APA claim is not being evaluated on the merits, and it would be premature to forecast Defendants' substantive position on it. Rather, Defendants' pending motion argues that this Court lacks subject matter jurisdiction. No substantive APA analysis is necessary in resolving it.

---

[9] Defendants decline to address each and every allegation made by Plaintiffs suggesting—falsely and without basis—that Defendants are not complying with their Mine Act duties and responsibilities as those duties relate to this lawsuit.

17

**CONCLUSION**

Based on the foregoing, and for the reasons outlined in the Memorandum of Law in Support of Defendants' Motion to Dismiss, (ECF No. 66), the Court should grant Defendants' Motion to Dismiss, (ECF No. 63), and dismiss the Second Amended Complaint, (ECF No. 59).

<div style="margin-left: 3em;">

Respectfully submitted,

LISA G. JOHNSTON
Acting United States Attorney

By:   **/s/ Matthew C. Lindsay**
Matthew C. Lindsay (W. Va. Bar No. 7896)
Assistant United States Attorneys
United States Attorney's Office
300 Virginia Street, East
Room 4000
Charleston, WV  25301
Telephone:  304-345-2200
Fax: 304-347-5104
Email: Matthew.Lindsay@usdoj.gov
*Counsel for United States of America*

</div>

## CERTIFICATE OF SERVICE

 I hereby certify that on September 18, 2025, I electronically filed the foregoing **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which will send notification to the following CM/ECF participants:

Samuel B. Petsonk
PETSONK PLLC
P.O. Box 1045
Beckley, WV 25802
(304) 900-3171 (phone)
(304) 986-4633 (fax)
sam@petsonk.com

Bren J. Pomponio
MOUNTAIN STATE JUSTICE, INC.
1217 Quarrier Street
Charleston, WV 25301
304-344-3144
Fax: 304-344-3145
Email: bren@msjlaw.org

J. Michael Becher (W.Va. Bar # 10588)
APPALACHIAN MOUNTAIN ADVOCATES
PO Box 507
Lewisburg, WV 24901
(304) 382-4798
mbecher@appalmad.org

                **/s/ Matthew C. Lindsay**
                Matthew C. Lindsay (W. Va. Bar No. 7896)
                Assistant United States Attorneys
                United States Attorney's Office
                300 Virginia Street, East
                Room 4000
                Charleston, WV 25301
                Telephone: 304-345-2200
                Fax: 304-347-5104
                Email: Matthew.Lindsay@usdoj.gov
                *Counsel for United States of America*